# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................................... 1

MINIMUM BASIC AGREEMENT FOR STAFF ANNOUNCERS ........................................ 3

| | | |
|---|---|---|
| 1. | Bargaining Unit | 3 |
| 2. | Representation | 3 |
| 3. | Union Shop | 3 |
| 4. | Admission to Premises | 3 |
| 5. | Minimum Terms - Waivers | 4 |
| 6. | Authorized Deductions | 4 |
| 7. | Arbitration | 4 |
| 8. | Strikes and Lockouts | 5 |
| 9. | Management Rights | 6 |
| 10. | Governmental Regulations | 6 |
| 11. | Term of Agreement | 6 |
| 12. | Title of Agreement | 6 |
| 13. | SAG-AFTRA Ratification | 6 |
| 14. | Laws of Pennsylvania | 7 |
| 15. | Check off | 7 |

SCHEDULE I ........................................................................................................................... 8

| | | |
|---|---|---|
| 1. | Work Week | 8 |
| 2. | Overtime | 9 |
| 3. | Meal period | 9 |
| 4. | Rest Between Staff Stretches | 9 |
| 5. | (a) Staff Duties | 9 |
| 5. | (b) Staff Booth Duties | 10 |
| 5. | (c) Use/Reuse/Simulcast/Right to Assign | 10 |
| 5. | (d) Non-exclusive Duties | 12 |
| 6. | Traveling Time and Expenses | 13 |
| 7. | Leave, Vacations, and Holidays | 13 |
| 8. | Termination of Employment | 16 |
| 9. | Selection of Announcers | 17 |
| 10. | Re-Employment after Military Service | 17 |

1

Exhibit 7

11.  Competitive Auditions ................................................................................................17

12.  Outside Employment ...................................................................................................18

13.  Staff Salaries ...............................................................................................................18

14.  Part-time Announcers ..................................................................................................18

15.  Accidental Death & Dismemberment Insurance ..........................................................19

16.  Personnel ....................................................................................................................19

17.  SAG-AFTRA Notification ...........................................................................................19

18.  Equal Opportunity ......................................................................................................20

19.  Payment Notification ...................................................................................................20

20.  Conflict of Interest ......................................................................................................20

21.  Pension and Insurance .................................................................................................20

22.  Productions Prosecuted ...............................................................................................22

23.  Outside Sources ..........................................................................................................22

24.  Safety ..........................................................................................................................22

SIDELETTER #1 ....................................................................................................................23

SIDELETTER #2 ....................................................................................................................24

SIDELETTER #3 ....................................................................................................................25

SIDELETTER #4 ....................................................................................................................27

SIDELETTER #5 ....................................................................................................................28

SIDELETTER #6 ....................................................................................................................30

SIDELETTER #7 ....................................................................................................................31

SIDELETTER #8 ....................................................................................................................32

SIDELETTER #9 ....................................................................................................................33

SIDELETTER #10 ..................................................................................................................34

SIDELETTER #11 ..................................................................................................................35

**2014-2017 SAG-AFTRA/KDKA-TV**

**MINIMUM BASIC AGREEMENT FOR STAFF ANNOUNCERS**

AGREEMENT made as of this __ day of August, 2015, between the SCREEN ACTORS GUILD–AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, and its OHIO-PITTSBURGH LOCAL, a voluntary association organized and existing under the laws of the State of California, and having its principal office at 5757 Wilshire Boulevard, Los Angeles, California 90036 (hereinafter called "SAG-AFTRA"), and CBS Broadcasting Inc. (and subsidiaries) (hereinafter called "the Company"), owner of Station KDKA-TV, located at One Gateway Center, Pittsburgh, Pennsylvania 15222.

In consideration of the covenants and agreements herein contained, it is agreed as follows:

**1.  Bargaining Unit**

This Agreement applies to all Staff Announcers (hereinafter called "artists"), now or hereafter employed by the Company at Station KDKA-TV in the City of Pittsburgh, Commonwealth of Pennsylvania. The Company warrants that it is the sole owner and operator of Station KDKA-TV.

**2.  Representation**

SAG-AFTRA warrants, represents, and agrees that it represents for collective bargaining purposes a majority of the artists employed by the Company. Upon such warranties, representations, and agreements by SAG-AFTRA, the Company hereby recognizes SAG-AFTRA as the exclusive collective bargaining agency.

**3.  Union Shop**

(a) It is agreed that, during the term of this Agreement, the Company will employ and maintain in its employment only such artists covered by this Agreement as are members of SAG-AFTRA in good standing or as shall make application for membership not later than thirty (30) days after the date of hiring as such, or the effective date of this paragraph, whichever is later.

(b) The provisions of this paragraph shall be subject to the National Labor Relations Act of 1947, as amended.

In the event that said Act is repealed or amended so as to eliminate the thirty (30) day waiting period, the above provision shall be deemed amended accordingly.

(c) SAG-AFTRA agrees that it is and will continue to be an open union and that it will keep its membership rolls open and will admit to membership all eligible television artists engaged by the Company. SAG-AFTRA agrees not to impose unreasonable entrance fees or dues upon its members.

**4.  Admission to Premises**

Any representative of SAG-AFTRA shall be admitted to the premises of the Station or where the rehearsal or broadcast takes place, at any reasonable time, to check the performance by the Company of this Agreement, but such checking shall be done so as not to interfere with the conduct of the Company's business. Nothing herein contained shall be construed as permitting access to or examination of the books, records, or accounts of the Company.

3

### 5. Minimum Terms - Waivers

The Company agrees that the minimum terms and conditions governing the employment of artists by the Company are those contained in this Agreement and in Schedule I, annexed hereto and made part hereof, and the Company agrees that it will not enter into any contract with or employ any artist upon terms and conditions less favorable to the artist than those set forth herein. The Company agrees that no waiver by any artist of any provision in this Agreement or in said Schedule I shall be sought by the Company from any artist or be effective unless the written consent of SAG-AFTRA to such waiver is first had and obtained. The Company further agrees that nothing in this Agreement shall be deemed to prevent any artist from negotiating for or obtaining better terms than the minimum terms provided for herein, and to the extent that any artist enjoys better terms and conditions than those provided herein, the Company agrees not to reduce such minimum terms and conditions during the course of the employment; provided, however, that changes in any such terms and conditions made pursuant to this Agreement shall not be construed as reductions hereunder.

### 6. Authorized Deductions

No deductions, directly or indirectly, by way of commission or otherwise, may be made by which any artist shall receive less than the minimum established by this Agreement, such minimums being net to the artist, except for withholdings or deductions which are required or directed by law, and except for group insurance, medical service, and other similar deductions, where mutually agreed upon in writing between the artist and the Company.

### 7. Arbitration

In the event there should be any controversy or dispute between SAG-AFTRA and the Company with respect to this Agreement or the interpretation or breach thereof, or any controversy or dispute between an artist and the Company with respect to this Agreement, SAG-AFTRA through its local representative and the Company through its representative will promptly and in good faith attempt to settle such dispute amicably. All grievances, however, must be filed in writing by SAG-AFTRA or the Company within thirty (30) calendar days of the event(s) giving rise to the grievance or within thirty (30) calendar days from when the employee, SAG-AFTRA, or the Company should reasonably have known or discovered the event(s) giving rise to the grievance. In the event the parties are unable to settle the matter within thirty (30) calendar days of the filing of the grievance, and unless the parties agree to further discussions, the grievance must be referred to arbitration by either party within thirty (30) calendar days of the last meeting, or the grievance shall not be subject to arbitration. Such arbitration shall be conducted in accordance with the rules then in effect of the American Arbitration Association, each party bearing half the expense. In referring the matter to the American Arbitration Association, the Company and SAG-AFTRA shall promptly request from the American Arbitration Association a list of available arbitrators -- and, if possible, from this list select a mutually agreeable arbitrator. If the parties cannot so select, they shall request another list and if necessary a third list, until an arbitrator agreeable to both parties is selected, provided, however, that if the parties cannot so select within thirty (30) calendar days from the time the matter is first referred to arbitration, the AAA shall designate the arbitrator. A final decision of the arbitrator shall be made speedily, shall be transmitted in writing by registered mail to the parties, and such a decision shall be binding upon both parties and each of them will promptly comply. There shall be no strikes, picketing, or boycotting during arbitration or prior to the decision. SAG-AFTRA will aid the enforcement of any awards against its members by appropriate disciplinary action. The powers of the arbitrator are specifically limited to a determination of the meaning or the application of this Agreement including the arbitration clause.

4

## 8. Strikes and Lockouts

(a) SAG-AFTRA agrees that during the existence of this Agreement, SAG-AFTRA and the employees covered by this Agreement, shall not call, support, or participate in any strike, sympathy strike, work stoppage, picketing, sit-down, slow-down, or any refusal to enter the Company's premises, or any other interference with any of the Company's services or operations wherever situated, whether or not the prohibited conduct is caused by a dispute with the Company, is in sympathy for a dispute with the Company or any other employer by employees of the Company not covered by this Agreement or employees of any other employer, or is caused by any other reason. The Company agrees that during the existence of this Agreement, it will not engage in a lockout.

(b) In no case shall any artist engage in the prohibited conduct described above by reason of the reception, broadcast and/or transmission by the Company of radio or television programs on which persons are used who are employed by an employer other than the Company, irrespective of whether such programs originate at a point at which SAG-AFTRA or others are striking, or are broadcast over the Company's facilities on behalf of a sponsor or agency against whom SAG-AFTRA or others are striking.

(c) SAG-AFTRA agrees during the existence of this Agreement that if an artist encounters a strike or picket line, whether it is located at KDKA-TV/KDKA-AM or at the site of a news or program event, and whether it is established by SAG-AFTRA or some other union or other employees, and whether it involves some other operation of the Company or not, the SAG-AFTRA shall not strike, honor the picket line, or engage in any other stoppage, and shall cross the picket line in order to perform his or her assigned duties.

(d) So long as KDKA-TV and KDKA-AM occupy the same building, the Company agrees not to penalize or discriminate against any artist because of his or her refusal to cross a lawful picket line which is located at KDKA and which is established by SAG-AFTRA on behalf of the employees covered by the KDKA-AM-SAG-AFTRA Agreement who are represented by SAG-AFTRA.

(e) SAG-AFTRA agrees that in the case of a strike by another union against the Company that it will not issue any order to the individuals covered by this Agreement to respect such a picket line.

(f) SAG-AFTRA and the Company agree that any alleged violation of this Section may be immediately submitted to arbitration without utilizing the preliminary step in the grievance procedure, pursuant to Section 7. Arbitration of this Agreement.

(g) SAG-AFTRA and the Company further agree that any alleged violation of this Section may be the Subject of judicial action prior to the exhaustion of the grievance and arbitration provisions set forth in Section 7. Arbitration of this Agreement, to maintain the status quo and to compel such arbitration.

(h) The Company agrees that if SAG-AFTRA is on strike against stations other than KDKA-TV, the Company will not require KDKA-TV artists, without the consent of SAG-AFTRA, to render services on programs originating at KDKA-TV and made available by the Company to any stations where such strike is in progress in excess of the number of programs originating at Station KDKA-TV which would normally be made available to such stations and where such excess

5

programs involving the services of artists are designed to replace programs which would, in the absence of such strike, originate at the station where such strike exists. The Company further agrees that artists shall not be required to go to any other Company television or radio station where an SAG-AFTRA strike is in progress to perform SAG-AFTRA struck work.

### 9. Management Rights

SAG-AFTRA recognizes and agrees that the Company retains all the regular and customary rights, powers, privileges, authority, responsibilities and functions of management except to the extent that they are limited by the provisions of this Agreement. Such rights include, but are not limited to, the right to manage the Company's operations; to direct the work force; to select, hire, promote, or layoff employees; to discipline, i.e., to warn, suspend, or to terminate employees; to assign work to be performed by employees; to determine the number of employees; to determine the programs to be broadcast; to extend, maintain, curtail, sell, or terminate all or any part of the operations of the Company's facilities; and to establish reasonable rules and regulations relating to safety.

It is understood that any suspension must be for just cause, and SAG-AFTRA shall have the right to grieve and arbitrate whether any suspension is for just cause. It is further understood that the right to grieve and arbitration a suspension does not provide SAG-AFTRA with a right to grieve or arbitrate terminations, which may be for any reason.

The Company's management rights include the right to design, create, and implement a job performance evaluation system. The Company has the right to require employees to attend job performance reviews. The Company and the Union agree that if an employee disagrees with any written job performance review, then either the employee and/or the Union shall have recourse thereafter to attach a written rebuttal to the employee's performance review which shall be attached thereto in the employee's personnel file. The union shall be consulted in the process of designing the job description/performance reviews. Such job descriptions and criteria for job performance reviews shall not be put into effect by the Company until it has given thirty (30) days written notice to the Union and the employees. Such a job performance evaluation system in and of itself shall not be considered a step in a progressive discipline procedure, but any aspect contained in the underlying evaluation may lead to the initiation of a progressive discipline procedure.

### 10. Governmental Regulations

This Agreement and all of its provisions are subject to the rules and regulations and orders of the Federal Communications Commission or any other governmental body having jurisdiction over the Company's broadcasting licenses for Station KDKA-TV.

### 11. Term of Agreement

This Agreement shall become effective November 16, 2014, and shall remain in full force and effect to and including November 15, 2017.

### 12. Title of Agreement

This Agreement shall be known as the 2014-2017 SAG-AFTRA/KDKA-TV Minimum Basic Agreement for Staff Announcers, and shall be binding upon and inure to the benefit of SAG-AFTRA, its successors, SAG-AFTRA members, and the Company, its successors and assigns.

### 13. SAG-AFTRA Ratification

This Agreement is subject to ratification by the SAG-AFTRA National Board and shall not become effective or binding upon the parties until so ratified SAG-AFTRA.

**14. Laws of Pennsylvania**

This Agreement made, executed, and delivered in the City of Pittsburgh, Commonwealth of Pennsylvania, shall be governed by the laws of the Commonwealth of Pennsylvania.

**15. Check off**

The Company agrees that on thirty (30) days written notice from SAG-AFTRA it will begin deducting from the wages due an artist all union dues, the percentage to be contained in the SAG-AFTRA notice, for whom there is filed with the Company a written assignment in accordance with Section 302(c) of the national Labor Relations Act, as amended. These deductions shall not include initiation fees, fines, or assessments. The Company shall commence making such deductions with the first wage payment to be made to each such artist following the date of the filing of his/her said written assignment and such deductions shall continue thereafter with respect to each and every subsequent wage payment, to be made to each such artist during the effective term of his/her said written assignment.

Within twenty (20) days after the end of each month, the Company shall remit to the Union, by check drawn to the order of SAG-AFTRA, the total amount of all deductions made during the said month for all such artists. At the time of such remittance, and together therewith, the Company shall also furnish to the Union a record certifying the names of the artists on whose account such deductions were made, their respective earnings during said months, and the amount of deductions for each such artist during said month.

**ACCEPTED AND AGREED TO:**
**CBS, INC.**
**KDKA-TV**

By: _Edfgan / Yeryon_

Date: _11/11/15_

**ACCEPTED AND AGREED TO:**
**SAG-AFTRA**

By: _____
**Brian Lysell**
**Executive Director**

Date: _11-12-2015_

**APPROVED AND RATIFIED:**
**SAG-AFTRA NATIONAL BOARD:**

By: _____
**Mary Cavallaro**
**Chief Broadcast Officer**

Date: _11/30/2015_

## SCHEDULE I

The Company agrees that the following are the minimum terms and conditions which govern employment of staff announcers now or hereafter employed by the Company at Station KDKA-TV.

### 1. Work Week

(a) The work week of a staff announcer shall consist of forty (40) hours in five (5) consecutive days of eight (8) consecutive working hours per day, within a seven (7) day period; provided that the Company may require the rendition of services for more than forty (40) hours or on more than five (5) days in any seven (7) day period, or more than eight (8) hours in anyone day, subject to the payment of overtime as hereinafter provided.

(b) The Company agrees, except in cases of emergencies, to schedule the work week of each staff announcer so that his/her two consecutive days off in each week shall permit him/her to be continuously absent from employment not less than sixty (60) hours.

(c) It is agreed that if Saturday and Sunday are scheduled as an announcer's day off, such scheduling shall be deemed in compliance with this provision. A "week" shall consist of seven (7) consecutive days beginning with the commencement of broadcasting on Sunday.

(d) All work schedules shall be posted seven (7) days in advance. All schedule changes must be confirmed by hard copy, email, or verbal notice to the Artist.

If the work schedule for days off and work shift is changed during the forty-eight (48) hours before the change is effective, there shall be a flat penalty payment of twenty dollars ($20) to the Artist who had his/her days off or shift changed; provided, however, that such penalty shall not apply in any circumstance where (i) such change is necessitated by the illness or convenience considerations of a Staff Artist with the consent of the affected Staff Artist; or (ii) overtime is added to the beginning of an Artist's scheduled shift. For purposes of this paragraph, a change of shift shall be defined as a starting time that is three (3) hours or more earlier or later from the original scheduled starting time. The penalty set forth herein shall apply only to Full-time Staff Artists.

(e) Notwithstanding the provisions of (a) above, an Artist may be assigned to a weekend (Saturday and/or Sunday) work schedule as a weather or sports anchor/reporter in which each extended day counts as two consecutive days worked, within the following parameters. All work must be scheduled between 7 a.m. and 12 midnight. The Artist may be scheduled to be on duty for no more than seven (7) consecutive hours, or for more than a total of 10 hours on such a day. However, no overtime or other penalty payments will be due unless work exceeds 12 hours.

So long as scheduling is within these parameters, the various turnaround, callback overtime and overtime provisions of this agreement which might otherwise apply, shall not apply to such a day. Work outside these parameters shall be credited as overtime. Turnaround restrictions would still be applicable for the shifts before and after such extended workday(s). Days of work must still be consecutive.

(f) The Station shall maintain its current practice of granting a compensatory day off, in half-day increments, to an employee who is called in on a scheduled day off.

**2.  Overtime**

(a) Hours worked by a staff announcer in excess of forty (40) hours in any work week or in excess of five (5) days in any work week shall be overtime. Hours worked in excess of eight (8) consecutive hours in anyone day shall be deemed overtime. Overtime hours, as defined herein, shall be paid for at the rate of time and one half (1.5) of one fortieth of the minimum weekly salary contained in Schedule I, Paragraph 13 of this Agreement, computed at no less than one-quarter *(1/4)* hour increments.

(b) The minimum assignment for a staff announcer to perform staff duties on his/her scheduled day off shall not be less than four (4) hours. The minimum assignment to perform staff duties on a regular work day, not contiguous to the regular schedule, shall be not less than five (5) hours.

(c) For commercial programs actually performed outside of staff stretch, announcers shall be compensated in accordance with the fees provided in the 1998-2002 SAG-AFTRA/KDKA-TV Freelance Agreement for Television Artists. Such fees shall constitute full compensation of "off-shift" (daily and/or weekly) work period; provided, however, that when a fee-paying service is performed in time in excess of forty (40) hours in a work week, and the fee is at least equal to the overtime payment otherwise applicable to the time spent in performing the fee-paying service, the fee shall be the sole compensation for such service and no additional payment shall be made for the overtime so accruing.

**3.  Meal period**

No meal period shall be assigned during the normal eight (8) hour work day of a staff announcer, and staff announcers shall be permitted to eat while on duty (so long as such meal-taking does not interfere with the performance of assigned duties). In the event a work day extends to ten (10) consecutive hours or more, the Company and the announcer may, by mutual agreement, arrange a meal period for such staff stretch.

**4.  Rest Between Staff Stretches**

The first staff assignment of any staff announcer shall begin not sooner than twelve (12) hours after the conclusion of his/her last staff assignment on the preceding day; provided, however, that this requirement shall not apply in the event of emergencies or other extraordinary program requirements of the Company, or in the case of an announcer performing on a regular commercial program for which the announcer is paid commercial fees, or where such scheduling results from a change of hours requested by the artist, or in the case where an artist is scheduled temporarily during such period by reason of the illness of another staff announcer. In all other cases, overtime at the applicable rate as set forth in Section 2(a) of this Schedule I, plus a penalty of seven dollars ($7.00), shall be paid to the staff announcer for each hour worked within the period which ends twelve (12) hours after the conclusion of the last staff assignment of the preceding day.

**5.  (a) Staff Duties**

For their weekly staff salary and within the regularly scheduled staff stretch, staff announcers may be assigned to perform the following services:

1. Making station identification, giving music credit, giving time signals, making flash or unscheduled unsponsored news inserts, certifying master copies of continuity, and giving switching cues, including the giving of the network cue on network programs originating over the station facilities in Pittsburgh, Pennsylvania. Except in emergency cases when no staff announcer is

available, only staff announcers may perform such services. Announcers may, as a staff duty, tape off-camera station identification and chain breaks and may, in addition, deliver (live or recorded; on or off-camera) Promotion, Public Service, and Reciprocal Trade announcements of a promotional nature. In addition, any promotional spot(s) recorded in shift may be aired on KDKA-AM and/or KDKA-TV, without any additional compensation and is deemed as a staff duty.

2. Off-camera announcing of local programs, off-camera delivery of local announcements (commercial or otherwise), off-camera performance as Feature Film Host, Supporting Performer, Incidental Performer or Extra; and off-camera incidental participation within the body of a local program (such as news, sports, weather, and the like).

3. Performing on-camera or off-camera on public service programs when the artist's duties do not require preparation of material or any special preparation that will require the artist to devote time outside of his/her regularly scheduled staff stretch.

4. Assembling and editing news or newscasts (in the newsroom, announce booth or studios) but not acting as relief or substitute to cover the newsroom.

5. Participating in individual voice auditions, competitive auditions and company-produced program auditions; as well as additional services in connection with sustaining and commercial programs and such routine duties as staff announcers have been in the practice of performing and which are consonant with their employment as staff announcers.

6. Writing scripts (except for editing news broadcasts as herein provided), production or direction (but this shall not be deemed to include activities which are merely incidental to standby duties), acting, singing, personal appearances or other special services to the extent not covered by this Agreement, shall be the subject of individual agreement between the artist and the Company. To the extent not covered by this Agreement such individual negotiation shall not be subject to arbitration.

7. The Company shall supply to SAG-AFTRA, within thirty (30) days of written notification, a list by name, date, and place of appearance of all talent requested by the Company to make personal appearances.

### 5. (b) Staff Booth Duties

Notwithstanding any other provisions set forth in this Agreement, the Company retains the right to utilize part-time announcers to perform booth announcer duties. A part-time announcer that performs booth announcer duties shall be compensated for the hours actually worked at the applicable part-time booth announcer rates set forth in Schedule I, Section 14B. A regular part-time booth announcer shall have a guaranteed minimum weekly call of ten (10) hours. A part-time booth announcer may be assigned by the Company to record all normal booth work, and these recordings can be played in or out of shift without additional compensation, however, the employee(s) may be called upon to do other work covered by this Agreement.

### 5. (c) Use/Reuse/Simulcast/Right to Assign

1. Right to Assign: Notwithstanding anything set forth elsewhere in this Agreement and subject to the provisions of sub-paragraph (3) below, SAG-AFTRA Staff Announcers may be assigned to perform work in connection with any material for use, reuse and/or simulcasts on cable television,

radio stations, television stations, videocassettes, telephone lines, airplanes, or any other media. However, nothing in this Agreement, including this paragraph (1) shall be construed as meaning that SAG-AFTRA has exclusive jurisdiction over the performance of such duties in connection with cable television, radio stations, television stations, videocassettes, telephone lines, airplanes or any other media other than the traditional public reception frequency of KDKA-TV. Compensation for such assignments shall be governed by subparagraphs 1(i) and 1(ii) below.

(i) The Company shall have the right to assign SAG-AFTRA Staff Announcers to perform duties as described in this Subparagraph (c) for KDKA-TV or for other than the public reception frequency of KDKA-TV and that assignment shall not require additional compensation beyond the minimums payable under Schedule I, Paragraph 2 - Overtime, Schedule I, Paragraph 13 - Staff Salaries, and Schedule I, Paragraph 14 - Part-time Announcers, unless otherwise agreed between the parties pursuant to subparagraph (c)(1)(ii) below. Staff Artists shall not be assigned to the supervision and control of another employer other than the Company to the extent that the Staff Artist becomes in effect an employee of such other employer.

(ii) If Staff Artists are assigned to perform duties described in this subparagraph (c) for material which, at the time the assignment is made, is not intended to be used, reused and/or simulcast on KDKA-TV or any other Company radio or television station or any television, radio and/or cable television station heard/seen outside the Pittsburgh ADI, but instead is intended to be distributed solely to other television, radio and/or cable television stations within the Pittsburgh ADI, then such assignment shall be governed by the terms of a negotiated agreement between the Company and the individual Staff Artist regarding whether or what additional compensation shall be required for such assignment. If the Company and the Staff Artist cannot agree to terms governing such assignment, then the Company shall immediately inform SAG-AFTRA and meet and bargain with SAG-AFTRA as to whether or what additional compensation shall be required for such assignment. If the Company and SAG-AFTRA cannot reach agreement, the Company may implement its final offer, subject to the terms of subparagraph (c)(l)(iii) below, if applicable. If the Company implements any final offer to a Staff Artist under this subparagraph (c)(1)(ii), SAG-AFTRA and the Staff Announcers it represents may legally engage in a strike or work stoppage upon fifteen (15) days' notice, notwithstanding the provisions set forth in Section 8 - Strikes and Lockouts. The Company agrees that in negotiating such terms, it will make a good faith effort to disclose to the Staff Artist all of the revenues and costs which it reasonably believes would be generated by such an assignment. Such information shall be kept strictly confidential by the Staff Artist and/or SAG-AFTRA. Nothing set forth herein shall prohibit the Company from assigning Staff Artists to perform such duties during the period prior to any agreement that may be reached under this subparagraph (c)(1)(ii), and no Staff Artist may refuse any such assignment, subject to the terms of subparagraph (c)(1)(iii) below, if applicable.

(iii) The Company acknowledges that it does not intend to utilize the terms of subparagraph (c)(1)(ii) above to issue assignments covered therein which have the effect of subjecting Staff Artists to regular and recurring overtime work, where the Company and the individual Staff Artist are unable to reach agreement as to the terms that govern such work.

(iv) For purposes of this subparagraph (c)(l) and subparagraph (c)(2) below, it is agreed that the negotiated agreement between the Company and any Staff Artist may not be imputed from existing boilerplate or general language in a personal services contract, but shall be the subject of specific negotiations regarding the assignment and/or use at issue. If an agreement is reached, its

separate terms may be incorporated into any subsequent PSC between the Company and the Staff Artist.

(v) For purposes of this <u>subparagraph (c)</u> and this Agreement, the term "Company television or radio stations" includes any station owned or operated by CBS Broadcasting Inc. or any successor, parent, subsidiary or division thereof.

2. Use/Reuse/Simulcasts: Notwithstanding anything set forth elsewhere in this Agreement, no fee shall be required for the use, reuse and/or simulcasts of any material on any Company television or radio station or any television, radio and/or cable television station heard/seen within the Pittsburgh ADI. If material produced pursuant to this collective bargaining agreement is used, reused, and/or simulcast on any media other than Company television or radio stations, or any television, radio and/or cable television station heard/seen within the Pittsburgh ADI, then such use, reuse, and/or simulcast shall be governed by the terms of a negotiated agreement between the Company and the individual Artist. If there is no agreement between the Company and the Artist and the Company and the Artist cannot agree to the terms governing such use/reuse/simulcast, then the Company shall immediately inform SAG-AFTRA and meet and bargain with SAG-AFTRA as to whether or what additional compensation shall be required for such use/reuse/simulcast. If the Company and SAG-AFTRA are unable to reach an agreement, and the Company has implemented its final offer, SAG-AFTRA and the Artists it represents may legally engage in a strike or work stoppage at that time, notwithstanding the provisions set forth in Section 8. -Strikes and Lockouts. The Company agrees that in negotiating such terms, it will make a good faith effort to disclose to the Artist all of the revenues and costs which it reasonably believes would be generated by such use/reuse/simulcast, Such information shall be kept strictly confidential by the Artist and/or SAG-AFTRA.

3. The Company agrees that it will not use this Paragraph 5.(c) to produce commercials for use, reuse and/or simulcast on other than KDKA-TV unless those commercials are part of a use, reuse, and/or simulcast of other KDKA-TV material as permitted by this Agreement.

4. Notwithstanding anything set forth elsewhere in this Agreement, any material produced by KDKA-TV for use, reuse, and/or simulcasts on cable television, radio stations, television stations, videocassettes, telephone lines, airplanes or any other media other than the traditional public reception frequency of KDKA-TV without the participation of SAG-AFTRA Staff Announcers is excluded from coverage by all the terms and conditions of this Agreement. In the event that any such material is so produced with the participation of SAG-AFTRA Staff Announcers, that participation shall be on a non-exclusive basis so that individuals not covered by this Agreement may also participate without being subject to the terms and conditions of this Agreement as a result of that participation.

5. It is understood and agreed that news programs require reasonable and adequate preparation time, including the time spent in gathering, writing, and editing news stories. Where the Company assigns duties pursuant to this paragraph 5(c) the Company shall take into consideration the pre-existing assignments and responsibilities which Staff Artists might also be responsible for performing.

**5. (d) Non-exclusive Duties**
(i) The parties agree to continue the current practice of SAG-AFTRAN's performing technical

duties not within the exclusive jurisdiction of another union and consistent with current practice, including self-recording of tracks, receiving and recording tape feed within certain hours, and assisting technicians in carrying gear outside the station (where circumstances permit).

(ii) In the event that during the course of the Agreement:

> 1)   Technical duties currently within the exclusive jurisdiction of another labor organization are no longer subject to such restriction, or:

> 2)   Technical duties already exist which are not currently the exclusive jurisdiction of another labor organization and not currently performed by SAG-AFTRANs, or;

> 3)   Technical duties are created by the availability of new technology, which are not within such exclusive jurisdiction, the News Director and the Shop Steward agree to meet and discuss the assignment of such duties, and training and safety issues upon request by the other party.  Either part may call in the Executive Director of SAG-AFTRA, the V.P. of Labor Relations, of their representative.

If after 30 days from the giving of notice the parties have not reached agreement, and subject to such extension as the parties may agree to, the Company may implement its proposal as it may have been amended in the process set forth above on 10 days' notice to the Union. Should the Company so implement without the agreement of the Union, the Union shall have recourse to grievance procedures regarding any undue hardship placed upon employee in the Union as a result of implementation.

### 6.  Traveling Time and Expenses

A proper allowance shall be included in the elapsed time for necessary traveling time to and from remote points on location assignments, and time spent at remote points to which a staff announcer may be assigned by the Company, it being understood and agreed that not less than eight (8) elapsed hours shall be credited to such staff announcer for each full day spent in transit and/or at such remote points on such assignment. No payments shall be required to sleeping time spent either in traveling or at remote points when accommodations, in accordance with Company policy, are furnished. The Company will pay all ordinary and necessary out-of-town traveling expenses actually incurred and provide transportation when available between the main studio and outside assignments in accordance with Company policy.   The Company will provide overnight accommodations where travel time to an assignment location is over three-and-one-half (3 1/2) hours, provided all other members (IATSE) of the crew on the assignment also agree to stay overnight. When the staff announcer, with the consent of the Company, uses his/her own car in connection with such traveling, he/she shall be paid mileage and parking expenses in accordance with Company policy.

### 7.  Leave, Vacations, and Holidays

(a) Leaves: The Company  agrees to grant sick leave to staff announcers in accordance with the policy of the Company prevailing at the time for similarly classified employees not covered by union contract. The Company also shall grant leaves of absence under the Family and Medical Leave Act, in accordance with Company policy in effect at such time. In addition, the Company agrees to consider requests by Staff Artists for paid leave for the purpose of professional development. Such requests shall be considered on a case by case basis and the Company retains the ultimate discretion

to grant or deny any such request. No decision to deny any such request shall be subject to the grievance and arbitration provisions in this Agreement.

(b) <u>Vacations and Holidays</u>

    1.      The Company will grant to each staff artist, at times mutually agreeable to the Company and the artist, taking into consideration "scheduling" and "operational needs," vacation with weekly salary in accordance with the then-current policy of the Company for all employees; provided that the staff artists with one year or more of service shall receive at least two (2) weeks' vacation with weekly salary; five (5) years or more shall receive three (3) weeks' vacation with weekly salary; fifteen (15) years or more shall receive four (4) weeks' vacation with weekly salary. Regular part-time Announcers shall receive proportionate vacations in accordance with Company policy. Staff Announcers' vacation weeks must coincide with their established work week and must be adjacent with the Staff Announcer's regular two (2) days off prior to and following the vacation period. The vacation shall be selected in segments of not less than one (1) week or more than two (2) weeks at a time; provided, however, that a staff artist may request a vacation period that is in excess of two (2) weeks at one time or less than one (1) week at one time, subject to the mutual agreement of the Company and the staff artist.

    2. Holidays are hereby defined to be:
        New Year's Day
        Martin Luther King Jr.'s Birthday
        President's Day
        Memorial Day
        Independence Day
        Labor Day
        Columbus Day
        Thanksgiving Day
        Day Following Thanksgiving Day
        Christmas Day

Any artist who is required to work such holidays (whether in or out of stretch) will be paid at the applicable overtime rate as set forth in Section 2(a) of this Schedule I in addition to base salary. Any artist who is on vacation during the time anyone of the recognized holidays is observed will be given one (1) additional day of vacation. Any artist who is on a regularly scheduled day off when a holiday is observed will receive one (1) extra day's pay. This Paragraph 2. is subject to the election made by the staff announcer as follows in Paragraphs 3(a) and 3(b); below.

    3.(a)    In lieu of the five following holidays:
        New Year's Day
        President's Day
        Memorial Day
        Independence Day
        Labor Day

Any artist shall receive one (1) additional week off with pay (i.e., five (5) consecutive work days plus the regular two (2) days off preceding and following for that week), such week to be added to the regular annual vacation period; or, the artist may elect to receive pay for these five (5) holidays in accordance with sub-paragraph 2 by written notification. This written notification must be in the

News Director's or Program Manager's office before January 10th of the current year and may not be changed. In the absence of written notification, the artist will be paid for all holidays in accordance with sub-paragraph 2.

      (b)     In addition, in lieu of the five following holidays:
                Martin Luther King Jr.'s Birthday
                Columbus Day
                Thanksgiving Day
                Day Following Thanksgiving Day
                Christmas Day

Any artist shall receive one (1) additional week off with pay (i.e., five (5) consecutive work days plus the regular two (2) days off preceding and following for that week), such week to be added to the regular annual vacation period; or, the artist may elect to receive pay for these five (5) holidays in accordance with sub-paragraph 2 by written notification. This written notification must be in the News Director's or Program Manager's office before January 10th of the current year and may not be changed. In the absence of a written notification, the artist will be paid for all holidays in accordance with sub-paragraph 2.

4. Announcers must advise the Company of their next year's vacation period preference no later than November 15th of each year, based on the publication by that November 1 by the Company of a calendar showing dates blacked out due to ratings periods.

5.. For the purpose of scheduling vacations, each of the following shall be deemed a separate group:

                Monday-Friday Anchors
                General Assignment Reporters
                Weekend evening Anchors
                Investigative Reporters
                Specialty Reporters

Within each group, the following selection procedure shall apply:

On the August 31st prior to each vacation year, the most senior employee will be provided with a vacation selection from showing available weeks for vacation the following year. The employee shall have three (3) days to fill in his/her first choice of vacation. The employee may select his earned weeks of vacation, but no block may be more than two consecutive weeks. Failure to select during the available period will result in forfeiture of the ability to select until others in the group have made their selection. The vacation selection form will then be passed to the next senior employee, who shall have three (3) days to select vacation, subject to the same terms as applied to the most senior employee.

This procedure will continue until all employees in the group have selected their earned vacation. Any vacation requests submitted after the completion of the above procedure shall be granted on a first-come, first-served basis. It is understood that employees may request changes in their vacation selections, but such changes shall be at the discretion of management.

6. In the event the Company establishes additional vacation and/or holiday(s) as Company policy, such will accrue to this contract.

7. Staff Announcers shall be entitled to personal days in accordance with Company policy, as such policy may be amended during the term of the Agreement and subject to management approval as to specific dates; provided, however, that Staff Announcers shall be entitled to no less than one (1) personal day per year.

## 8. Termination of Employment

(a) The Company, in its sole discretion, may terminate the employment of any Staff Announcer and such termination shall not be subject to grievance and arbitration.

(b) In case the Company shall terminate the employment of any Staff Announcer other than for gross insubordination, gross misconduct, drunkenness on the job or other serious cause, the Company shall give any Staff Announcer who has been in the employ of the Company more than six (6) months, five (5) weeks' notice, or five (5) weeks' pay in lieu of notice plus one (1) week staff salary for each year or fraction thereof of service with the Company up to a maximum payment of five (5) weeks' staff salary.

A Staff Announcer who has been in the employ of the Company more than six (6) months shall be required to give a minimum notice of two (2) weeks of his/her intent to resign. In the event that he/she fails to do so, he/she shall not be entitled to the accrued vacation and holiday benefits provided herein.

There shall be no obligation to the Company to give notice or pay in lieu thereof to Announcers who have been in the employ of the Company less than six (6) months, nor shall there be any obligation on the part of the Announcer who has been in the employ of the Company less than six (6) months to give notice of his/her intent to resign.

(c) If a Staff Announcer is terminated in accordance with this provision and at that time has in effect a personal service agreement which provides a rate of compensation that is in excess of the minimum provided for in this Agreement, all notice payments, as well as any accrued vacation time, shall be paid at the rate in effect within the personal service agreement in lieu of the staff salary provided for above.

(d) Notwithstanding the above or any terms contained in any PSC, the Company agrees that it will not reduce the compensation of any Artist working under a PSC until at least five (5) weeks after the Company has presented its reduced offer to the Artist.

(e) The Company and SAG-AFTRA agree that a Staff Artist who is terminated by the Company who is eligible for severance pay pursuant to Paragraph 8(b) of the Agreement shall have the option to execute a release as provided below.

In consideration for the execution by such terminated Staff Artist of a release on a form provided by the Company, he/she shall receive, in lieu of severance pay as provided by Schedule I, Paragraph 8(b) of the Agreement, compensation calculated at two (2) weeks staff salary for each year or fraction thereof of service with the Company up to a maximum payment of forty-six (46) weeks staff salary. The Staff Artist shall have a ten (10) week review period from date of notice of

16

termination to review and execute the release, and this ten (10) week review period shall be inclusive of any notice periods contained in the release, the Agreement and any existing personal agreement. Upon execution of the release by the Staff Artist he/she shall have a seven (7) day reconsideration period to withdraw the release, and this seven (7) day reconsideration period shall be inclusive of any reconsideration periods contained in the release. Payment of compensation under this Sideletter shall be made after the expiration of the reconsideration period unless the release has been withdrawn.

### 9. Selection of Announcers

The Company shall have the sole right to select and hire staff announcers.

### 10. Re-Employment after Military Service

Any artist who enlists or is drafted into active military service of the United States shall be granted a leave of absence for the period of such military service (but not to exceed the period required by draft on one enlistment). Such announcer who thereafter (1) receives a certificate or other evidence of honorable discharge under the laws of the United States and (2) is, at the time of discharge or completion of such military service, qualified to perform the duties of the position of employment which he/she left, and (3) makes application for re-employment within ninety (90) days after he/she is relieved from such military service, shall be restored by the Company to the position which he/she left or to a position which is of like seniority, status, and pay within the bargaining unit covered by this Agreement, at Television Station KDKA-TV where he/she had been employed and with seniority accumulated during service unless the circumstances have so changed as to make it impossible or unreasonable to do so.

### 11. Competitive Auditions

(a) When requested by a sponsor or advertising agency to submit a list of staff announcers available for employment by such sponsor or advertising agency to render other than staff duties upon a commercial program, the Company shall submit the names of all staff announcers employed by it except those engaged to render services on programs advertising competing products or scheduled to render services at a conflicting time upon commercial programs or under exclusive contract to another sponsor or advertising agency or scheduled on a sustaining program for which the announcer is receiving a fee and which is considered important by the Company and for which, in its opinion, there is not available a suitable substitute. Competitive auditions shall be held whenever requested by sponsors or advertising agencies and prompt notice thereof shall be given contestants. Time spent in commercial auditions outside the staff stretch shall not be compensated for or be included as part of the work day or work week unless the announcer is directed to participate in the audition by Company assignment. No staff announcer shall directly or indirectly solicit employment upon commercial programs. The Company agrees to encourage local agencies and clients and out-of-town agency and client representatives when in Pittsburgh in the use of live competitive auditions.

(b) Whenever a Pittsburgh client or agency requests an audition of staff announcers, all announcers shall be notified at least twenty-four (24) hours in advance of the time for such audition. When such notice period falls during an announcer's absence, the Company will take reasonable steps to notify such announcer by telephone or telegram.

(c) Freelance fees to apply for staff announcers, when selected by an open, competitive audition, for shows within their staff stretch.

17

Whenever an out-of-town client or agency requests such audition, notice shall be given to all announcers as soon as is practicable.

### 12. Outside Employment

Staff announcers shall not be permitted to engage in outside activities which interfere with their duties, relations, and obligations to the Company. Announcers shall not perform or appear either off-camera or on-camera on any other television or radio station located in the Pittsburgh area as defined in Paragraph 47 of the Free Lance Agreement. The Company may grant permission, upon written request, to accept 'employment during the time not assigned for the performance of staff duties for the purpose of:

1. recording of transcriptions;
2. commercial spot announcements, whether on transcription, film, or the like;
3. the narration of newsreels or motion picture shorts and the like.

provided that such transcription and film are not to be used on the stations in the above area and that such outside engagements are not in its reasonable discretion adverse to the best interests of the Company. The Company may, in its sole discretion, grant permission for any outside engagement.

### 13. Staff Salaries

The minimum weekly base salary for full time staff announcers, based upon the time they have been employed by the Company, shall be as follows:

| Period of Service | November 16, 2014 | November 16, 2015 | November 16, 2016 |
|---|---|---|---|
| Under 12 months | $921.06 | $939.48 | $958.27 |
| 13-24 months | $939.42 | $958.21 | $977.37 |
| 25-36 months | $952.68 | $971.73 | $991.17 |
| 37-48 months | $972.06 | $991.50 | $1,011.33 |
| 48-60 months | $994.50 | $1,014.39 | $1,034.68 |
| 60-72 months | $1,025.10 | $1,045.60 | $1,066.51 |
| Over 72 months | $1,059.78 | $1,080.98 | $1,102.60 |

The above staff salaries include the total compensation that Staff Announcers shall receive for all staff duties and functions rendered both in and out of shift.

The period of employment for determining the above rates of pay and other benefits of provisions measured by a period of service shall exclude the following: a layoff period in excess of thirty (30) days, a period of leave-of-absence and a period of disability due to off-the-job causes in excess of twenty-six (26) weeks of such disability in anyone (1) year period.

### 14. Part-time Announcers

(a) Part-Time Announcers: The Company shall be permitted to hire one (1) Part-Time Announcer for each two (2) Full-Time Announcers employed on the following basis:

(1) A Part-Time Announcer shall be paid an hourly rate that is not less than one fortieth (1/40th) of the minimum weekly staff salary then in effect for full-time Staff Announcers (see Paragraph 13. -Staff Salaries (above), taking into account the Part-Time Announcer's length of

service, for each hour engaged in broadcast, preparation, rehearsal, or other services provided and permitted for Staff Announcers:

(2) A Part-Time Announcer shall be paid for a minimum of six (6) hours (or the length of the on-air shift plus one (1) hour, whichever is greater) on any day on which he/she is called to work.

(3) In the event a Part-Time Announcer works more than eight (8) hours in any work day, or more than forty (40) hours in any work week, or more than five (5) days in any week, he/she shall be paid overtime for all such excess hours at the applicable rate as set forth in Section 2.(a) of this SCHEDULE I taking into account his/her service. Payment to a Part-Time Announcer shall be computed in not less than one-half (1/2) hour units.

(b) Part-Time Booth Announcers

(1) A part-time booth announcer shall be paid no less than the following minimum hourly rates of pay for each hour engaged in broadcast, preparation rehearsal, or other services provided and permitted for staff announcers:

Hourly rate
Eff. 8/7/00
$28.05

(2) A regular part-time booth announcer shall be guaranteed a minimum weekly call often (10) hours.

(3) In the event a part-time booth announcer works more than eight (8) hours in any work day, or more than forty (40) hours in any work week, or more than five (5) days in any week, he/she shall be paid overtime for all such excess hours at the applicable rate set forth above.

(4) In the future, employees employed on other than a full-time basis will be permitted to choose between employment under the staff agreement, with no benefits, or employment under a special provision to be added to the Freelance agreement which will prescribe day rates reduced from equivalent hourly rates in the staff agreement, the difference being the cost of the current contribution to the SAG-AFTRA H&R Funds.

**15. Accidental Death & Dismemberment Insurance**

All announcers shall be eligible to participate in the CBS Business Travel Accident Insurance Policy.

**16. Personnel**

The Company and the Union agree on the principle that executive or sales personnel shall not perform except that the Program Manager, Assistant Program Manager, or the equivalent, will be permitted to perform on one public service program per week and this paragraph shall in no way be interpreted to prevent the occasional appearance of the station manager or other high officials of the Company.

**17. SAG-AFTRA Notification**

The Company will give notice to SAG-AFTRA of the hiring, change of classification, or

19

termination of Staff Announcers.

### 18. Equal Opportunity

The Company and the Union agree to treat any employee or performer in accordance with Federal, state, and local laws regarding employment discrimination or the grounds which are established by such laws, including race, sex, creed, color, national origin, age, religion, physical or mental handicap, or status as a veteran of the Vietnam Era, and further it is agreed that the appropriate government agencies established by such laws shall be the exclusive forum to determine all allegations of employment discrimination.

Nothing in in this Agreement shall operate or be construed to restrict the Company in any manner whatsoever in complying with its obligations under the Americans With Disabilities Act. After the Company determines that an accommodation will be made for a qualified person with a disability, as defined in the Americans With Disabilities Act, where such person is or will be a member of the bargaining unit, the Company will discuss the accommodation in advance with the Union prior to implementation. Where a necessary accommodation for a qualified individual with a disability, as defined in the Americans With Disabilities Act, requires that such individuals be provided with either full or part-time assistance from persons not already members of the bargaining unit, such persons will not be considered members of the bargaining unit or otherwise covered by the terms and conditions of the collective bargaining agreement, solely as the result of providing such assistance. The Company will not arbitrarily or capriciously utilize this provision to evade the collective bargaining agreement.

### 19. Payment Notification

Where a non-news show is repeated and there is a fee payable under the agreement(s), the Company shall notify the performer(s) in writing of the date of replay and the amount of payment due.

### 20. Conflict of Interest

The Union and the employees covered by this Agreement agree that all employees shall complete the standard Company "Conflict of Interest Questionnaire" and shall review the standard Company Code of Business Ethics and Conduct and, if requested by the Company, any other standard Company policies/directives including but not limited to regulatory, safety, and/or operational policies and procedures and acknowledge both receipt and that he/she has read such policies/directives.

### 21. Pension and Insurance

Full time staff announcers covered under this agreement shall continue to participate on the same basis as previously either in the Westinghouse component of the CBS Combined Pension Plan, the CBS Fund the Future Plan, or both plans depending on their status at the time the CBS Fund the Future Plan was instituted, the Infinity Medical Plan, and, on the same basis as other employees of the station, the Company's life insurance and accidental dismemberment plans, disability plans, the Company's 401(k) plan, and the Company's Flexible Spending Account plan, <u>PROVIDED</u>, that employees who have "opted out" or in the future "opt out" of the Company's medical and pension plans as provided elsewhere in this paragraph shall then no longer participate in the Company's Pension, Fund the Future, Medical and Dental plans. (Vesting rules for participation up to the date of "opt out" are unaffected.)

It is understood that any union-represented employee who participates in any Company-sponsored benefit plan (e.g., pension plan, medical plan, etc.) and/or policy (e.g., sick leave, jury duty, travel insurance, etc.), does so on the same basis as other non-union employees of this Station/operation. Therefore, changes may be made in such plan and/or policy which are applicable to other, non-union employees of this Station/operation, and such changes will apply to employees of this Station/operation covered by this Agreement and the company will not be obligated to bargain over such changes with the Union.

By way of example, but not limitation, changes in any such plan or policy may include termination of the plan or policy, substitution of, or merger with, another plan or policy, or part of such plan or policy, modifications in the terms of the plan or policy, all subject to the condition that where the changes apply to non-union employees of this Station/operation, they will apply to employees of this Station/operation covered by this Agreement.

The parties also agree that notwithstanding anything contained in this Agreement to the contrary, anyone buying or leasing all or part of an operation cannot literally assume this entire Agreement because certain plans and policies therein are unique to the Company. Thus, anyone buying or leasing all or part of an operation or facility will not be obligated to assume those provisions of the Agreement which relate to benefit plans or policies which are provided by the Company. However, it is understood that if such purchaser/lessee does not assume some or all of the provisions of this Agreement which relate to benefit plans or policies, that the purchaser/lessee must bargain in good faith with SAG-AFTRA as to what replacement benefit plans or policies, if any, shall be provided.

Individuals at KDKA-TV shall be given the option, once a year during open enrollment beginning in the Fall of 1999, to individually and irrevocably opt out of both the CBS Medical (including Dental) and the CBS Pension and into SAG-AFTRA Health and Retirement coverage. Effective January 1, 2015, the Company shall contribute to SAG-AFTRA H&R at a rate of 10.5% with an earnings cap of $110,000. Effective January 1, 2016, the Company shall contribute to SAG-AFTRA H&R at a rate of 11% with an earnings cap of $115,000.

New employees shall be given the opportunity to individually and irrevocably opt out of both the CBS Medical (including Dental) and the CBS Pension and into SAG-AFTRA Health and Retirement coverage at the time of hire. If the new employee chooses the CBS Medical (including Dental) and the CBS Pension, he or she shall be given the same opportunity to opt into SAG-AFTRA Health and Retirement once a year during open enrollment beginning in the Fall of 1999.

SAG-AFTRA and the Company agree that as a result of the negotiations that culminated in the KDKA-AM-SAG-AFTRA Agreement for Staff Announcers/Newspersons effective September 1, 1989 between the parties, that the following sources of income shall be considered for benefit purposes, in accordance with the provisions of the applicable benefit plans, for the Staff Announcers/Newspersons covered by this Agreement:

1. Minimum weekly Staff Salaries set forth in the KDKA-TV-SAG-AFTRA Agreement
2. Talent Fees
3. Guaranteed income originating from personal services contracts
4. Overtime
5. Premium Hours
6. Penalty Pay (not meal penalties)

7. Retroactive Pay
8. Vacation Advances
9. Retroactive Raises

All other compensation not considered for benefit purposes in the past shall continue to be excluded from consideration.

### 22. Productions Prosecuted

In the event that the program for which an employee is engaged as a performer is complained of, and any prosecution, civil or criminal, private or governmental, shall follow, Company agrees at its expense to defend the employee and to pay all charges and judgment so incurred. This Article does not apply to a case where the prosecution concerns material furnished by the employee or acts done by the employee without the acceptance by or the authorization of the Company.

### 23. Outside Sources

The Company and SAG-AFTRA acknowledge that the Station has an established practice of utilizing material from "Outside Sources" (e.g., West Penn AAA; distributors of syndicated products) and other Company owned and/or operated stations. The Company shall continue to have the right, consistent with but not limited to the specific past practice of the Station, to acquire broadcast material from Outside Sources and Company owned and/or operated stations for use on KDKA-TV. This paragraph is not intended to apply to circumstances covered by the KDKA-TV/SAG-AFTRA FREELANCE AGREEMENT, or to allow the use of leased employees to perform covered work outside the terms of this Agreement.

### 24. Safety

It is the responsibility of the Company to maintain and repair any equipment the Staff Announcers are assigned to use in the performance of their duties. Staff Announcers shall not be required to operate unsafe equipment or vehicles, not shall they be held responsible for the consequences of not having operable equipment. The News Director (and other personnel as necessary) will meet with the SAG-AFTRA Station Representative (Shop Steward) upon reasonable notice to discuss issues concerning safety and health.

**ACCEPTED AND AGREED TO:**
CBS, INC.
KDKA-TV

By: _____

Date: ___11/11/15_____

**ACCEPTED AND AGREED TO:**
SAG-AFTRA

By: _____
Brian Lysell
Executive Director

Date: ___11-12-2015_____

22

**SIDELETTER #1**

The Sideletter applies to the following agreement:

1998-2002 SAG-AFTRA/KDKA-TV MINIMUM BASIC AGREEMENT FOR STAFF ANNOUNCERS

1. Regular staff employees may work in the booth.

   <u>During periods of time when no SAG-AFTRA Employee is on duty</u>

   a. If it is deemed by management that a live local broadcast is necessary, KDKA will call in an SAG-AFTRA/KDKA-TV staff employee to announce said broadcast and KDKA-TV will pay said staff employee (over any contract guarantee the member may have) four (4) hours at one and one-half (1-1/2) times the then current base SAG-AFTRA rate.

   b. If there is an immediate need, any non-SAG-AFTRA member can broadcast said material with the understanding that KDKA-TV will pay (over any contract guarantee the member may have) four (4) hours at the applicable overtime rate as set forth in Section 2 (a) of Schedule I to the most logical member that would have been called in.

**ACCEPTED AND AGREED TO:**
CBS, INC.
KDKA-TV

By: _Edgar / Yurgen_

Date: _11/11/15_

**ACCEPTED AND AGREED TO:**
SAG-AFTRA

By: _____
Brian Lysell
Executive Director

Date: _11-12-2015_

**SIDELETTER #2**

The Sideletter applies to the following agreements:

1. 1998-2002 SAG-AFTRA/KDKA-TV MINIMUM BASIC AGREEMENT FOR STAFF ANNOUNCERS
2. 1998-2002 SAG-AFTRA/KDKA-TV FREE LANCE AGREEMENT FOR TELEVISION ARTISTS
3. 1998-2001 SAG-AFTRA/KDKA-AM MINIMUM BASIC AGREEMENT FOR STAFF ANNOUNCERS NEWSPERSONS
4. 1998-2001 SAG-AFTRA/KDKA-AM RADIO FREELANCE AGREEMENT

The undersigned hereby agree that any of the provisions of the above agreements notwithstanding, compensation to all KDKA-AM and KDKA-TV Staff Employees covered under these Agreements appearing on the Children's Hospital Program shall be on the basis of a flat fee of Fifty dollars ($50.00) per performer irrespective of the type of performance rendered or the length of such performance, and such flat fee shall be paid over any contract guarantee a staff employee may have.

**ACCEPTED AND AGREED TO:**
**CBS, INC.**
**KDKA-TV**

By: _____

Date: _____11/11/15_____

**ACCEPTED AND AGREED TO:**
**SAG-AFTRA**

By: _____
**Brian Lysell**
**Executive Director**

Date: __11-12-2015__

## SIDELETTER #3

The Sideletter applies to the following Agreement:

1.  1998-2002 SAG-AFTRA/KDKA-TV MINIMUM BASIC AGREEMENT FOR STAFF ANNOUNCERS

It is agreed that the Company can employ up to two (2) trainees (no more than one (1) in News and one (1) in Programming) for KDKA-TV subject to the following conditions:

1.      To be able to qualify as a trainee, said individual must not have had any prior professional broadcasting experience. Professional broadcasting experience means actual on-the-air working experience at a commercial or public broadcasting radio and/or TV station. For purposes of this letter of agreement, on-air work at a commercial or public service college radio or TV station, or on-air work at a commercial radio or TV station where employment was in connection with the trainee's curriculum through a college is not considered professional broadcasting experience.

2.      Once the trainee performs on-the-air (live or recorded), the trainee must become a member of "SAG-AFTRA".

3.      The maximum length of time a trainee can be employed is for a period of eighteen months from the date the person is originally classified as a trainee. The Company, in its sole discretion, has the right to have the trainee become a staff announcer prior to the end of the one year training period.

4.      During the training period no provisions of the SAG-AFTRA/KDKA-TV Agreement apply. Seniority, base salary, longevity clauses, and all other provisions of the SAG-AFTRA Agreement shall start on the date the trainee commences as a Staff Announcer. Vacations, insurance, and other fringe benefits shall be measured from the date of employment.

5.      In the event of a layoff, trainees shall be laid off prior to staff announcers being laid off.

6.      A trainee in News will be assigned initially to work directly with a reporter(s) for a reasonable period of time, but in no event less than two (2) months.

7.      A trainee in News can perform all the duties of an SAG-AFTRA reporter except he/she shall not be assigned to anchor a one-half (1/2) hour news program, i.e., the 6 P.M. or 11 P.M. newscast.

8.      If the Company is actually employing a trainee in News the following further provisions shall apply:
        (a)      The Company must maintain eighteen (18) Full-Time Staff Announcers on staff to maintain one News trainee on staff.
        (b)      If the staff announcers employed by the Company fall below eighteen (18), the Company has sixty (60) days to bring the total back to eighteen (18) by hiring a new employee(s) or promoting the News trainee to a full staff announcer.

                In the event the Company does not hire a new staff announcer(s) or promote the

News trainee, the Company is obligated to release the News trainee within two (2) weeks.

9.      The Company shall provide to SAG-AFTRA the names of all trainees that are employed by the Company.

10.     A trainee shall be paid fifty percent (50%) of the applicable base salary set forth in Schedule I for staff announcers for the first twelve months of his or her employment.  After twelve months of employment, a trainee shall be paid seventy-five percent (75%) of the applicable base salary set forth in Schedule I for staff announcers.

**ACCEPTED AND AGREED TO:**
**CBS, INC.**
**KDKA-TV**

By: _____

Date: _____ 11/11/15 _____

**ACCEPTED AND AGREED TO:**
**SAG-AFTRA**

By: _____
**Brian Lysell**
**Executive Director**

Date: _____ 11-12-2015 _____

## SIDELETTER #4

The Sideletter applies to the following agreement:

1. 1995-1998 SAG-AFTRA/KDKA-TV MINIMUM BASIC AGREEMENT FOR STAFF ANNOUNCERS

During the negotiations that led up to the 1992-1995 SAG-AFTRA-KDKA-TV Agreement for Announcers and Freelance Performers, the parties agreed as follows:

The Company will provide new hires as part of negotiating for Personal Service Contracts (PSCs) or other overscale arrangements a copy of the SAG-AFTRA Agreement. However, the failure to do so will not invalidate any PSC or other overscale arrangements, or be subject to the grievance/arbitration provisions of this Agreement..

**ACCEPTED AND AGREED TO:**
**CBS, INC.**
**KDKA-TV**

By: _Edgar J Yergan_

Date: _11/11/15_

**ACCEPTED AND AGREED TO:**
**SAG-AFTRA**

By: _____
**Brian Lysell**
**Executive Director**

Date: _1-12-2015_

## SIDELETTER #5

The Sideletter applies to the following Agreements:

1. 1998-2002 SAG-AFTRA/KDKA-TV MINIMUM BASIC AGREEMENT FOR STAFF ANNOUNCERS
2. 1998-2002 AFIRA/KDKA-TV FREELANCE AGREEMENT FOR TELEVISION ARTISTS

### NEWS GATHERING AND PROGRAM JURISDICTION

1.      It is agreed any non-SAG-AFTRA employee of KDKA-TV may conduct news interviews to be aired on KDKA-TV subject to the following conditions:

        a. The non-SAG-AFTRA member's voice and his or her picture must be cut out prior to airing.

        b. The Company agrees that it will not expand beyond its present usage of news interviews conducted by non-SAG-AFTRA employees during the life of this Agreement. If for some unforeseen reason it becomes necessary for the Company to change its current practice, the Company agrees to meet and bargain with SAG-AFTRA regarding such changes.

2.      The Company may use non-SAG-AFTRA employees in connection with investigative reports including interviews. When the report is aired it must be introduced by an SAG-AFTRA member. The intent is that in most cases the SAG-AFTRA member who introduces the report will be the SAG-AFTRA member designated internally as the investigative reporter.

3.      The Company agrees that in the Program. Department the Company will not expand beyond its present usage of interviews conducted by non-SAG-AFTRA employees during the life of this Agreement.

4.      Notwithstanding anything set forth in the Collective Bargaining Agreement between the parties effective September 1, 1998 and remaining in effect to and including August 31, 20021998 (the "1998-2002 Agreement"), and/or in this Sideletter, the Company shall have the right to assign an individual not covered by the 1998-2002 Agreement to ask a question in order to elicit a response for the purpose of broadcasting and/or otherwise utilizing the question and/or any response, subject to the following conditions:

        (1)     The individual asks the question during an interview, press conference or "spot news report" situation, or in a similar situation.
        (2)     The individual asking the question is not seen on the air during the piece in which the response appears.
        (3)     The individual's voice is not aired, except for during a "spot news report" where the value of the "spot news report" is in an "eyewitness" account, and where no individual covered by the 1998-2002 Agreement is present at the time the question is asked.

Furthermore, the Company shall have the right to assign an individual not covered by the 1998-2002 Agreement to report in a "spot traffic report" and/or a "spot news report" situation, and to broadcast or otherwise utilize the "spot report", including the airing of the individual's voice, where the value of the "spot report" is in an eyewitness account, and where no individual covered by the 1998-2002 Agreement is present at the time of the "spot report" situation.

An individual who is assigned to ask a question and/or report in a "spot report" situation, as described above shall not be subject to the union security provisions as set forth in Section 3. – Union Shop of the 1998-2002 Agreement, except that, in the event the individual is so assigned with such regularity, and the individual's voice is aired with such frequency, that the individual becomes, in the opinion of SAG-AFTRA, a *de facto* "Artist", such that the individual should be subject to such "union security" provisions, SAG-AFTRA shall have the right to pursue a "Grievance" pursuant to Section 8. – Arbitration of the 1998-2002 Agreement.  In the event such a "Grievance" proceeds to arbitration, the Arbitrator's authority shall be limited to determining whether the individual has been so assigned to ask questions and report in such a manner that the individual is a *de facto* "Artist".  In the event the Arbitrator determines that the individual is a *de facto* "Artist", the individual shall become subject thereafter to such "union security" provisions.

5.     a.     The Company must maintain eighteen (18) full-time Staff Announcers on the staff to maintain the provisions of this Sideletter.

    b.     If the Staff Announcers employed by KDKA-TV fall below eighteen (18), the Company has sixty (60) days to bring the total back to eighteen (18).  In the event the Company does not bring the total back to eighteen (18) within sixty (60) days, the provisions of this Sideletter shall no longer be effective and the terms of Sideletter #8 to the 1977-1980 SAG-AFTRA/KDKA-TV Minimum Basic Agreement for Staff Announcers and Freelance Artists shall thereafter apply for the remainder of the 1998-2002 Agreement.

**ACCEPTED AND AGREED TO:**
**CBS, INC.**
**KDKA-TV**

By: _Edgar J Yngen_ _____

Date: _11/11/15_ _____

**ACCEPTED AND AGREED TO:**
**SAG-AFTRA**

By: _____
**Brian Lysell**
**Executive Director**

Date: _11-12-2015_ _____

## SIDELETTER #6

During the negotiation that culminated in the 1998-2002 KDKA-TV/SAG-AFTRA Agreement, SAG-AFTRA and the Company discussed the issue of crossover of Staff Announcers between KDKA-TV and KDKA-AM.  The parties agreed as follows:

Staff Announcers employed by KDKA-TV shall receive no additional compensation for the performance of services for KDKA-AM, except as described below:

Staff Announcers employed by KDKA-AM shall receive no less than the minimum daily rate for Staff Announcers under the KDKA-TV/SAG-AFTRA Agreement for any day that he/she performs reporting services for KDKA-TV. No additional compensation shall be required for promotional appearances on either station.

On any day that a KDKA-AM Staff Announcer performs services for both KDKA-AM and KDKA-TV, that Staff Announcer shall receive no less than the minimum daily rate for Staff Announcers under the KDKA-TV/SAG-AFTRA Agreement, but in general such Staff Announcer is not entitled to compensation under both collective bargaining agreements.

Notwithstanding the above, the Company acknowledges that it has, in the past, paid additional compensation beyond that set forth above to certain Staff Announcers employed by KDKA-TV for the performance of services on behalf of KDKA-AM (and vice versa) where the nature of such services are of a regular, recurrent, and substantial nature. The Company represents that it has no present intent to discontinue this practice. If there is some change in that intent, the Station(s) will notify SAG-AFTRA in order to meet, discuss, and if appropriate bargain to the extent required by law and/or this Agreement concerning such performances.

**ACCEPTED AND AGREED TO:**
**CBS, INC.**
**KDKA-TV**

By: _____

Date: _____
11/11/15

**ACCEPTED AND AGREED TO:**
**SAG-AFTRA**

By: _____
**Brian Lysell**
**Executive Director**

Date: _____
11-12-2015

30

**SIDELETTER #7**

During negotiations that culminated in the 1998-2002 KDKA-TV/SAG-AFTRA Agreement, SAG-AFTRA expressed concern that changes involving Use, Reuse, and Right to Assign might be utilized to avoid the payment of network fees which might be otherwise required under SAG-AFTRA's network agreements (e.g., CBS) in the event Staff Artists were assigned to or agreed to perform under the direction and control of a network, or if network use fees would otherwise have been required.

The Company agrees that it will not, so long as SAG-AFTRA represents on-air employees of any particular network, interfere with the payment of fees to Staff Artists working under this Agreement by such a network, however, this is not intended to preclude the Company from seeking any changes to any network agreement through collective bargaining. In addition, the Company will not, for the purpose of evading obligations under this Agreement or any network agreement, assign Staff Artists to perform under the direction and control of a network without treating such work under the terms of the applicable network agreement. It is understood that network feeds performed under the direction and control of the Station shall continue to be treated under the terms of the KDKA/SAG-AFTRA Agreement.

**ACCEPTED AND AGREED TO:**
**CBS, INC.**
**KDKA-TV**


By: _Edgar J Yuguan_

Date: _11/11/15_


**ACCEPTED AND AGREED TO:**
**SAG-AFTRA**


By: _____
**Brian Lysell**
**Executive Director**

Date: _11-12-2015_

## SIDELETTER #8

During negotiations that culminated in the 1995-98 KDKA-TV/SAG-AFTRA Agreement, SAG-AFTRA and the Company each made proposals to change .and/or add to the language contained in subparagraph (d) of <u>Schedule I, Section 8 -Termination of Employment</u> (p.14) of the 1992-1995 KDKA-TV/SAG-AFTRA Agreement. After exchanging several proposals and counterproposals, the parties instead mutually agreed to delete subparagraph (d) from the Agreement. The parties thus agreed as follows:

1) Neither the Company nor SAG-AFTRA nor any Staff Announcer may cite or refer to the deletion of <u>Schedule I, Section 8, subparagraph (d)</u> or any proposals made in these negotiations related to such <u>Schedule I, Section 8, subparagraph (d)</u> in any litigation, hearing, arbitration, grievance, negotiation or any other proceeding of any kind for any purpose whatsoever.

2) No judge, jury, arbitrator, panel, government agency or other third party shall construe the deletion of <u>Schedule I, Section 8, subparagraph (d)</u> against either the Company or SAG-AFTRA. Any interpretation of Schedule I, Section 8 by any such judge, jury, arbitrator, panel, government agency or other third party shall be based strictly upon the contractual language contained therein and shall not include any inquiry into the bargaining history underlying the deletion of subparagraph (d).

3) The Company expressly reserves its stated position that under <u>Schedule I, Section 8</u> as amended, the Company possesses the unfettered right to reduce any Staff Announcer to minimum scale without violating this Agreement and that such reduction would not constitute a discharge. Likewise, SAG-AFTRA expressly reserves its stated position that a significant reduction in compensation, while not violating this Agreement, would constitute a discharge. The parties agree that the question of severance entitlement shall be controlled by the language of this Staff Agreement, and the circumstances of each case, and not by language contained in a personal services contract ("PSC") related to the termination of that PSC.

4) The Company and SAG-AFTRA both expressly reserve their positions with respect to the effect of an employee's decision to accept employment under reduced terms upon the enforceability of non-compete and right-of-first-refusal provisions of an expired PSC.

ACCEPTED AND AGREED TO:
CBS, INC.
KDKA-TV

By: _Edgar J Yuyan_

Date: _11/11/15_

ACCEPTED AND AGREED TO:
SAG-AFTRA

By: _____
Brian Lysell
Executive Director

Date: _11-12-2015_

32

**SIDELETTER #9**

The Sideletter applies to the following agreement:

1. 1998-2002 SAG-AFTRA/KDKA-TV MINIMUM BASIC AGREEMENT FOR STAFF ANNOUNCERS
2. 1998-2002 SAG-AFTRA/KDKA-TV FREELANCE AGREEMENT FOR TELEVISION ARTISTS

During the course of the 1998 negotiations the parties discussed the scheduling situation at its news bureaus, which currently exist in Westmoreland, Beaver, and Washington counties. Specifically, the company was concerned about overtime worked by Staff Artists. To provide the company with flexibility in scheduling to avoid accrual and payment of overtime, the parties have agreed that during the term of this agreement Staff Artists working regularly in bureaus may be assigned a regular $\frac{1}{2}$ hour or one hour unpaid meal period during their shift, which may not be scheduled during the first two or the last two hours of the shift. Incursions into the meal period due to instructions or assignments made by the station, or Staff Artists' inability to take a meal period because of the demands of breaking news, will be recorded as time worked. Other than for obvious breaking news situations, working through the lunch period will be cleared through the assignment desk. In any event a reasonable effort will be made to contact desk. The intent is that if a meal period is assigned, it will not be work time. If it becomes work time, it will be recorded as such. During the term of this agreement, the company may elect to grant Staff Artists working regularly in bureaus compensatory time off (at time and $\frac{1}{2}$) in lieu of overtime pay under the following conditions. Staff Artists may not be required to take the time off in less than full day increments. Time off will be scheduled by mutual agreement, or added to the regular vacation period. The company may elect to credit up to 5 hours overtime (as defined in this agreement) per work week against overscale compensation if a personal contract permits such crediting. Comp time that has not been used in a calendar year because it was accrued during the fourth calendar quarter, or because requests to use it were denied, may be taken during the first quarter of the following year.

**ACCEPTED AND AGREED TO:**
**CBS, INC.**
**KDKA-TV**


By: _____

Date: _____11/11/15_____

**ACCEPTED AND AGREED TO:**
**SAG-AFTRA**


By: _____
**Brian Lysell**
**Executive Director**

Date: ____11-12-2015____

33

**SIDELETTER #10**

The Sideletter was intentionally deleted.

## SIDELETTER #11

**During the 1998 negotiations the parties agreed to continue the following arrangement with respect to appearance of Pittsburgh Post-Gazette employees or employees of other newsgathering organizations on KDKA-TV.**

1.      The co-host and commentator positions of the "Sunday Edition" program will be covered under the KDKA-TV/SAG-AFTRA Freelance Agreement (the "Freelance Agreement").

2.      With respect to other appearances by employees of the Post-Gazette or any other new gathering organization on KDKA-TV, including guest interview appearances on the "Sunday Edition" program or other similar programs as well as "debriefings" on newscasts, such employees shall not be covered by this Agreement or the Freelance Agreement.

3.      The Company agrees that no full-time staff employee will be laid off as a direct result of the use of this sideletter. The Company further agrees that for this sideletter to be invoked, there must be an agreement between KDKA-TV and the employer of the person who appears on KDKA-TV.

4.      This agreement is conditioned upon and subject to the Post-Gazette and the union representing its reporters reaching agreement regarding compensation to be paid for appearances not covered by this Agreement.

**ACCEPTED AND AGREED TO:**
**CBS, INC.**
**KDKA-TV**


By: _____

Date: __11/11/15_____

**ACCEPTED AND AGREED TO:**
**SAG-AFTRA**


By: _____
**Brian Lysell**
**Executive Director**

Date: __11-12-2015_____

35