**(524)**

# KPIX-TV/KBCW-TV - IBEW AGREEMENT

## July 22, 2017 - July 21, 2020

Exhibit 15

# INDEX

**Page**

**ARTICLE I - DURATION AND TERMINATION** .......................................................1

Section 1. - Duration .........................................................................................1
Section 2. - Change or Termination ..................................................................1
Section 3. - Status Quo ......................................................................................1

**ARTICLE II - JURISDICTION AND NON-JURISDICTION** .....................................2

Section 1. - Jurisdiction .....................................................................................2
A.  Inconsistent Duties ......................................................................................2
B.  New Devices ................................................................................................2

Section 2. - Exceptions to Jurisdiction ..............................................................3
A.  Geographical Jurisdiction ...........................................................................3
B.  Electronic Field Production, Editing, and Post Production ........................3
  1.  ENG v. EFP ..............................................................................................3
  2.  Remote Programs Defined .......................................................................3
  3.  Remote ENG Programs ............................................................................4
  4.  EFP and Remote EFP Programs ..............................................................4
  5.  ENG Microwave .......................................................................................4
  6.  Major Remotes .........................................................................................4
  7.  ..................................................................................................................5
  8.  Previewing of Broadcast Material, Editing/Post Production of Broadcast Material ......5
    a.  ............................................................................................................5
    b.  ............................................................................................................5
    c.  Linear/Analog Editing Equipment .....................................................5
    d.  Non-Linear/Digital Editing Equipment .............................................6
C.  Productions Outside the Control of the Employer ......................................6
D.  Electronic Graphics .....................................................................................6
E.  Electronic/Computer Equipment, Operation, Control and Data Transfer ......7
F.  Video/Audio File/Media Servers ................................................................7
G.  Loading of Media ........................................................................................8
H.  Master Control Computerized System ........................................................8
I.  Contract Services .........................................................................................8
J.  Supervisors ..................................................................................................9
K.  Non-Bargaining Unit Employee "Hands-On" ............................................9
L.  Audio and/or Video Tape Recorders ..........................................................9
M. Audio Recording .........................................................................................9

**INDEX**/page 2

Page

N.  Tape Recordings ...........................................................................................9
O.  Mobile Radio-Telephone Equipment................................................................9
P.  News Bureaus - Microwaving ......................................................................10
Q.  Aircraft ................................................................................................10
R.  Broadcast Material From Other Entities .........................................................10
S.  Closed Captioning ...................................................................................10
T.  Directorial Functions ...............................................................................10
U.  Video Switching......................................................................................10
V.  ........................................................................................................11
W.  Non-Exclusive Duties ..............................................................................11
X.  Stage Managing Functions.........................................................................11
Y.  Studio/Control Room Automation System .....................................................12
Z.  Writers Satellite Coordinators/Production Assistants ........................................13
AA. Audio/Video Transmission .......................................................................13

Section 3. - Scope and Intent ..........................................................................13

**ARTICLE III - DELETED**

**ARTICLE IV - INTERCHANGEABILITY** ..........................................................13

**ARTICLE V - RECOGNITION**...........................................................................14

**ARTICLE VI - CONFERENCES** .......................................................................14

**ARTICLE VII - UNION MEMBERSHIP**...............................................................14

**ARTICLE VIII - NEW EMPLOYEES**.................................................................16

**ARTICLE IX - NON-DISCRIMINATION** ...........................................................16

**ARTICLE X - NO STRIKE OR LOCKOUT** .........................................................16

**ARTICLE XI - MANAGEMENT RIGHTS**...........................................................18

**ARTICLE XII - GRIEVANCE AND ARBITRATION** ............................................18

**ARTICLE XIII - WORK WEEK - WORK DAY**....................................................20

**ARTICLE XIV - MEAL PERIODS AND MEAL PENALTIES** ..................................21

**ARTICLE XV - WORK SCHEDULES**................................................................21

INDEX/page 3

Page

ARTICLE XVI - CALL-IN AND CALL-BACK ................................................22

ARTICLE XVII - DAYS OFF ...............................................................22

ARTICLE XVIII - SHORT-TURNAROUND, REST PERIOD ...................................22

ARTICLE XIX - OVERTIME ................................................................23

ARTICLE XX - TYPES OF EMPLOYEES...................................................24

ARTICLE XXI - INDUSTRY CREDIT .......................................................25

ARTICLE XXII - COMPENSATION ........................................................26

ARTICLE XXIII - DELETED

ARTICLE XXIV - DELETED

ARTICLE XXV - TEMPORARY UPGRADING ...............................................28

ARTICLE XXVI - NIGHT SHIFT PREMIUM ................................................28

ARTICLE XXVII - TRANSPORTATION, TRAVEL TIME
 AND ALLOWANCES; TRAINING ..........................................................29

ARTICLE XXVIII - HOLIDAYS ............................................................30

ARTICLE XXIX - VACATIONS .............................................................32

ARTICLE XXX - SENIORITY ..............................................................34

ARTICLE XXXI - LAYOFFS ...............................................................35

ARTICLE XXXII - REHIRE ................................................................36

ARTICLE XXXIII - DISCHARGE ...........................................................37

ARTICLE XXXIV - LEAVES OF ABSENCE ..................................................39

**INDEX**/page 4

**Page**

**ARTICLE XXXV - SICK LEAVE**...................................................................39

**ARTICLE XXXVI-A – KPIX-TV-PENSION AND INSURANCE
AND POLICY BENEFITS**...........................................................................40

**ARTICLE XXXVI-B – KBCW-TV-PENSION AND INSURANCE
AND POLICY BENEFITS**...........................................................................41

**ARTICLE XXXVII - JURY DUTY** ............................................................42

**ARTICLE XXXVIII - SAFETY** ...................................................................42

**ARTICLE XXXIX - UNION VISITATION**..................................................42

**ARTICLE XXXX - MISCELLANEOUS PROVISIONS** ..............................43

**ARTICLE XXXXI - COMPANY POLICY MANUAL, CONFLICT
OF INTEREST QUESTIONNAIRES, CODE OF ETHICS & CONDUCT, ETC.** ......43

**ARTICLE XXXXII - MODIFICATIONS TO AGREEMENT**.......................43

**SUPPLEMENTARY LETTERS OF UNDERSTANDING AND INTENT**

**NO. 1   INTERCHANGEABILITY (NEWSGATHERING)** .....................44
**NO. 2   NON-BARGAINING UNIT EMPLOYEES "HANDS-ON"** ...........49
**NO. 3   CASUAL EMPLOYEE CHECK-OFF** .....................................50
**NO. 4   SPECIAL WORK WEEK**.........................................................51
**NO. 5   VACATION SENIORITY PREFERENCE** ...............................53
**NO. 6   COMPENSATION (DELETED)**.................................................
**NO. 7   "VACATION PAY"** ..................................................................54
**NO. 8   VACATION SELECTION** ........................................................56
**NO. 9   EYE ON THE BAY** ..................................................................57
**NO. 10  NON- LINEAR/DIGITAL/EDITING** ......................................58
**NO. 11  "SINGLE VACATION DAYS"**.................................................59
**NO. 12  TRANSMITTER TECHNICIANS**.............................................60
**NO. 13  SWEEPS – VACATION SCHEDULE**.......................................61
**NO. 14  UNION ACTIVITIES – REPLACEMENT COSTS** ...................62
**NO. 15  FOUR DAY WORK WEEK** .....................................................63
**NO. 16  CASUALS – SIXTH/SEVENTH DAYS** ...................................64
**NO. 17 MEAL PERIODS**......................................................................65
**NO. 18 ELECTRONIC TIMEKEEPING SYSTEM** ..............................67
**NO. 19 MULTI-MEDIA JOURNALIST** ...............................................68
**NO. 20 HUBBING OF MASTER CONTROL**........................................74

### KPIX-TV/KBCW-TV-IBEW
### LOCAL 45 AGREEMENT
### 2017-2020

Agreement made and entered into the 6th day of November, 2017, by and between KPIX-TV and KBCW-TV with an office at 855 Battery Street, San Francisco, California 94111, or its successor, hereinafter called the "Company" or the "Employer", and the International Brotherhood of Electrical Workers, Local 45, with its principal offices at 6255 Sunset Blvd., Suite 721, Hollywood, CA 90028, or its successors, hereinafter called the "Union" or "Local 45", the bargaining representative for broadcast technicians, technical operators, and stage managers, as defined in Article II herein  hereinafter collectively called "Employees", and individually called "technicians", "technical operators", and "stage managers", now or hereafter employed at KPIX-TV/KBCW-TV, its lessees, successors, or assigns during the term of this Agreement.

### BASIC PRINCIPLES

The Employer and the Union have a mutual interest in the broadcasting industry.  Stabilized conditions of employment improve the relationship between the Employer, the Union, and the public.  All will benefit from harmonious relations and by adjusting any differences through rational, common-sense methods.

Wherefore, to these ends, and in consideration of the mutual promises and agreement herein contained, the parties hereto agree as follows:

### ARTICLE I - DURATION AND TERMINATION

**Section 1. - Duration:**  This Agreement shall remain in full force and effect as of the 22nd day of July, 2017, to and including the 21st day of July, 2020, unless otherwise extended as herein provided.

**Section 2. - Change or Termination:**  This Agreement shall automatically be extended from the 22nd day of July 2017, to the 21st day of July, 2020, and from year to year thereafter, unless either party, at least sixty (60) days prior to the annual expiration date, gives notice in writing to the other party of its desire to terminate or change the Agreement, accompanied by a statement of changes, if any, desired.  When such changes are being discussed, the entire Agreement, or any part thereof, is subject to negotiation and modification.  However, changes may be made at any time by mutual consent.  Any changes agreed upon shall be reduced to writing and signed by both parties hereto.

**Section 3. - Status Quo:**  Whenever notice to change the Agreement is given by either party in accordance with **Section 2.** above, the parties will promptly enter into negotiations thereof.  In the event that, as a result of such negotiations, this Agreement has not been renewed, modified, or extended by the date on which it would otherwise have terminated as a result of such notice, status quo conditions shall continue in effect until either party gives the other ten (10) days written notice terminating this Agreement.  However, where notice to terminate this Agreement is given by either party in accordance with **Section 2.** above, this **Section 3.** shall not apply, and the Agreement shall therefore terminate at 12:01 a.m. on July 22nd, 2014.

## ARTICLE II - JURISDICTION AND NON-JURISDICTION

**Section 1. - Jurisdiction:** Subject to the provisions set forth in **ARTICLE II** below, the trade jurisdiction under this Agreement shall apply to the installation, maintenance, repair and operation of technical equipment at the Company's studios, transmitter site, and at remote locations (as specifically defined in **ARTICLE II, Section 2.B.3.**), only when such equipment is being utilized to originate television programs that are produced and controlled by KPIX-TV/KBCW-TV (including auditions and rehearsals thereof), provided that such television programs are to be broadcast exclusively by KPIX-TV/KBCW-TV through its transmitter on its assigned public reception frequency for direct public reception. As used in this Agreement, the term "broadcast exclusively by KPIX-TV/KHBK-TV through its transmitter on its assigned public reception frequency for direct public reception" means the traditional analog program service or the single digital program service that directly replaces it. During the transition period from analog to digital television, this term shall refer to both the traditional analog program service and the digital program service which directly replaces it. After such transition period, this term shall refer to only the digital program service which directly replaced the traditional analog program service. However, if work is to be performed within the Company's two main studio facilities in connection with the production of material by KPIX-TV/KBCW-TV not within the jurisdiction of this Agreement, e.g., material produced and controlled by KPIX-TV/KBCW-TV that is not to be broadcast exclusively through KPIX-TV/KBCW-TV's transmitter on its assigned public reception frequency for direct public reception; material aired on another VHF signal, or on AM, FM or UHF signals; syndicated programming, cable programming, non-broadcast material, digital program services, etc., the Company agrees to utilize bargaining unit employees scheduled that day to work in the two main studios if they are available, in the Company's opinion, to perform such work during their regularly scheduled shift, but in no event shall the Company be allowed to utilize the services of more than three (3) individuals not covered by this Agreement within those two main studios.

The Employer may lease its broadcasting facilities and such facilities shall not come under the jurisdictional provisions of this Agreement and shall not require the assignment of bargaining unit employees when so leased. The Company agrees, however, that in the event it leases one of its two main studio facilities that the lessee may utilize the services of its own employees within those two main studios. At its discretion, the Company may assign bargaining unit Employees to work with the lessee in such circumstances. However, if KPIX-TV/KBCW-TV supplies technical services to such lessee that otherwise would be performed by bargaining unit employees if this were a KPIX-TV/KBCW-TV television program under the jurisdiction of this Agreement, the Employer agrees that bargaining unit Employees shall perform such services within those two main studios.

A.   **Inconsistent Duties:** Technicians, technical operators, and stage managers shall not be assigned to perform any work which is both inconsistent with the jurisdiction of this Agreement and is inconsistent with duties performed by technicians in the broadcast industry.

B.   **New Devices:** In the event that the Company introduces or permits to be used any process, machinery, equipment, or device which substitutes for, supplements, or replaces any

present process, machinery, equipment, or device being operated by an employee within the bargaining unit and covered by the jurisdiction set forth in this Agreement, the parties hereto agree to enter into discussion to determine whether the operation of such process, machinery, equipment, or device comes within the jurisdiction of the unit covered hereunder.

If no agreement on jurisdiction can be reached, the parties agree to submit the question to arbitration under the procedures set forth in **ARTICLE XII, Sections 3. through 8.**  The decision of the arbitrator shall be binding upon both parties.

### Section 2. - Exceptions to Jurisdiction:

A.   **Geographical Jurisdiction:** Neither the Union nor the Employees covered by this Agreement shall have any jurisdictional rights under this Agreement, e.g., under this **ARTICLE II**, beyond the geographical area encompassed by the City Limits of Sacramento and the below listed counties:

    1.   Santa Clara
    2.   San Francisco
    3.   San Mateo
    4.   Alameda
    5.   Contra Costa
    6.   Solano
    7.   Sonoma
    8.   Marin
    9.   Napa
    10.  Santa Cruz
    11.  San Joaquin

B.   **Electronic Field Production, Editing, and Post Production:**

    1.   **ENG v. EFP:**   All production outside the Company's studios which is not Electronic News Gathering (ENG), shall be defined as Electronic Field Production (EFP).

    2.   **Remote Programs Defined:**  A remote program shall be defined as the production of a program using electronic cameras, outside the KPIX-TV studios, either live or on any recorded media, that involves one or more of the following criteria:

        a.   Camera operations are under the control of a director using headsets at the remote location during the actual production.

        b.   A switcher is used at the remote location to select, mix, and perform special effects on the program video during actual production.

      **c.**    The complete program is fed from the remote location to the studio or to any recording media at the remote location as a complete program.

**3.**    **Remote ENG Programs:**  The Union shall have jurisdiction over remote ENG programs when such production constitutes a "remote program" as defined in this **Section 2.** above.

**4.**    **EFP and Remote EFP Programs:**  It is agreed that employees who are not represented by Local 45 may operate portable electronic cameras and all related and associated equipment, including microwave transmission equipment, in connection with the production of any EFP material, including EFP remote programs as "remote programs" is defined above in this **Section 2.**  However, even where the nature of the field production is EFP rather than ENG, if the production constitutes a major remote, as specifically defined in **ARTICLE II, Section 2.B.6. Major Remotes,** e.g., the Employer has contracted with an outside contractor for a remote production facility/truck to cover the EFP event, then the Union shall have jurisdiction over the production of such event in accordance with **ARTICLE II, Section 2.B.6. Major Remotes.**

**5.**    **ENG Microwave:**  It is agreed that employees who are represented by Local 45 shall operate microwave transmission equipment for ENG, except as provided in Supplementary Letter of Intent and Understanding No. 1 attached hereto and except as provided in **ARTICLE VII** of the 2011-2014 KPIX-IATSE Local 600 Agreement.

**6.**    **Major Remotes:**  The Employer may utilize the services of outside contractors to provide broadcast material, in whole or in part, for major remote events such as, but not limited to, parades, telethons, full-term sports telecasts, concerts, etc.  The parties specifically agree that where the Employer has contracted for a remote production facility/truck to cover the production of program material under the jurisdiction of this Agreement that such production shall be considered a major remote event for purposes of this **Section 2.B.6.**  However, the Employer shall have the right to assign technicians, on a non-exclusive basis, to the production of such major remote events.  In addition to outside contractors, the Employer may have station employees not represented by the Union perform functions otherwise covered by this Agreement for such major remove events.

Notwithstanding the above, the Employer agrees that fifty percent (50%) of the total number of individuals assigned to the production of major remote events (other than full term sports telecasts and Sales related remote productions) that are produced by KPIX-TV/KBCW-TV and aired exclusively on KPIX-TV/KBCW-TV, (e.g., KPIX-TV newscasts produced in the field with a remote production facility/truck) to perform duties which otherwise would be covered by this Agreement shall be either full-time or casual employees covered by this Agreement or the KPIX-I.A.T.S.E. Local 600 Agreement

In the event bargaining unit employees are assigned to major remotes, none of the penalty provisions of the Agreement, e.g., short-turnaround, night-turn differential, meal penalties, schedule change penalty, etc., other than **ARTICLE XIX - OVERTIME,** shall be applicable to such employees working at the major remote.  For example, no short-turnaround will result from any infringement on the rest periods on the workdays immediately before and after such assignment.

7.    Nothing in this Agreement shall be deemed to prohibit employees not covered by this Agreement from packing/unpacking equipment, transporting equipment, and running cable from location to location and checking the cable run for continuity.  In addition, employees not covered by this Agreement may assist technician(s) in technical set-up and/or tear down of equipment, at the request of the technician or management.

8.    **Previewing of Broadcast Material, Editing/Post Production of Broadcast Material:**

    **a.**    Individuals not covered by this Agreement may operate any technical equipment for the purposes of previewing any material, or for making edit decisions and shot sheets.

    **b.**    Except as specifically provided for in subparagraph e. below, the Union shall not have jurisdiction over the editing and/or post production of any material that is not news/sports/weather material produced by KPIX-TV/KBCW-TV covered under **ARTICLE II, Section 1.**, e.g., material not broadcast on KPIX-TV/KBCW-TV, non-news programming material such as entertainment material and public affairs material, commercials, promotional announcements, public service announcements, editorials, etc.

    **c.**    **Linear/Analog Editing Equipment:**  It is agreed that the editing of any news/sports/weather material under the exclusive jurisdiction of this Agreement,  including "voiceovers" and "voice-overs to sound", but not "packages", as these terms are understood in the trade, may be performed on "linear/analog" editing equipment by individuals who are not represented by Local 45.  No more than one employee who is not represented by Local 45 or IATSE Local 600 may be editing news "voice-overs" or "voice-overs to sound" at any given time.  Such individuals shall not be subject to any of the terms and conditions of this Agreement while, or as a result of, performing such work.  The editing of news/sports/weather material on "linear/analog" editing equipment shall not be performed by such individuals to the extent such editing becomes a majority of such individual's work time.

Should any regular full-time bargaining unit Employee employed as such as of July 5, 1993, who is assigned on a regular basis to news editing be laid off during the term of this Agreement, and still retain recall rights, the Company may no longer assign employees

who are not represented by Local 45 to the editing of "voice-overs" or "voice-overs to sound" on "linear/analog" editing equipment.

Editing, as used in this **Section 2.B.8.,** includes the use of switching and special effects, such as but not limited to wipes, dissolves, keying, titling and digital effects, in conjunction with the editing equipment.

      d.    **Non-Linear/Digital Editing Equipment:** Notwithstanding any other provisions in this Agreement, including but not limited to **ARTICLE II, Section 1.B. New Devices,** the editing and/or post production of any material, including but not limited to any news/sports/weather material (e.g., "voice-overs", "voice-overs to sound", "packages", etc.) may be performed without restriction on "non-linear/digital" editing equipment by individuals not covered by this Agreement. Such "non-linear/digital" editing may include dubbing material into a video/media file server or other "non-linear/digital" storage devices, and the creation or manipulation of electronic graphic/still store images as a part of the editing process. Such individuals shall not be subject to any of the terms and conditions of this Agreement, while, or as a result of, performing such work.

**C.**    **Productions Outside the Control of the Employer:** The Union shall not have jurisdiction over the production of any material where the Employer does not have control over the production of such material, e.g., sports events produced by the local team, programming where the Employer's access is limited by a third party, programming where exclusive rights to a pick-up have been granted by a third party to some other entity, programming where existing contractual arrangements involving third parties specifically sets forth exclusive control by others such as house jurisdiction.

**D.**    **Electronic Graphics:** For purposes of this Section, electronic graphics shall be defined to include all electronic image creation and manipulations devices, such as but not limited to, character generators, electronic palette/air systems, electronic animation systems, electronic weather illustration systems, electronic still store systems, and all ancillary equipment used therewith, _e.g._, cameras, switchers, etc.

The installation and maintenance of all electronic graphics equipment shall be performed by technicians except where such functions are provided by either the equipment vendor or specialized outside services. The operation of all equipment capable of electronic graphics functions, including but not limited to, composing, creating, entering, editing, storing, sequencing, sorting, cataloging, recording, and/or recalling, may be performed by individuals other than employees covered by this bargaining agreement.

Recalling of material for direct incorporation within programs produced through a control room production switcher may be performed by technicians or technical operators, or by individuals other than employees covered by this Agreement.

E.   **Electronic/Computer Equipment, Operation, Control and Data Transfer:**   The installation, maintenance and operation of electronic/computer equipment and/or systems, including but not limited to computer work stations, may be performed by individuals other than bargaining unit employees covered by this Agreement.  The Company may also assign bargaining unit employees to perform the installation and/or maintenance and/or operation of such equipment.

There shall be no restriction on the transfer by individuals other than Employees covered by this Agreement, or by equipment, of electronic/computer information among such equipment and other station equipment, including equipment that the Union otherwise would have exclusive jurisdiction to operate.  The Parties further agree that such transfer of electronic/computer information may include the transfer and implementation of machine control instructions, including machine control instructions among equipment. The transfer and implementation of machine control instructions shall specifically include, but shall not be limited to, loading, previewing, video/audio editing, preparing/cuing, recording/playback, routing control, antenna/receiver control, electronic graphic creation/manipulation, archive access/retrieval, handling magnetic/optical media, and recalling any material for on-air broadcast.  The Parties specifically acknowledge that this paragraph permits individuals not covered by this Agreement to operate any equipment by means of voice activation.  The Company agrees, however, that individuals who enter data into a computer work station that has the effect of operating equipment that the Union otherwise would have exclusive jurisdiction to operate shall be performed by such individuals only where such data entry supplements or is performed in connection with or is otherwise related to the normally assigned duties of that particular employee or of that employee's job title/position.

Notwithstanding the above, while the installation and maintenance of the electronic/computer equipment described in the above two paragraphs is non-exclusive, the Company recognizes the benefit of assisting Technicians in improving their knowledge and skills to enable them to perform certain kinds of maintenance on such electronic/compute equipment where, in the Company's sole judgement, it is practical and in the Company's best interest to do so.

Notwithstanding the above, Technicians shall continue to have exclusive jurisdiction over the operation of robotic/remote controlled equipment under the exclusive jurisdiction of this Agreement, whenever it is necessary to operate such equipment through control panels or input devices specifically dedicated to the equipment for its operation.  Moreover, Technicians shall have exclusive jurisdiction over the initial establishing of presets or the subsequent modification of presets for the above referenced robotic/remote controlled equipment, including the Master Control Switcher and related equipment in Master Control, except where such presets are initially established prior to installation by outside contractor or equipment manufacturer and/or prior to acceptance by the Employer.

F.   **Video/Audio File/Media Servers:**   The installation, maintenance and operation of video/audio file/media servers and all related and associated equipment may be performed by individuals other than Employees covered by this Agreement.  The Employer may also

assign Employees covered by this Agreement to perform the installation and/or maintenance and/or operation of such equipment.

The dubbing or transfer of any media into or out of video/audio file/media servers may be performed by individuals other than Employees covered by this Agreement.

**G.**   **Loading of Media:**  The loading of media into computer peripherals located in the Master Control/Telecine/Equipment Room area may be done by individuals other than technicians and technical operators.

**H.**   **Master Control Computerized System:**  See attached sideletter regarding Hubbing of Master Control.

**I.**   **Contract Services:**  The Company reserves the right to use the specialized knowledge, equipment, or skills of outside experts, or manufacturers or their representatives, for the installation, maintenance, and repair of equipment, or for the performance of other work required by this Agreement.  It is understood that this provision permits the Employer to utilize the services of outside contractors, consultants, integrators, design engineers, wiremen and installers to perform, in whole or in part, new equipment installations up to and including complete turnkey systems. It is also understood that this provision permits the Employer to utilize outside contractors, outside experts, and/or manufacturers or their representatives, to perform installation, maintenance, repair and operation of the Company's transmitter equipment. The Employer, in its sole discretion, may also utilize the skills of bargaining unit employees on an as needed basis.  The Company will make a reasonable effort to assist the technicians in improving their knowledge and skills, and will, whenever practical, utilize technicians to maintain the Station's technical broadcast equipment.

**J.**   **Supervisors:**  Nothing in this Agreement is to be construed so as to prevent technically qualified executives and supervisors from operating technical equipment for the purposes of installation and testing of new equipment (or major revisions of existing systems), training technicians, technical operators, stage managers, or technical trainees, and on-the-air operation during emergencies.  Any and all assistance for these executives shall be provided by an employee of the proper jurisdictional status covered by this Agreement.

In addition to the above paragraph, the Employer may assign designated, technically qualified management supervisors employed full time by KPIX Broadcast Operations and Engineering Department to operate studio ENG receiving equipment and satellite uplink equipment and its associated hardware, and in the performance of technical maintenance duties, provided, however, that such employees shall not perform such Bargaining Unit work covered by this paragraph to such an extent as to cause the layoff of any full time technician employed as of July 9, 1993, as the result of performing such bargaining unit work, nor to such an extent it becomes their primary job function.

In addition to the above paragraph, the Employer may assign technically qualified KPIX-TV/KBCW-TV management employees to perform the installation, maintenance, repair

and operation of the Stations' transmitter equipment and such work, being non-exclusive jurisdictional work, shall not count against the twenty-five (25) hour provision set forth below in <u>Section 2., Paragraph K. Non-Bargaining Unit Employee "Hands-On"</u>.

**K.**   **<u>Non-Bargaining Unit Employee "Hands-On"</u>:**   The Employer may assign designated, technically qualified employees of KPIX-TV/KBCW-TV to perform operations duties covered by this Agreement to supplement the staff of technicians, provided, however, that such employees shall not perform such Bargaining Unit work covered by this paragraph for more than a total of twenty-five (25) hours in any calendar week.  The above referenced twenty-five (25) hours shall be calculated in accordance with Supplementary Letter of Intent and Understanding No. 2. However, the Company may average the twenty-five (25) hours per week over a calendar quarter and still be in compliance with the twenty-five (25) hour weekly limitation. Therefore the Company could exceed the twenty-five (25) hour weekly limitation in a calendar week so long as it does not average in excess of twenty-five (25) hours per week during any calendar year quarter (13 weeks). No such employees shall be assigned to perform operations duties covered by this paragraph to the extent it becomes an employee's primary job function. Such employees shall not perform such operations work covered by this paragraph to such an extent as to cause the layoff of any full-time technician employed as of July 9, 1993, as the result of performing such bargaining unit work.

**L.**   **<u>Audio and/or Video Tape Recorders</u>:**   News Department employees other than technicians may operate audio/video tape recorders to record news material within the stations' News Department facilities, including changing tapes and operating source selection devices (e.g., tuner and routing switchers located at the video tape recorder).

**M.**   **<u>Audio Recording</u>:**   Notwithstanding any other provision contained in this Agreement, individuals not represented by the Union may operate all technical equipment necessary for making recordings or transcriptions that include their voices and/or the voices of individuals interviewed on the phone.  In the case of news materials, the recordings will be limited to the individual's own voice and/or the voice of the party being interviewed.  In all other situations, e.g., station promotion, commercials, public affairs, and program announcements, the recording of the individual's voice may also include music or sound effects.

**N.**   **<u>Tape Recordings</u>:**   Audio tape recorders of the type usually referred to as cubcorder, minitape, or magnotape may be operated without the services of a technician or technical operator.  Video tape recorders of the type available to consumers generally, and designed primarily for home use, may be utilized by non-technical employees of KPIX in their offices (or homes) to record off the air, or from non-broadcast equipment, and to play back program material for non-air uses in their respective offices, in the conference rooms, or outside the building.

**O.**   **<u>Mobile Radio-Telephone Equipment</u>:**   Mobile radio-telephone equipment owned by the Company may be maintained by technicians but may be operated without the services of a technician.

P.  **News Bureaus - Microwaving:**  When an employee represented by Local 45 is not readily available, employees not represented by Local 45 assigned to the news bureau (excluding clerical employees) may perform all functions necessary to operate a fixed microwave transmitter and media recording/storage/playback devices for the purpose of feeding material back to the stations.

Q.  **Aircraft:**  The Company may have all work performed in connection with aircraft, including but not limited to photography, the operation of television relay equipment/microwave equipment and the operation of audio and switching equipment, etc., performed by individuals employed by helicopter services, who shall not be deemed covered by this Agreement.

In the event the Company directly employs an individual to operate television relay equipment/microwave equipment; and/or operate audio and switching equipment; and/or aim and otherwise operate cameras, it is understood and agreed that such individual shall be a bargaining unit employee.

R.  **Broadcast Material From Other Entities:**  Nothing in this Agreement shall restrict the Company under a reciprocal arrangement, from utilizing any broadcast material, either live or taped, produced by entities other than KPIX-TV/KBCW-TV, e.g., radio and television stations, cable companies, etc. (including entities Viacom/CBS/Infinity or KPIX-TV/KBCW-TV may have an equity interest in), including any broadcast material which otherwise would be produced under the terms and conditions of this Agreement. However, the Company agrees that the utilization of broadcast material produced by an entity other than KPIX-TV/KBCW-TV, which except for this provision would otherwise be required to be produced under the terms and conditions of this Agreement, (e.g., microwaving and editing news material produced within the geographic jurisdiction of this Agreement to be broadcast exclusively over KPIX-TV/KBCW-TV assigned public reception frequency), shall not be utilized to such an extent as to cause the layoff of any full time technician.

S.  **Closed Captioning:**  The operation of closed captioning encoding equipment shall not be within the exclusive jurisdiction of the bargaining unit.  Installation and maintenance of closed captioning equipment located within KPIX-TV's/KBCW-TV's main studio building or transmitter shall be performed by bargaining unit employees, subject to the provisions contained in **ARTICLE  II, Section 2.H.**

T.  **Directorial Functions:**  The Union expressly acknowledges the Company's right to assign Employees, on a non-exclusive basis, to perform directorial functions, including in conjunction with simultaneously performing switching functions.

U.  **Video Switching:**  Notwithstanding any other provisions set forth elsewhere in this Agreement, Directors may switch preproduction.  In addition, Directors may switch news updates through the ENG room.  Furthermore, in the case of breaking news stories where an IBEW represented switcher is not readily available in the Company's opinion, a Director

may switch in such limited circumstances.  If an IBEW represented switcher subsequently becomes available, the Director shall cease such switching duties at that time.  Likewise, the Employer may, in its sole discretion, assign a bargaining unit Employee on a non-exclusive basis to both switch and direct such material.

**V.**     Notwithstanding anything set forth elsewhere in this Agreement, work performed by Technicians which is not within the exclusive jurisdiction of this Agreement, shall not become the exclusive jurisdiction of the Union solely as a result of those duties being performed on particular equipment and/or in any "technical area", "studio" or other location (e.g., "Post Production", Studio Control Rooms", etc.) unless otherwise specifically provided for in this **Article II**.  Moreover, work not within the exclusive jurisdiction of this Agreement may be performed by the individuals not covered by this Agreement on any equipment and/or in any "technical area", "studio" or other location (e.g., "post production", "studio control rooms", etc.) unless otherwise specifically provided for in this **Article II**.

**W.     Non-Exclusive Duties:**

**1.**     The Company shall have the right to assign bargaining unit employees to conduct news interviews.

**2.**     In addition, the Company shall have the right to assign to Technicians, on a non-exclusive basis, work which is not covered by this Agreement and is not within the exclusive jurisdiction of another collective bargaining Agreement.  Examples of such work includes, but is not limited to, work in connection with syndicated programming; cable programming, programming for television stations other than KPIX-TV/KBCW-TV; non-broadcast material such as sales presentations, awards presentations, making dubs that are not to be aired on KPIX-TV/KBCW-TV, etc. When the Company makes such an assignment, full-time staff Technicians shall be covered by all terms and conditions contained in this Agreement, e.g., they are not upgraded or downgraded when they perform such work.  The above specifically referenced examples of non-exclusive work may be assigned to employees other than bargaining unit employees.  If a casual employee performs no work under the exclusive jurisdiction of this Agreement on a particular work day, he/she shall not be deemed covered by this Agreement on those work days, even if such employee works as a casual under this Agreement on other work days.

**3.**     Employees of other television stations and/or networks may perform work for their own employer using any Company equipment or facilities.

**X.     Stage Managing Functions:**  Stage managing functions shall be defined as the following:

**1.**     The setting up, striking, and storing of all scenery, stage properties, miniatures, and other articles scheduled to be televised, after delivery to the studios by individuals not covered by this Agreement.  Positioning pneumatic audience bleachers in the two main studios.

**Exceptions:**

    **a.**    Art Department and/or Scene Shop employees may set up sets and make adjustments to same.

    **b.**    Art objects, jewelry or other such objects may be handled by personnel from a museum or art gallery, etc.

    **c.**    The placement and handling of props may be performed by individuals not covered by this Agreement.

**2.**    Stage managing of all live studio telecasts, whether such telecasts are released live or by delayed telecast.  Stage managing of all rehearsals and multi-camera studio auditions.

**Exceptions:**

    **a.**    Nothing in this Agreement shall prohibit the Director, Producer, or other studio control room personnel from cueing a Booth or Studio Announcer by means of the production interphone, IFB, tally lights and/or electronic signal systems.  Tally lights and cue lights and buttons on the audio console in the Studios and in MC may continue to be used as signal or cue devices to the talent.  Nothing in this Agreement shall be construed as requiring the use of a stage manager where talent cueing is accomplished by means of production interphone, IFB, tally lights and/or electronic signal systems.

    **b.**    Nothing in this Agreement shall be construed as requiring the use of a stage manager in connection with the broadcast of any EBS or Emergency Action Notification Announcement.

    **c.**    The Program interrupt System will continue to be operated as in the past.

    **d.**    The miking of talent or guests may be performed by individuals not covered by this Agreement.

**Y.**    **Studio/Control Room Automation Systems** – The Union shall not have exclusive jurisdiction over the operation of studio/control room automation systems utilizing robotic or remote control equipment, and there shall be no restriction on the Employer's use of such studio/control room automation systems, except as provided below in this paragraph. Studio/control room automation systems may be utilized to operate studio equipment such as, but not limited to, cameras, lights, audio, etc., even if the operation of such equipment is otherwise covered by this Agreement.  Technicians shall operate technical studio equipment covered by this Agreement when such equipment is not under the control of such automation system(s) (such as, but not limited to, times when the automation system has become inoperative or otherwise deactivated).  The loading of the initial robotic system preset coordinates on the control panels dedicated exclusively to the operation of robotic

cameras shall be performed by bargaining unit Employees. It is further understood that this paragraph permits employees other than Technicians to operate computer systems which control studio operations or technical equipment, which is otherwise the exclusive jurisdiction of Technicians.  This paragraph shall not affect the Union's jurisdiction over the installation, maintenance and repair of technical equipment as provided for in **ARTICLE II., Section 1. – Jurisdiction**.

Z.     **Writers/Satellite Coordinators/Production Assistants:**  The Company shall have the right to assign writers/satellite coordinators/production assistants employed under the KPIX-TV/IBEW Agreement to perform any work under the jurisdiction of this Agreement, provided such employees are paid at least the minimum scale applicable to such work under this Agreement.

AA     **Audio/Video Transmission** – The Union shall not have exclusive jurisdiction over audio/video transmission that use internet protocol, or that use cellular or mobile services including but not limited to 3G, 4G, broadband wireless networks, or other similar types of transmission, as the means of transmission back to KPIX-TV, e.g., IBEW/IATSE represented employees and/or non-IBEW/IATSE represented employees may transmit material back to KPIX-TV via the use of internet protocols or cellular/mobile services or broadband wireless networks, etc.  It is understood, however, that the IBEW shall have exclusive jurisdiction over traditional satellite and microwave technologies that originate from the Station's satellite/microwave trucks.

**Section 3. - Scope and Intent**:  **Sections 1. and 2.** above represent an endeavor to spell out the more important elements of the Company's past and current practice.  Except as otherwise expressly provided in this Agreement, it is not the intent of either party, and nothing herein contained shall be deemed, to amend, alter, expand, or lessen the historic work jurisdiction of the technicians, technical operators, and stage managers.

**ARTICLE III - DELETED.**

**ARTICLE IV - INTERCHANGEABILITY**

The Employer shall have the right to assign an employee permanently assigned the job classification of technician to perform the functions of a technician, a technical operator, and/or a stage manager.

The Employer shall have the right to assign an employee permanently assigned the job classification of technical operator to perform the functions of technical operator, stage manager, and/or technician.  When a technical operator is assigned to perform the functions of a technician, he or she shall be temporarily upgraded in accordance with **ARTICLE XXV** herein.

The Employer shall have the right to assign an employee permanently assigned to the job classification of stage manager to perform the functions of a technician, a technical operator, and/or stage manager.  When a stage manager is assigned to perform the functions of a technical operator or a technician, he or she shall be temporarily upgraded in accordance with **ARTICLE XXV.**

Each and every function performed by technicians, technical operators, and stage managers covered by this Agreement shall be completely interchangeable among each and every technician, technical operator or stage manager in that any technician, technical operator or stage manager may be assigned to perform any and all functions encompassed by **ARTICLE II** herein during any single workday, without regard to whether such employee would have, prior to the effective date of this Agreement, performed different job functions.

## ARTICLE V - RECOGNITION

The Company recognizes the right of its employees to organize and bargain collectively through representatives of their own choosing.  The Union is hereby recognized as the collective bargaining representative for all technicians, technical operators, and stage managers, as defined in Article II, employed by the Company during the term of this Agreement.

## ARTICLE VI - CONFERENCES

The Company agrees to meet and confer with representatives of the Union, at reasonable times, on any and all questions or matters relative to the terms and conditions of this Agreement.  Should any employee, acting in an official capacity as a steward or officer representing the Union, confer with the Company during his or her regular working hours, he or she may do so without loss of time or pay.

Representatives of the Employer and representatives of the Union shall meet at least once every three (3) months, unless waived by mutual consent, to discuss subjects of mutual concern or interest that may arise during the term of this Agreement or matters necessary to the implementation of this Agreement.  Both parties shall submit written items for the agenda to the other normally not less than fourteen (14) days before the scheduled date of a meeting, but discussions need not be restricted to items on such written agendas.  Any statement or positions of any party at such meetings shall not be utilized for any purpose during any subsequent grievance or arbitration proceedings.

## ARTICLE VII - UNION MEMBERSHIP

A.      Membership in the Union, after the thirtieth (30) day following the beginning of employment or the effective date of this Agreement, whichever is later, shall be a condition of employment.  The Company agrees to notify the IBEW of any new hires or status changes of existing employees on a regular on-going basis.  The parties will attempt to update this information monthly.

B.      The Company shall be obligated, under this Article, to terminate, within fourteen (14) calendar days, the employment of any employee, by reason of his or her failure to obtain or maintain membership in the Union, as required by this Article, upon receipt of written request by registered mail for such termination from the Union; except that the Company shall have the right to refuse such request if it has reasonable ground for believing: (1) that such membership is not available to the employee on the same terms and conditions

generally applicable to other members, or (2) that membership has been denied or terminated for reasons other than the failure of the employees to tender the periodic dues and initiation fees uniformly required as conditions of acquiring or retaining membership.

C.   The Union agrees to indemnify and save harmless the Company for any payment the Company may be required to make, by order of any governmental agency or court of law, in favor of any employee whose service is terminated solely pursuant to any such written request.

D.   **Dues Check-off:** Any Technician who wishes to have the Employer deduct the amount of monthly Union membership dues, but not payments toward initiation fees or assessments/fines, from his/her pay for transmittal to the Union shall execute an authorization card to be furnished by the Union in the form prescribed.  Such authorization shall automatically cancel any prior deduction authorization executed by such Technician. The amounts of monthly Union memberships dues will be certified to the Employer in writing from time to time by the Financial Secretary of the local union.  A certification from said Financial Secretary, which changes the amount of said dues, shall become effective no later than the first day of the month following a period of thirty (30) days from the date the Employer received such certification.

Authorization for deductions of dues which are executed in the form prescribed on or after the effective date of this Agreement may be revoked by a Technician by a written notice to the Employer and the local union by registered U.S. mail, return receipt requested, not less than ten (10) days prior to the expiration of each one (1) year period of authorization. Such revocation shall be effective with respect to the deduction which would otherwise have been made immediately after such revocation.  A newly-executed authorization signed by the Technician shall be required, if he/she desires to replace an authorization under which deductions have terminated in accordance with the provisions hereof.  It is understood and agreed that the Employer assumes no responsibility or liability for deducting such dues/amounts other than that of collecting the amounts indicated from each individual's earnings for the designated payroll period and promptly remitting to IBEW Local 45 the amounts so deducted.

It is agreed that a written assignment in the following form (or in a form substantially the same as the following form) will be acceptable for the purposes of this Agreement:

I hereby authorize and direct KPIX-TV/KBCW-TV to deduct from my pay Union dues in the amounts fixed in accordance with By-Laws of Local Union No. 45 and the Constitution of the International Brotherhood of Electrical Workers and pay same to said Local Union in accordance with the terms of the bargaining agreement between the Employer and the Union.

In consideration of the Employer following the above instructions, I absolve the Employer from any liability in connection therewith, other than being responsible for the sums collected until they have been paid to the Financial Secretary of the Union.

This authorization shall be irrevocable for a period of one year from the date hereof or until the termination date of said agreement whichever occurs sooner and I agree that this authorization shall be automatically renewed and irrevocable for successive periods of one year unless revoked by written notice to you and the Union not less than ten (10) days prior to the expiration of each one year period, or of each applicable bargaining agreement between the Employer and the Union, whichever occurs sooner.

**Signature** _____

**Date** _____

## ARTICLE VIII - NEW EMPLOYEES

When new or additional technicians, technical operators, or stage managers are needed, the Employer shall notify the Union of the number and classifications of employees needed, and the Union shall have two (2) working days from receipt of notice to refer applicants for the vacancies hereunder to employ only those applicants referred by the Union.

The Employer agrees, within seven (7) days of the date of hiring, to notify the Union of the name or names, addresses, classification, and rate of pay of all new employees hired.

In applying the above provisions, it is agreed that the parties will adhere to existing statutes which make preference or discrimination in hiring based upon membership or non-membership in the Union an unfair labor practice.

## ARTICLE IX - NON-DISCRIMINATION

The Union and the Employer agree that each party shall comply with local, state and federal statutes and regulations governing employment discrimination.  Nothing in this Agreement shall operate or be construed to restrict the Company in any manner whatsoever in complying with its obligations under the Americans With Disabilities Act.  After the Company determines that an accommodation will be made for a qualified person with a disability, as defined in the Americans With Disabilities Act, where such person is or will be a member of the bargaining unit, the Company will discuss the accommodation in advance with the Union prior to implementation.  Where a necessary accommodation for a qualified individual with a disability, as defined in the Americans With Disabilities Act, requires that such individuals be provided with either full or part-time assistance from persons not already members of the bargaining unit, such persons will not be considered members of the bargaining unit or otherwise covered by the terms and conditions of the collective bargaining agreement, as the result of providing such assistance.  The Employer will post all regular job openings, full-time and part-time, when such openings occur.

## ARTICLE X - NO STRIKE OR LOCKOUT

**A.**     The Union agrees that, during the existence of this Agreement, the Union, its representatives and agents, and the technicians, technical operators, and stage managers

shall not call, support, or participate in any strike, sympathy strike, work stoppage, picketing, sit-down, slow-down, or any refusal to enter the Company's premises, or any other interference with any of the Company's services or operations wherever situated, whether or not the prohibited conduct is caused by a dispute with the Company, is in sympathy for a dispute with the Company or any other employer by employees of the Company not covered by this Agreement or employees of any other employer, or is caused by any other reason.  The Union will order its members not to engage in the conduct proscribed in this Article and will order its members to perform their obligations under this Agreement.  The Company agrees that during the existence of this Agreement, it will not engage in a lockout.

B.     In no case shall any technician, technical operator, or stage manager engage in the prohibited conduct described above by reason of the reception, broadcast, and transmission by the Company of television or radio programs on which persons are used who are employed by an employer other than the Company, irrespective of whether such programs originate at the point at which IBEW or others are striking, are transmitted to a point at which IBEW or others are striking, or are broadcast over the Company's facilities on behalf of a sponsor or agency against whom IBEW or others are striking.

C.     The Union waives the rights of the technicians, technical operators, and stage managers within the bargaining unit to engage in a strike or honor a picket line.  If a technician, technical operator, or stage manager encounters a strike or picket line in any circumstance, whether it is located at KPIX-TV/KBCW-TV or elsewhere, including at the site of a news or program event, and whether it is established by the Union or some other union or other employees, and whether it involves some other operation of the Company or not, the technician, technical operator or stage manager shall not strike or engage in any other work stoppage and shall cross the picket line and perform his or her assigned duties.

D.     Employees shall not be required to go to any other radio or television station, studios, transmitter, or property where a strike of radio or television employees is in progress to perform struck work to a greater extent than prior to the strike, nor shall employees be required to handle additional programs over the Company's facilities, for transmittal to others, that would be occasioned because others are striking at another station.

E.     The Union agrees that in the case of a strike by another union against the Company, the Union will not issue any order to its members employed by KPIX-TV/KBCW-TV to respect such a picket line.

F.     The Union and the Company agree that any alleged violation of this Section may be immediately submitted to arbitration pursuant to **ARTICLE XII** of this Agreement.

G.     The Union and the Company further agree that any alleged violation of this Section may be the subject of judicial action, without reference to **ARTICLE XII** of this Agreement, to maintain the status quo and to compel arbitration.

**Section 2. - Procedure:**

A.      Both the Union and the Employer may initiate grievances, except that the parties agree that, in recognition of the difficulty of establishing facts, any grievance must be brought to the attention of the other party by the aggrieved party within thirty (30) calendar days of the event which gives rise to the grievance, or any such grievance shall be deemed not to exist, unless the event could not reasonably have been discovered within such period.

B.      All grievances shall be in writing, setting forth the facts and the applicable part of this Agreement upon which the grieving party relies.

C.      The Union and the Employer shall meet and confer with respect to grievances as soon as possible.   All grievances shall first be taken up for adjustment between designated representatives of the Employer and the Union.

**Section 3. - Arbitration:**   Should the Union and the Company fail to settle any grievance, either party must refer the matter to arbitration within thirty (30) calendar days (five (5) calendar days in case of discharge) of the final meeting under **Section 2. C.** above in order for the matter to be subject to arbitration.   Such arbitration shall be conducted under the rules of the American Arbitration Association, as amended, and in effect July 1, 1958 (and which have remained in effect until the effective date of this Section), except that:

A.      No arbitrator shall be appointed by the Association who has not been approved by both parties, unless and until the parties have had submitted to them at least three (3) lists of arbitrators from the Association's panels, and have been unable to select a mutually satisfactory arbitrator therefrom.

B.      No modification of such Rules of the Association shall be controlling in any arbitration proceeding under this Agreement without mutual agreement in writing by the Company and the Union, except that both parties will comply with modifications to the extent that they involve the amount of the administrative fees of the Association.

**Section 4. - Costs:**   Each party shall bear its own expenses in presenting its case to the arbitrator. The arbitrator's fee and any administrative expense he or she may incur shall be shared equally by the Employer and the Union. Either party may have a reporter present to record the proceedings, and it shall pay for same; or, if mutually agreed upon, such cost may be borne equally. If the arbitrator desires a copy of the transcript, each party agrees to pay one-half the cost of such transcript copy.

**Section 5. - Hearing and Decision:**   Subject to the right of the parties to agree on the time and place of the arbitration hearing, the arbitrator shall, within five (5) days following the request for formal arbitration, by written notice to the parties, set the time and place of the arbitration hearing, which shall be held not less than ten (10) or more than thirty (30) days following the formal request for arbitration. The arbitrator shall proceed to hear the case and make his/her decision as speedily as possible. The decision or award of the arbitrator shall be in writing, and a copy thereof shall be

sent to the Company and the Union. Such decision or award shall be final and conclusive upon the parties hereto, except that neither party shall be bound by any such decision which is contrary to law.

The arbitrator shall have jurisdiction to determine only the issue presented to him or her by the request for arbitration. The arbitrator shall in all respects be bound by the terms of this Agreement and shall have no jurisdiction to determine any issue not covered by the provisions of this Agreement.

**Section 6. - Right to Counsel:** Each party shall have the right to appear, represented by counsel, and to present evidence subject to the right to cross-examination. Each party shall have the right to present arguments at the close of evidence, orally and/or in writing, as it elects. The decision of the arbitrator shall be in writing and signed by him/her.

**Section 7. - No Retaliation:** No punitive action will be taken against any employee because of testimony which he/she may give in an arbitration proceeding under this Agreement.

**Section 8. - Expiration of Agreement:** Any "grievance" filed after the expiration of this Agreement shall not be subject to grievance and arbitration, notwithstanding that the grievance might involve the interpretation or application of this Agreement, or that the events giving rise to the grievance occurred prior to the expiration of this Agreement, unless the Union or Company can establish that the events giving rise to the grievance did occur prior to the expiration of this Agreement and that the Union or Company did not know prior to the expiration of this Agreement that the grievance had arisen.

## ARTICLE XIII - WORK WEEK - WORK DAY

**Section 1. - Work Week:** The regular work week shall consist of seven (7) days starting at 12:01 a.m. Sunday until 12:00 p.m. midnight the following Saturday; and shall consist of no more than forty (40) hours, or five (5) consecutive eight (8) hour days, followed by the rest periods indicated, and two (2) full days off.

Technicians, technical operators or stage managers assigned to vacation relief shall work in the shift pattern of those technicians, technical operators or stage managers on vacation, when there are any on vacation. When a technician, technical operator or stage manager is scheduled to one of these vacation relief shifts, he/she may, when necessity demands, be scheduled to more than five (5) consecutive days of work without penalty to the Employer, provided that, in any event, he or she shall have two (2) consecutive days off in any calendar week. Saturday followed by Sunday shall be considered consecutive days off.

**Section 2. - Work Day:** A work day shall consist of eight (8) hours of actual work, exclusive of any unpaid meal period if assigned. Work starting on one calendar day and continuing into the next calendar day (whether scheduled in that manner or occasioned by addition of overtime), shall have all hours worked attributable to the first day and shall be considered as one work day.

## ARTICLE XIV - MEAL PERIODS AND MEAL PENALTIES

Meal periods shall consist as follows:

A.    The Company will assign employees an unpaid meal period of not less than thirty (30) consecutive minutes nor more than sixty (60) consecutive minutes in duration. In situations where employees are unable to be relieved of duty due to the nature of their job duties, the Company may assign such employees to have an "eat on the job" meal period, in which event such employees' work day shall consist of eight (8) elapsed hours. [See Supplementary Letter of Intent and Understanding No. 17]  In the event California law changes to allow "eat on the job" meals regardless of whether employees are unable to be relieved of duty, then the Company shall have the right to assign an "eat on the job" to any employee covered by this Agreement.

B.    Where an unpaid meal period is assigned, an employee's work day shall be extended by an equivalent period, and the Company shall not incur overtime liability as a result of assigning an unpaid meal period, e.g., overtime would not be required until after an employee has actually worked in excess of eight (8) hours.

C.    In the event that an employee receives less than his/her assigned unpaid meal period, the employee shall be paid overtime at the rate of one and one-half (1-1/2) times his/her straight time rate, in one-quarter (1/4) hour segments, for such portion of the unpaid meal period actually worked except that such overtime shall be reduced or eliminated where the Company shortens an employee's scheduled work day on the day the meal period is not allowed in full.  The Company will not assign unpaid meal periods during the first two (2) hours of an employee's workday.

D.    When the work day is increased through contiguous overtime so that the hours actually worked by an employee are in excess of twelve (12) hours, the Company shall assign a second unpaid meal period of not less than thirty (30) minutes nor more than sixty (60) consecutive minutes in duration to be completed usually by no later than the end of the seventh (7th) hour after completion of the first unpaid meal period.  Alternatively, in situations where employees cannot be relieved of duty due to the nature of their job duties, the Company may assign a second "eat-on-the-job" meal period in accordance with, and subject to, the provisions of subparagraph A above.

## ARTICLE XV - WORK SCHEDULES

A.    Employees shall be given seven (7) days advance notice of any changes affecting an Employee's scheduled day(s) off.  The schedule may be changed by the addition of overtime, at the beginning or the end of a shift, without incurring a schedule change penalty.  Work schedules shall show time in and time out.  The start/end time of any shift may be altered on twelve (12) hours notice prior to the originally scheduled start time of the affected shift, or prior to the end of an employee's work day immediately preceding the work day being changed, whichever notice period is less.  Changing an employee's meal period from an "eat-on-the-job" meal period to an unpaid meal period, or expanding the length of an employee's unpaid meal period such that an employee's end time is made later,

may only occur where notice of such change is made prior to the end of an employee's work day immediately preceding the work day being changed.

**B.** **Penalty:** Except as provided in Paragraph A. above, when an Employee's off days are changed on less than seven (7) days notice or when an Employee's start/end time on any scheduled shift is changed without the notice required in Paragraph A., the employee affected shall receive, in addition to any other compensation, a penalty in the amount of half-time for all time worked outside of his/her previously assigned work schedule, except where changes are occasioned by absence of another employee, but in no case shall such exception apply to individual cases of absence extending more than seven (7) days. This means that the Company will not be penalized because there is less than seven (7) days notice from an employee who is returning to work after an absence.

## ARTICLE XVI - CALL-IN AND CALL-BACK

A call-back shall be defined as requesting an employee to return to work following a regular or overtime day with hours attributable to that work day.

A call-in shall be defined as requesting an employee to work on a day not a regular work day (e.g., a day off).

A call-back shall be for a period of not less than four (4) hours for work not contiguous with a regular or overtime work day.

A call-in shall be for a guaranteed minimum period of four (4) hours. All hours worked on a call-back or call-in shall be at time and one-half. Short turnaround penalty will not apply to a minimum four (4) hour call-back.

## ARTICLE XVII - DAYS OFF

**A.** Except as provided in **Supplementary Letter of Intent and Understanding No. 4** attached hereto, two (2) consecutive days off will be given each employee at the end of the work week. A day off shall be twenty (20) hours, preceded by a ten (10) hour rest period, and two (2) days off shall be forty-eight (48) hours, preceded by a ten (10) hour rest period.

**B.** **Penalty:** For any hours worked by an employee on his/her assigned days off, compensation will be at the rates specified in **ARTICLES XVI and XIX**, and for a minimum of four (4) hours. The minimum of four (4) hours is inapplicable if such work is contiguous with a regular work day.

## ARTICLE XVIII - SHORT-TURNAROUND, REST PERIOD

**A.** No employee shall be assigned to work until ten (10) hours shall have elapsed since his/her other last previous assignment, including overtime, regular or irregular, scheduled or unscheduled, unless paid as provided in **Paragraph D.** below.

B. The ten (10) hour rest period between assignments shall be applicable whether occurring:

  **1.** between work on days normally considered regular work days;
  **2.** between work on a regular work day and work on a first "day off";
  **3.** between work on a "day off" and work on a "day off";
  **4.** between work on a "day off" or vacation and work on a regular day.

C. Employees will be given ten (10) hours rest and twenty (20) hours off preceding work on the "second day off".  If this thirty (30) hour span is encroached upon, a penalty will be paid as provided in **Paragraph D.** below.

## ARTICLE XIX - OVERTIME

Employees shall be paid at overtime rates for work performed as follows:

A. Time and one-half for work in excess of forty (40) hours in any one work week.

B. Time and one-half for hours worked on a regular work day in excess of eight (8) hours per day; double time for hours actually worked on a regular work day in excess of twelve (12) hours per day, except that this double time provision shall not be applicable when an Employee is on an overnight assignment outside the geographic jurisdiction of this Agreement.

C.

  **1.** **Sixth Day:**  Time and one-half for the first twelve (12) hours actually worked on a sixth (6th) work day in any one work week.  Double time for hours actually worked in excess of twelve (12) hours on a sixth (6th) work day in any one work week, except that this double time provision shall not be applicable when an Employee is on an overnight assignment outside the geographic jurisdiction of this Agreement.

  **2.** **Seventh Day:**  Time and one-half for the first eight (8) hours actually worked on a seventh (7th) consecutive day in any one work week.  Double time for hours actually worked in excess of eight (8) hours on a seventh (7th) consecutive work day in any one work week, (where the sixth (6th) consecutive day was also actually worked), except that this double time provision shall not be applicable when an Employee is on an overnight assignment outside the geographic jurisdiction of this Agreement.

  **3.** **Eighth Day:**  An eighth (8th) consecutive work day shall be construed as the first work day of a new work week and shall be at straight time.

D. Overtime shall not be considered as base pay for determining penalty rates; however, overtime may be cumulative with a penalty and a penalty may be cumulative with a penalty.

E.      Overtime and penalty payments shall be made no later than the pay day of the third week following the work week during which the overtime work was performed or the penalty was incurred.   Nothing in this Agreement shall be construed to restrict the Company from compensating Employees on a bi-weekly or semi-monthly basis.

## ARTICLE XX - TYPES OF EMPLOYEES

A.      **Regular Full-Time Employees:**  Regular full-time employees are those employees who have been employed full-time for more than one-hundred and eighty (180) days and who are employed on a full-time basis (i.e., eight (8) hours per day, five (5) days per week, as defined in Article XIII).

B.      **Casual Employees:**  The Company has the right to utilize "casual employees" to perform duties covered by this Agreement for purposes which shall include, but not be limited to, the following:

1.      Vacation Relief
2.      Payback Relief concerning holidays
3.      Sick Relief
4.      Leave of Absence Relief
5.      Jury Duty Relief
6.      Military Leave Relief
7.      Special Events Coverage
8.      Staff supplements for periods not to exceed six (6) consecutive months (e.g., construction, program pilots and/or new shows).
9.      Covering shifts that are not covered by regular full-time Staff Employees.

Casual employees shall be compensated at no less than the minimum rates set forth in this Agreement applicable to the classification in which the casual Employee is employed. Casual Employees employed for periods of less than a full week shall be compensated on a pro-rata basis with a minimum call of four (4) hours.

Casual employees shall acquire no rights as to seniority, reemployment, termination notice and/or severance pay, except that in the case of a casual employee who is subsequently hired as a full-time regular employee, his/her seniority shall include any period of continuous full-time casual service that immediately preceded his/her employment as a full-time regular employee for purposes of applying the applicable provisions of this Agreement for which seniority is a factor.

Casual employees have no rights whatsoever to further employment beyond the duration of any specific temporary assignment for which they are hired.  Casual employees can be terminated at any time, including while on temporary assignment, for any reason whatsoever, and such terminations shall not be subject to grievance or arbitration.

In addition to the above, the following provisions of this Agreement will not be applicable to casual employees:  **ARTICLE XIII - WORK WEEK-WORK DAY, Sections 1, 2;**

**ARTICLE XV - WORK SCHEDULES; ARTICLE XVI - CALL-IN AND CALL-BACK; ARTICLE XVII - DAYS OFF; ARTICLE XXI - INDUSTRY CREDIT; ARTICLE XXIX - VACATIONS; ARTICLE XXX - SENIORITY; ARTICLE XXXI - LAYOFFS; ARTICLE XXXII - REHIRE; ARTICLE XXXIII - DISCHARGE; ARTICLE XXXIV - LEAVES OF ABSENCE; ARTICLE XXXV - SICK LEAVE; ARTICLE XXXVI - PENSION AND INSURANCE AND SAVINGS PLAN; and ARTICLE XXXVIII - JURY DUTY** (except to the extent required by Federal or State law). Casual employees who are employed on a full-time basis for more than two (2) consecutive weeks shall thereafter be subject to the provisions in **ARTICLE XIII - WORK WEEK-WORK DAY, ARTICLE XVI - CALL-IN AND CALL-BACK**, and **ARTICLE XVII - DAYS OFF**, so long as they remain continuously employed on a full-time basis. Casual employees, however, shall work under all other conditions provided in this Agreement.

Casual employees shall not automatically become regular full-time employees should their employment exceed one hundred eighty (180) days. However, casual employees will be given consideration for regular employment should openings occur. However, no casual employee may be continuously employed on a full-time basis for a period longer than twelve (12) months.

The Company agrees, in lieu of all benefits for casual employees, to pay each casual employee a premium of five percent (5%) above his/her applicable base pay. If a casual employee is employed during any calendar year for more than one thousand forty (1040) hours, the Company agrees to thereafter increase the above referenced premium to ten percent (10%) of that particular employee's applicable base pay. In the event the Company is required by law to make contributions to provide, in whole or in part, medical benefits for casual employees, the Company shall not be required to also pay the above referenced percentage premiums.

It is agreed that the Company shall once each month transmit to the Union a report on the use of casuals. This report shall include the casuals name, hourly rate of pay and gross monthly wages.

## ARTICLE XXI - INDUSTRY CREDIT

The Company shall have the right to determine a weekly salary for a newly-hired or transferred employee, commensurate with experience and background. The rate assigned such employee will not be less than the minimums set forth in Article XXII, provided, however, that industry experience shall be recognized for technicians as follows:

A.     **Radio:**  One (1) month's service credit for each year of experience in radio, up to a maximum of six (6) months service credit.

B.     **Television:**   Full service credit for all television experience, up to a maximum of twenty-four (24) months service credit.

C.    The maximum service credit required to be recognized by the Company, under any combination of A. and/or B. above, shall be twenty-four (24) months.

## ARTICLE XXII - COMPENSATION

The Employer agrees to pay each employee on the basis of the following minimum weekly salary which would be applicable to the particular employee:

|  | 07/22/2017 | 07/22/2018 | 07/22/2019 |
|---|---|---|---|
| **A. Maintenance** | | | |
| Lead | -$1,644.87 | $1,677.77 | $1,711.33 |
| 0-1 year | $1,379.57 | $1,407.16 | $1,435.31 |
| 1-2 years | $1,432.63 | $1,461.28 | $1,490.51 |
| 2-3 years | $1,485.69 | $1,515.41 | $1,545.71 |
| 3 or more years | $1,538.75 | $1,569.53 | $1,600.92 |
| **B. Photographers** | | | |
| Lead | $1,591.81 | $1,623.65 | $1,656.12 |
| 0-1 year | $1,326.51 | $1,353.04 | $1,380.10 |
| 1-2 years | $1,379.57 | $1,407.16 | $1,435.31 |
| 2-3 years | $1,432.63 | $1,461.28 | $1,490.51 |
| 3 or more years | $1,485.69 | $1,515.41 | $1,545.71 |
| **C. Technical Director** | | | |
| Lead | $1,591.81 | $1,623.65 | $1,656.12 |
| 0-1 year | $1,273.45 | $1,298.92 | $1,324.90 |
| 1-2 years | $1,379.57 | $1,407.16 | $1,435.31 |
| 2-3 years | $1,432.63 | $1,461.28 | $1,490.51 |
| 3 or more years | $1,485.69 | $1,515.41 | $1,545.71 |
| **D. ENG** | | | |
| Lead | $1,485.69 | $1,515.41 | $1,545.71 |
| 0-1 year | $1,273.45 | $1,298.92 | $1,324.90 |
| 1-2 years | $1,326.51 | $1,353.04 | $1,380.10 |
| 2-3 years | $1,379.57 | $1,407.16 | $1,435.41 |
| 3 or more years | $1,432.63 | $1,461.28 | $1,490.51 |
| **E. Master Control** | | | |
| Lead | $1,538.75 | $1,515.41 | $1,545.71 |
| 0-1 year | $1,273.45 | $1,298.92 | $1,324.90 |
| 1-2 years | $1,326.51 | $1,353.04 | $1,380.10 |
| 2-3 years | $1,379.57 | $1,407.16 | $1,435.31 |
| 3 or more years | $1,432.63 | $1,461.28 | $1,490.51 |
| **F. Studio Technicians** | | | |
| Lead | $1,379.57 | $1,407.16 | $1,435.30 |

|              |             |             |             |
|--------------|-------------|-------------|-------------|
| 0-1 year     | $1,167.33   | $1,190.68   | $1,214.49   |
| 1-2 years    | $1,220.39   | $1,244.80   | $1,269.69   |
| 2-3 years    | $1,273.45   | $1,298.92   | $1,324.90   |
| 3 or more years | $1,326.51 | $1,353.04 | $1,380.10   |

**G. Editors**

|              |             |             |             |
|--------------|-------------|-------------|-------------|
| Lead         | $1,379.57   | $1,407.16   | $1,435.31   |
| 0-1 year     | $1,167.33   | $1,190.68   | $1,214.49   |
| 1-2 years    | $1,220.39   | $1,244.80   | $1,269.69   |
| 2-3 years    | $1,273.45   | $1,298.92   | $1,324.90   |
| 3 or more years | $1,326.51 | $1,353.04 | $1,380.10   |

**H.**   **Minimum Rates:** All rates of pay set forth above constitute minimum rates of pay, and the Company shall be free to pay any employee(s) at rates in excess of those stated above. The Union will be informed of the name and rate of pay of any employee(s) paid at a higher rate than those set forth above.

**I.**   **Current Employees:**

1. All full-time and casual Employees actively employed on July 22, 2017 shall receive a 2% increase in their base pay effective July 22, 2017, unless the individuals wage is less than the applicable wage set forth above.  In that event the wage increase shall not be less than the 2%.

2. All full-time and casual Employees actively employed on July 22, 2018 shall receive a 2% increase in their base pay effective July 22, 2018, unless the individuals wage is less than the applicable wage set forth above.  In that event the wage increase shall not be less than the 2%.

3. All full-time and casual Employees actively employed on July 22, 2019 shall receive a 2% increase in their base pay effective July 22, 2019, unless the individuals wage is less than the applicable wage set forth above.  In that event the wage increase shall not be less than the 2%.

4. Definition of Base Pay: "Base Pay for all full-time and casual employees actively employed as of the ratification of this agreement shall be their current base pay rate as of the ratification of this agreement, plus the percentage increases as they become effective during the term of this Agreement.  It does not include any additional overscale payments or increases granted to the individual technician during the term of this Agreement. By way of example, a technician that earned $1622.40 per week as of the ratification of this Agreement would have their base pay increased to $1654.85 effective July 22, 2017; effective July 22, 2018 to $1687.95 and effective July 22, 2019 to $1721.71.  In the event that the current full-time or casual employee received any other increases to their base rate during the term of the Agreement and these additional monies increased their base pay beyond the compensation they would earned based on annual two percent (2%) increase based on their base pay in effect as of the ratification of this agreement, than there would be no additional

increase due.  Any wage increase beyond these required increases are subject to individual bargaining between the Company and the technician.

**J.**     All prescribed base rate increases based upon length of service, as specified in this Agreement, shall become effective on the anniversary dates and ~~the six-month dates~~ as specified in the escalator.

**K.**     **Job Classifications:**  During the 2014 negotiations for a new Agreement the parties agreed to modify job classifications and rates of pay to properly reflect the current job duties and classifications. Nothing in this **ARTICLE XXII, Section K** shall be deemed to expand or restrict the jurisdiction of this Agreement as defined in **ARTICLE II - JURISDICTION AND NON-JURISDICTION.**

## ARTICLE XXIII - DELETED

## ARTICLE XXIV - DELETED

## ARTICLE XXV - TEMPORARY UPGRADING

**A.**     In the event that an employee is temporarily transferred (up-graded) to a higher-paid classification than that to which he/she is regularly assigned, he/she shall be paid at the normal wage scale for such higher classification during the actual period of such upgrading. For example, if an employee permanently assigned the job classification of technical operator is temporarily upgraded to the classification of technician, such employee shall be paid at the minimum technician rate for each hour or fraction thereof actually worked in the upgraded classification.  However, a technical operator shall not be deemed temporarily upgraded to a technician when a technical operator is being given training as a technician and is not acting without immediate supervision.  Similarly, a stage manager shall not be deemed temporarily upgraded to a technical operator or a technician when a stage manager is being given training as a technical operator or technician and is not acting without immediate supervision.

**B.**     A meal period or in-shift illness relief shall not be deemed to be such an assignment on a temporary basis.

**C.**     In no event, however, is an employee to receive less than his/her regular wage scale during his/her regular work week, if assigned temporarily to a lower classification than his or her regular status.

## ARTICLE XXVI - NIGHT SHIFT PREMIUM

Any employee who works between the hours of 12:00 midnight and 5:00 a.m., in any day, shall receive an additional twenty percent (20%) of his/her straight time base rate (calculated on the basis of a forty (40) hour work week) for all hours actually worked during the aforementioned period.  The night shift premium shall be prorated on the basis of increments of one quarter (1/4) hour for time worked less than one hour.

## ARTICLE XXVII - TRANSPORTATION, TRAVEL TIME AND ALLOWANCES; TRAINING

**A.**    If an employee is required by the Company to work or carry out his/her duties at more than one place in the same day, the Company shall furnish reasonable transportation.

**B.**    **Travel Expenses:**  The Company agrees to reimburse each employee for all actual, incidental, reasonable, and necessary expenses incurred and authorized by the Company, in connection with the employee's duties away from his or her normal place of assignment.

**C.**    **Expense Payments:**  All expenses incurred under this Article shall be reimbursed within one (1) month after such expenses are accurately reported and submitted to the Company on standard expense report forms.

**D.**    **Use of Employee's Car:**  Employees covered by this contract will not be required to use their own automobiles on Company business.  However, those who do agree to use their own vehicles for Company business shall be compensated at the same rate as are other employees not covered by this contract.

**E.**    **Travel Status:**  An Employee shall be considered to be in travel status from the time he/she leaves the Company premises or his/her residence, whichever is closer to the location of his/her original assignment, until his/her return to the Company premises or his/her residence, whichever is closer to the location of his/her last assignment.

**F.**    **Travel Time:**  When an Employee is given an overnight assignment, and the total actual elapsed hours traveled and/or worked when combined do not exceed eight (8) hours in a calendar day, the Employee shall be paid for that calendar day in accordance with this Agreement with a minimum guarantee of eight (8) hours as provided for in **ARTICLE XIII - WORK WEEK - WORK DAY, Section 2.** of this Agreement.

When an Employee is given an overnight assignment, and the total actual elapsed hours traveled and/or worked when combined exceed eight (8) hours in a calendar day, no matter in what order the travel and/or work occurs, the Employee shall be paid in accordance with this Agreement for all elapsed hours actually worked, and for all elapsed hours actually traveled up to a maximum of eight (8) hours of travel in a calendar day.

For the purpose of computing actual elapsed hours of travel during a calendar day under this **ARTICLE XXVI - TRAVEL TIME AND ALLOWANCES,** when an Employee commences travel on a calendar day (the "first day") and such travel continues uninterrupted into the following calendar day (the "second day"), the actual elapsed hours continuously traveled during the second day shall be attributed to the first day and not the second day.

**G.**    **Overnight Assignments:**  Notwithstanding any other provisions set forth in this Agreement, when an Employee is on an overnight assignment outside the geographic

jurisdiction of this Agreement, including breaking news stories, none of the penalties or premiums in this Agreement, e.g., short-turnaround, schedule change penalty, night-turn differential, fees, etc., but excluding only overtime as provided for in **ARTICLE XIX - OVERTIME**, shall be paid in such circumstances. All of the penalties and/or premiums in this Agreement shall not be applicable to an employee effective on the work day the employee commences his/her overnight assignment. However, all of the penalties and/or premiums in this Agreement shall be applicable to an employee effective on the first work day at the Station following his/her overnight assignment, e.g., short-turnaround incurred on the first work day after the employee has concluded his/her overnight assignment due to work performed on such assignment shall be paid.

On travel assignments lasting more than four (4) days, the Employer shall have the right to schedule an employee off on what is his/her regular day(s) off if no work or traveling is required. This right to schedule an employee off shall not apply when the travel is to an unsafe location (e.g., combat zone). It is understood that all applicable provisions of this Agreement shall continue to apply to an employee who is scheduled off, and further, that any employee who is scheduled off shall continue to receive necessary expenses with regard to such travel assignment.

H.    **Training:**  In the event an Employee is assigned to attend a seminar or training session (the attendance at which will increase the Employee's skills and knowledge) the Employee shall receive payment for actual travel time at his/her regular straight time rate, and in addition shall receive pay equivalent to actual time in attendance at the training but not less than one (1) regular eight (8) hour shift (at his/her regular straight time rate) for each day of training or training and travel. In no event, however, shall an Employee receive any compensation beyond his/her regular straight time rate of pay for eight (8) hours on any day of such training and/or travel. The Company shall give Employees as much advance notice as possible prior to scheduling Employees to attend out-of-town or overnight training seminars.

## ARTICLE XXVIII - HOLIDAYS

**Section 1.** - Holidays are hereby defined to be:

> New Year's Day
> Independence Day (July 4)
> Labor Day
> Thanksgiving Day
> Christmas Day

**Section 2.** - New Year's Day (January 1), Independence Day (July 4), Labor Day, Thanksgiving Day and Christmas Day (December 25) shall be compensated as follows:

A.    If such holiday falls on an employee's regularly scheduled day off or while he/she is on vacation, he/she shall receive:

        A day off with pay at a later date, in addition to his/her regular full weekly wages (and overtime, if any).

**B.**    If such holiday falls on an employee's regularly scheduled work day and he/she works on such day, he/she shall receive:

        A day off with pay at a later date, plus one-half (1/2) straight time wages for the first eight (8) hours worked on that day, (overtime on such a holiday shall be at the time and one-half (1-1/2) rate, in addition to his/her regular, full weekly wages (and overtime, if any).

**C.**    If such holiday falls on an employee's scheduled day off and he/she is called in to work on that day, he/she shall receive:

        A day off with pay at a later date, plus straight time wages for the first eight (8) hours worked, and time and one-half (1-1/2) for any hours in excess of eight (8) hours for that day, in addition to his/her regular, full weekly wages (and overtime, if any).

**D.**    If such holiday falls on an employee's regularly scheduled work day and he/she does not work on such day, he/she shall receive:

        No additional day off with pay or other additional compensation beyond his/her regular, full weekly wages (and overtime, if any).

**E.**    Requests by employees to schedule the day(s) off with pay referred to in **Paragraphs A., B. and C.** above must be made in writing two (2) weeks in advance of the date the employee desires to take such day or days off.  Such requests are subject to Company approval, based on its operating necessities.  The Company will consider such requests on less than two (2) weeks written notice where circumstances clearly warrant it, e.g., personal emergencies or situations where the employee could not have planned in advance of the date the request was made.

These days with pay may not be carried from one calendar year to the next, and if not scheduled and taken by December 15th, the employee shall be paid for all unused days on the next regular pay period.  Employees who are entitled to a day off with pay for working Thanksgiving Day and/or Christmas Day shall have until June 15th of the following year to schedule such days off, and if not scheduled by June 15th, the employee shall be paid for all unused days on the next regular pay period.  The Company is not required to "advance" a compensatory day off prior to an employee having worked on a holiday.

The Company shall not incur any schedule change penalty or short turnaround penalty as a result of another employee covering for an employee who is taking a day(s) off with pay with less than two (2) weeks notice.

**F.**    The holiday premium hours in **Paragraph B.** above will apply only to the hours, or fractions of hours, actually worked by an employee on said holidays.

G.     The days off with pay referred to in **Paragraphs A., B. and C.** above are considered days worked for the purpose of calculating overtime and/or the penalty provisions of this Agreement.

## ARTICLE XXIX - VACATIONS

A.     **First Year:** Each regular, full-time employee shall be eligible for vacation during their first year of employment as follows:  employees hired on or before June 30 are eligible for five (5) days of vacation after six (6) months of employment, in the current year.  If hired on or before June 30, employees may carry their vacation to March 30 during the first year of employment.

B.     **Three Weeks:**  Each regular, full time employee having at least fifty-two (52) weeks total Company seniority prior to the start of the vacation period as defined in this Section shall receive an annual vacation of two (2) weeks, plus one (1) week in lieu of the following holidays:

> Employee's Birthday
> Martin Luther King's Birthday
> Memorial Day
> Columbus Day
> Day after Thanksgiving Day

Such time shall be paid for at the employee's regular, straight-time rate.  The Company agrees to allow regular full time employees not having at least fifty-two (52) weeks total Company seniority prior to the start of the vacation period as defined in this Article to pick and receive their vacation as provided above.  However, in the event such an employee's employment terminates prior to he/she actually having accumulated at least fifty-two (52) weeks total continuous full-time service, his/her final pay check shall be reduced proportionately for vacation pay such employee as "advanced" in excess of that Employee would have been required by California law to have been paid on termination.

C.     **Four Weeks:**  Each regular, full-time employee having five (5) or more years total Company seniority shall receive an annual vacation of three (3) weeks, plus one (1) week in lieu of the following holidays:

> Employee's Birthday
> Martin Luther King's Birthday
> Memorial Day
> Columbus Day
> Day after Thanksgiving Day

Such time shall be initially granted during the calendar year in which the regular, full-time employee completes his/her fifth year of seniority and shall be paid for at the employee's regular, straight-time rate.

**D.**   **Five Weeks:**  Each regular, full-time employee having fifteen (15) or more years total Company seniority shall receive an annual vacation of four (4) weeks, plus one (1) week in lieu of the following holidays:

> Employee's Birthday
> Martin Luther King's Birthday
> Memorial Day
> Columbus Day
> Day after Thanksgiving Day

Such time shall be initially granted during the calendar year in which the employee completes his/her fifteenth year of seniority and shall be paid for at the employee's regular, straight-time rate.

**E.**   Vacation shall start following the respective employee's regularly scheduled days off. However, if, for the convenience of the Company, a vacation should start at a time other than following an employee's regularly scheduled days off, the employee shall be entitled to two (2) additional days off.  This provision will not reduce the regular compensation for the week from which the two (2) days are taken.

**F.**   No vacation block shall be less than one (1) week.

**G.**   Vacation period preferences shall be given on the basis of total bargaining unit seniority. The vacation period for employees should be determined and posted prior to January 1 of each year and shall not be changed except by mutual consent of the Company and the particular employee concerned. Employees who split their vacation may only exercise their seniority for the first block selected.  After other bargaining unit employees who are splitting their vacations have selected their first block, seniority shall again govern for second and subsequent blocks until all vacation weeks have been selected."

**H.**   Regular pay for time to be spent on vacation shall be paid to the employee prior to his/her starting his/her vacation.

**I.**   No employee may be recalled to duty for any reason during his/her vacation.

**J.**   The overall vacation period shall run from January 1 through December 31, with the start of the overall vacation period being defined as January 1.  Vacation must be started within the current calendar year and may be contiguous with the vacation for the following year, with the consent of the Company.

**K.**   Any employee who resigns, is laid off, or is discharged shall be paid for all accumulated, but unused, vacation time to which he/she is entitled in accordance with Company policy. If California law requires an employee be paid vacation pay in excess of Company policy when an employee resigns, is laid off, or is discharged, he/she shall be compensated in accordance with California's legal requirements.

## ARTICLE XXX – SENIORITY

A.  **General Seniority Provisions:**  Seniority shall commence from the date of last hire as a regular full-time employee in the bargaining unit, for each such employee, whether hired by the Company or its predecessors. The parties have agreed that during the term of this new agreement to have a cooperative committee made up of bargaining unit employees and station management with the task of conforming the current seniority lists to the current positions set forth in the wage rates.  The Committee will make recommendations to the bargaining parties during the next round of negotiations.

B.  Regular full-time technicians shall be classified by the Employer as being on one of eleven (11) separate seniority lists.  The Employer shall classify a technician as being on the seniority list which represents the primary job function(s) which is being performed by the technician.  Each seniority list shall be considered a separate seniority classification for layoff and rehire purposes, and technicians shall have seniority as defined in this Article only among full-time employees on their respective seniority list.  The Employer may transfer a technician from one seniority list to another seniority list which represents the primary job function(s) which is being performed by the technician.

If a technician transfers, or is transferred, from one classification to another all of their accumulated seniority in the classification from which they are transferring shall be frozen. The technician shall be placed as the least senior in the new classification they are transferring to, and shall commence accruing seniority as the least senior for purposes of layoff.  Should a layoff occur effecting a transferred technician, and should that technician have greater seniority than the least senior employee in the classification from which the technician came, the technician may "bump back", displacing the less senior technician from the classification from which the technician came, and thereby avoid the layoff.  In no event shall a technician's "bumping" right period exceed the technician's length of continuous full-time service previously accumulated in the classification the technician is bumping back to, up to a maximum of one (1) year.  Once a technician has accumulated one (1) year of seniority in the new classification, all previously accumulated bargaining unit seniority shall be bridged with the newly accumulated seniority and a new seniority date for purposes of layoff shall be established.

The following are the eleven (11) seniority lists:

1.   Maintenance Technicians (other than Transmitter Technicians)
2.   Transmitter Technicians
3.   Studio Operations
4.   Master Control
5.   Technical Directors
6.   Post Production
7.   News Photographers/Van Technicians
8.   News Editor
9.   Stage Managers

10.     ENG Technicians
11.     Multi-Media Journalist

A maintenance technician shall be defined for purposes of this Section B. as an employee who, in general, is assigned by the Company to perform installation, maintenance and/or repair duties for the majority of his/her actual work time.

As an additional example, Technicians who are regularly assigned on an ongoing basis to perform technical director functions in connection with a live show shall be considered Technical Directors for seniority classification purposes.

C.     An employee's seniority shall be determined from the date of the beginning of his/her full time employment as a regular employee, and shall be stated in terms of years, months, and days of service. Days off, holidays, vacation, paid sick leave, and paid leaves of absence shall be counted as time served.

Seniority records shall be maintained by the Employer.

D.     A newly employed regular full-time employee shall be on probation for the first one hundred eighty (180) days of his/her employment. If during such period the Company finds that such employee is not qualified for the position to be filled, it may terminate the employment of such employee without notice or severance and such termination shall not be subject to grievance or arbitration. During this period of employment, an employee shall work under the conditions and receive not less than the minimum rate of pay in his/her applicable classification provided in this Agreement. A regular full-time employee retained in the employ of the Company for more than one hundred eighty (180) days shall be considered employed on a permanent basis with seniority rights in accordance with the above, dating from the first day of the current hiring. If released for any reason during the probationary period, he/she will not have achieved any seniority status.

## ARTICLE XXXI - LAYOFFS

A.     When layoffs (reduction in force) of employees are to be made, the Company, in its sole discretion, shall determine the number of employees to be laid off.

B.     If such layoff shall be confined solely to casual employees, the Company shall have the absolute right of selection among such employees.

C.     If such a layoff shall involve casual employees and regular full-time employees, the Company shall lay off all casual employees employed within a particular functional area corresponding to the seniority classification to be reduced, before laying off regular full-time employees within that seniority classification.

D.     Regular full-time employees shall be laid off by inverse order of seniority within the employee's respective seniority list.

Regular full-time employees subject to layoff, who have greater seniority in another classification group than the least senior regular full-time employee in that classification group, shall have the right to displace the less senior employee subject to the provisions of **ARTICLE XXX - SENIORITY, Section A.** and thereby avoid the layoff.

If a regular full-time employee is designated by the Company to be laid off and does not have greater seniority in another seniority classification than the least senior employee in that classification (as provided in **ARTICLE XXX - SENIORITY, Section A.)** but is capable, in the Company's opinion, of satisfactorily performing work that is being performed by casual employees who are employed in a different functional area than the regular full-time employee is currently assigned to, then that employee shall be offered that casual work, which could, if a sufficient amount of such work exists, avoid the need to layoff that employee.

In addition, the Company agrees to consider arrangement whereby a regular full-time employee may be moved from one functional area to another functional area where casual work is being performed in order to create a casual opening for a laid off regular full-time employee.

E.    **Layoff Notice & Pay:**  The Company will give any regular full-time employee, who has more than one hundred eighty (180) days of full time service, and who is laid off, four (4) weeks' notice or two (2) weeks' pay in lieu thereof.  In addition to four (4) weeks' notice or two (2) weeks' pay in lieu thereof, the Company will pay an employee two (2) weeks' severance pay for each full year of service, up to a maximum of forty (40) weeks.  The granting of severance pay as outlined in this **Section E.** is expressly conditioned on an Employee having executed a complete general release on a form determined and provided by the Employer prior to receipt of such severance pay.  In no event shall any employee receive severance pay more than once for the same period of service.

## ARTICLE XXXII - REHIRE

A.    **Rehiring Consideration:**  Nine (9) separate rehiring lists corresponding to the nine (9) seniority classification lists set forth in **ARTICLE XXX – SENIORITY, Section B.**, shall be maintained by the Company, composed of regular full-time employees (not casual employees) with more than one hundred eighty (180) days of regular full-time service at the time of their layoff.  All rehiring shall be from the appropriate seniority rehire list for openings in that particular seniority classification in order of greatest seniority, until such list is exhausted.  Thereafter, the Employer may hire employees without regard to this Article.

An employee's name must be retained on the appropriate seniority rehire list for a period of twelve (12) months following his/her date of layoff.  The twelve (12) month recall period shall be computed starting the day following the last day worked as a regular full-time employee.  An employee's rehire rights shall terminate if (1) the employee has not been offered reemployment within the twelve (12) month recall period; or (2) the employee has been rehired full-time; or (3) to the knowledge of the Union, the employee has been offered

rehire (other than casual or part-time) and the employee has either refused or failed to accept the offer of rehire within six (6) calendar days from the date the employee receives or refuses a registered letter of notification to the last address on file with the Union and the Company, or the letter of notification is returned by the postal service marked "return to sender" undeliverable.  It shall be the responsibility of the employee involved to keep the Union and the Company informed of his/her correct address and to notify the Company if he/she is going to be out of the area for extended periods of time.  An employee accepting an offer of rehire shall have up to nineteen (19) calendar days before he/she must appear for work.  The Company shall have no obligation to employ any employee after twelve (12) months have elapsed from the employee's date of layoff.

B.      **Rehiring Privileges:**  An employee laid off and reengaged within twelve (12) months shall have all his/her seniority rights bridged for pay and other purposes so that his/her seniority upon returning shall be that which he/she had on the effective date of layoff.

If an employee is rehired within the span of time for which he/she may have received severance pay, he/she will be required to reimburse the Company the severance pay overpayment differential.

If an employee has received severance pay and is subsequently rehired, the employee's rehire date, not the original date of employment, shall be the basis for the computation of future severance pay.

C.      **Temporary Work:**  Employees on layoff with rehire rights may be offered available short term (five (5) working days) or daily assignments in the functional areas corresponding to their applicable seniority classifications, subject to their ability, in the company's opinion, to satisfactorily perform such available assignments and further subject to their immediate availability by telephone to report when necessary for the assignment.  For pre-scheduled events where temporary work is known at least ten (10) calendar days in advance to be available, the employee on layoff with rehire rights will be contacted in advance by telephone and/or mail and must respond within three (3) calendar days from the date of notice.  If notice is mailed by the Company, the date of notice shall be deemed three (3) calendar days after the date of mailing.  Employees on layoff with rehire rights who work as a casual or part-time employee shall have their severance pay suspended for periods in which they work in this capacity (e.g., severance pay will not be paid during periods such Employee works as a casual or part-time employee, but such suspended severance pay shall be reinstated when they cease working as a casual/part-time employee.

In addition to the above, employees on layoff with rehire rights shall be informed by the Company of suitable technical openings at other CBS stations.

## ARTICLE XXXIII – DISCHARGE

A.      The Company may discharge any employee for just cause and, upon so doing, shall promptly notify the employee and the local union office, in writing, setting forth the reasons for such discharge.  The Company agrees, if requested by the Union, to fully

discuss with the Union, within seven (7) working days from receipt of such notice by the Union, the matter of the cause for each discharge.

Should the Union not agree with the propriety of such discharge, it may within five (5) working days following the meeting with the Company, refer the matter to arbitration before the American Arbitration Association, and both parties shall be bound by the Association's Voluntary Labor Arbitration Rules.  It shall be the arbitrator's decision whether the employee shall be reinstated, and whether any reinstatement shall be with or without retroactive pay.

The parties agree that also included within the meaning of "just cause", is "unsatisfactory performance".   For purposes of discharge or discipline under this Agreement, "unsatisfactory performance" means inability, failure (whether willful, negligent or incompetent) or unwillingness to perform the particular work required for the Company, according to the standards expected by the Company.  Length of employment shall not be considered a relevant factor by an Arbitrator in discipline or discharge cases involving "unsatisfactory performance".

Each Employee has an obligation to remain abreast of changes and new developments in the technology and operations of the broadcasting industry, whether such changes or new developments are, for example, in the nature of a modification in the design and/or an improvement in the capability of equipment and/or technical systems, and to maintain and when needed upgrade the Employees skills, in order to perform and to continue performing, the responsibilities of any job to which the Employee is assigned by the Company.

Likewise, the Company must provide the Employee adequate training to equip the Employee to perform assigned tasks prior to such assignments being made.

The "unsatisfactory performance" definition described above shall apply even where the essential nature of the Employee's job has changed, whether, for example, on account of technological improvements, or due to other work related advancements in the broadcast industry, provided the Company has met its obligation to provide adequate training to equip the Employee to perform the functions of any job to which the employee is assigned.

The "unsatisfactory performance" definition described above shall also apply where the Company has assigned an Employee to perform tasks which the Employee has not been assigned to perform previously, provided the Company has met its obligation to provide adequate training to equip the Employee to perform the functions of any job to which the Employee is assigned.  A reasonable period of familiarization with new tasks for which adequate training has been provided will precede any progressive discipline for performance of such new tasks.

The Company will follow a process of progressive discipline in all cases of discipline and/or discharge of an Employee due to unsatisfactory performance, except where a failure to perform is due to an insubordinate refusal to carry out an assignment in connection with the Employee's work.  The arbitrator shall not have the power to substitute his or her

judgment for any judgment exercised by the Company during the process of progressive discipline prior to that instance of discipline or discharge which is the subject of the grievance before the Arbitrator.

## ARTICLE XXXIV – LEAVES OF ABSENCE

A.  An employee with three (3) years or more of service, and upon sixty (60) days written notice to the Company, shall be granted a leave of absence, for a minimum of forty-five (45) days and a maximum period of one-hundred and eighty (180) days, without pay, with the express understanding that the Company may refuse to grant any leave of absence which might impair normal operations or work undue hardship on the Company.  An employee must exhaust all his/her vacation prior to being granted a leave of absence.  Such leaves of absences granted by the Company will be limited to no more than one leave per employee each three (3) years.  On return, the employee shall have the same seniority as at the start of his/her leave.

B.  **Exceptions:** Leaves of absence, without pay, for personal health, family health, or Military Service shall require no minimum notice.  In the case of Military Service, the maximum duration shall be for the period of one draft or one enlistment, and, on return, the employee shall have seniority, for lay-off purposes, as if his/her Military Service had been Company service.

C.  **Family Medical Leave Act:**  Leaves of absence covered under the Family Medical Leave Act shall be granted subject to Company policy.

## ARTICLE XXXV – SICK LEAVE

**Waiver of the San Francisco Paid Sick Leave Ordinance:**  To the fullest extent permitted, this agreement shall operate to waive any provisions of the San Francisco Paid Sick Leave Ordinance, San Francisco Administrative Code Section 12W, and shall supersede and be considered to have fulfilled all requirements of such Ordinance as presently written, and or amended during the life of this Agreement.  Instead, the CBS Company Policy applicable in California generally shall apply.

Notwithstanding the above, the Company agrees as follows:

(1)  While the Ordinance shall not apply to full-time staff under the IBEW or IATSE Agreements, such full-time staff technicians will be allowed to carry over up to a maximum of eight (8) sick days from one calendar year into the next calendar year.

(2)  The Station agreed to follow the San Francisco Sick Leave Ordinance for Casual Employees employed under the IBEW and IATSE Agreements.

The Company may require a doctor's certificate evidencing any illness or disability.  The payment by the Company will be reduced by the amount of Workers' Compensation, State Disability

Insurance Benefit, and Sickness and Accident payment, if any, during said period.  The Company agrees that any employee absent because of sickness or disability will be restored to his/her former status and seniority, if he/she returns to work within six (6) months and is still capable of performing his/her work.  Nothing in this paragraph will be construed as a waiver by any employee of any rights or privileges under any Workers' Compensation law or Occupational Disease Law.

**Effective December 31, 2019 the current Sick Leave provision shall be amended as follows:**

"To the fullest extent permitted, this agreement shall operate to waive any provisions of the San Francisco Paid Sick Leave Ordinance, San Francisco Administrative Code Section 12W, and shall supersede and be considered to have fulfilled all requirements of such Ordinance as presently written, and or amended during the life of this Agreement. **Employees under this agreement shall be allowed to use other paid time off for sick leave as permitted in accordance with the San Francisco Paid Sick Leave Ordinance.** Instead, the CBS Company Policy applicable in California generally shall apply.

The Station agreed to follow the San Francisco Sick Leave Ordinance for Casual Employees employed under the IBEW and IATSE Agreements.

The Company may require a doctor's certificate evidencing any illness or disability.  The payment by the Company will be reduced by the amount of Workers' Compensation, State Disability Insurance Benefit, and Sickness and Accident payment, if any, during said period.  The Company agrees that any employee absent because of sickness or disability will be restored to his/her former status and seniority, if he/she returns to work within six (6) months and is still capable of performing his/her work.  Nothing in this paragraph will be construed as a waiver by any employee of any rights or privileges under any Workers' Compensation law or Occupational Disease Law."

## ARTICLE XXXVI-A – KPIX-TV PENSION, INSURANCE AND POLICY BENEFITS

The Group W Pension Plan component of the CBS Combined Pension Plan (for "grandfathered" employees), the Cash Balance Plan component of the CBS Combined Pension Plan (for "non-grandfathered" employees who were actively participating in the Group W Pension Plan component prior to April 1, 1999), the CBS Fund the Future Restricted Share Unit Program, CBS 401(k) Plan, CBS Medical Plans, CBS Flexible Spending Account (FSA) Plan, CBS Dental Plan, CBS Life and Accident Insurance Plans, CBS Long Term Disability Plan, in effect as of the date of this Agreement, including any amendments made to these plans by CBS during the term of this Agreement, will be applicable to all regular full-time Employees (not casual Technicians) in the bargaining unit covered by this Agreement.

It is understood that any Union represented Employee who participates in any Company sponsored benefit plan (e.g., pension plan, medical plan, etc.) and/or policy (e.g., sick leave, jury duty, travel insurance, etc.), does so on the same basis as other, non-union employees of KPIX-TV.  Therefore, as has been understood in the past, changes may be made in any such plan and/or policy which are applicable to other, non-union employees of KPIX-TV, and such changes will apply to Employees

covered by this Agreement, and the Company will have no obligation to bargain over such changes with the Union.

By way of example, but not limitation, changes in any such plan or policy may include termination of the plan or policy, substitution of, or merger with, another plan or policy, or part of such plan or policy, modifications in the terms of the plan or policy, all subject to the condition that where the changes apply to non-union employees of KPIX-TV, they will apply to Employees covered by this Agreement.

The parties also agree that notwithstanding anything contained in this Agreement to the contrary, anyone leasing or buying all or part of an operation cannot literally assume this entire Agreement, because certain plans and policies therein are unique to the Company.  Thus, anyone buying or leasing all or part of KPIX-TV will not be obligated to assume those provisions of the Agreement which relate to benefit plans or policies which are provided by the Company.

## ARTICLE XXXVI-B – KBCW-TV PENSION, INSURANCE AND POLICY BENEFITS

The San Francisco Television Station KBCW Inc. Retirement Plan for Television Technicians, the CBS Fund the Future Restricted Share Unit Program, CBS 401(k) Plan, CBS Medical Plans, CBS Flexible Spending Account (FSA) Plan, CBS Dental Plan, CBS Life and Accident Insurance Plans, CBS Long Term Disability Plan, in effect as of the date of this Agreement, including any amendments made to these plans by CBS during the term of this Agreement, will be applicable to all regular full-time Employees (not casual/relief Technicians) in the bargaining unit covered by this Agreement.

It is understood that any Union represented Employee who participates in any Company sponsored benefit plan (e.g., medical plan, etc.) and/or policy (e.g., sick leave, jury duty, travel insurance, etc.), does so on the same basis as other, non-union employees of KBCW-TV.  Therefore, as has been understood in the past, changes may be made in any such plan and/or policy which are applicable to other, non-union employees of KBCW-TV, and such changes will apply to Employees covered by this Agreement, and the Company will have no obligation to bargain over such changes with the Union.

By way of example, but not limitation, changes in any such plan or policy may include termination of the plan or policy, substitution of, or merger with, another plan or policy, or part of such plan or policy, modifications in the terms of the plan or policy, all subject to the condition that where the changes apply to non-union employees of KBCW-TV, they will apply to Employees covered by this Agreement.

The parties also agree that notwithstanding anything contained in this Agreement to the contrary, anyone leasing or buying all or part of an operation cannot literally assume this entire Agreement, because certain plans and policies therein are unique to the Company.  Thus, anyone buying or leasing all or part of KBCW-TV will not be obligated to assume those provisions of the Agreement which relate to benefit plans or policies which are provided by the Company.

## ARTICLE XXXVII – JURY DUTY

In the event an employee is required to serve on a jury of any court of law or equity, jury service shall be treated in accordance with Company policy.

## ARTICLE XXXVIII – SAFETY

**A.** One person may enter the transmitter cubicle for the purpose of replacing tubes, or making minor emergency repairs or adjustments that might be necessary, during regular operating hours or maintenance periods, provided that when he/she is required to perform such work inside the interlocked compartments, he/she must first throw the main power circuit breakers on the power panel to the "off" position and connect ground sticks to the high voltage circuits to make them safe before entering the cubicle.  However, as a safety precaution, two people, at least one of whom shall be an employee hereunder, shall be present in the transmitter room when any servicing or testing is done that requires:

    **1.** Power applied to the transmitter, and

    **2.**   a) The interlock switches are to be rendered inoperative, or
           b) The connection of a test instrument directly to the interior of the transmitter (as distinguished from externally connecting such test instrument by means of jacks or similar receptacles or devices), or
           c) The removal of any dead-front panel, window, or door.

**B.** Employees shall not be assigned to hazardous duty unless reasonably adequate safety precautions are taken by the Company.

**C.** Reasonably adequate provisions shall be made at all regular Company locations for the safety and comfort of the employees, with facilities for the preparation of meals, storage of food, individual lockers for the storage of personal effects, and space for the storage of clothes.

## ARTICLE XXXIX – UNION VISITATION

**A.** The Company agrees that it will permit two duly authorized representatives of IBEW to enter upon the premises of the Company at reasonable times for the purpose of determining the performance of this Agreement, provided that such representatives shall exhibit evidence of their authority and provided that any person so admitted shall comply with all the rules and regulations of the Company while on its premises and shall not interfere with the conduct of the Company's business.  Nothing herein contained shall authorize IBEW or any of its representatives to examine any of the books, papers, records, or files, except time cards, of the Company, subject to any and all legal rights which might accrue to IBEW by reason of any lawful court process.

**B.** The Union is privileged to use the bulletin boards at Company locations.

## ARTICLE XXXX – MISCELLANEOUS PROVISIONS

**A.**     Employees shall not be required to provide equipment, tools, or supplies for any purpose. It shall be the responsibility of the employee to take reasonable care of the tools and supplies issued to him/her by the Company.

**B.**     Employees shall not be required to furnish any form of fidelity bond as a condition of employment.

**C.**     Employees shall not be required to appear in front of a camera except when caused by circumstances under which such appearance is unavoidable or unintentional.

## ARTICLE XXXXI – COMPANY POLICY MANUAL, CONFLICT OF INTEREST QUESTIONNAIRES, CODE OF ETHICS & CONDUCT, ETC.

The Union and the employees covered by this Agreement agree that all employees shall review the standard Company Policy Manual, the standard Company Code of Business Ethics & Conduct, the Company Conflict of Interest Questionnaire, the Company Rules of Conduct, and other similar standard Company policies/directives including but not limited to regulatory, safety and/or operational policies and procedures and acknowledge both receipt and that he/she has read such standard Company policies/directives.  If any employee has any questions or concerns as to the interpretation or application of such standard Company policies/directives, he/she shall have the obligation to seek a resolution to such questions or concerns by seeking clarification from appropriate Station management.  Failure to comply with the requirements of this provision shall be deemed just cause for disciplining an employee, up to and including discharge.

## ARTICLE XXXXII – MODIFICATIONS TO AGREEMENT

Any changes, supplements or amendments made during the term of this Agreement must be reduced to writing and signed by the parties hereto.

**KPIX-TV/KBCW-TV**

By: _____
**Kevin Walsh**
**President & General Manager**

Date: __7/31/18__

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS – LOCAL 45, AFL-CIO-CFL**

By: _____
**Elaine Ocasio**
**Business Manager/Financial Secretary**

Date: ____8/10/18____

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 1

## INTERCHANGEABILITY (NEWSGATHERING)

September, 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

This will confirm the Agreement reached during our most recent negotiation concerning interchangeability for purposes of newsgathering.

WHEREAS, I.B.E.W. is the sole and exclusive collective bargaining representative for certain employees employed by the Company at KPIX-TV; and

WHEREAS, the Company and I.B.E.W. are parties to a collective bargaining agreement effective as of July 22, 2011 to and including July 21, 2014 ("2011 - 2014 Agreement"); and

WHEREAS, I.B.E.W. has been provided a copy of a collective bargaining agreement between the Company and Local 600, I.A.T.S.E., AFL-CIO ("Local 600"), effective as of July 22, 2011 to and including July 21, 2014; and

WHEREAS, I.B.E.W. and Local 600 each represent employees of the Company assigned to various technical and newsgathering functions under their respective collective bargaining agreements; and

WHEREAS, I.B.E.W., Local 600, and the Company wish to provide for "interchangeability" of various technical and newsgathering functions performed by employees represented by I.B.E.W. and Local 600; and

WHEREAS, the Company and I.B.E.W. desire to establish the terms and conditions of employment which shall apply to employees represented for collective bargaining purposes by I.B.E.W. who are assigned to perform various technical newsgathering functions by the Company;

NOW, THEREFORE, the Company and I.B.E.W. agree as follows:

(1)     The Company shall have the right to assign individuals who are represented for collective bargaining purposes by either I.B.E.W. or Local 600 to the performance of the functions covered by the 2011 - 2014 Agreement (except for maintenance and operation of the broadcast transmitter, maintenance and operation of fixed satellite transmission equipment

- 44 -

other than facilities controlled from the News Room, master control operations, primary videotape operations associated with master control, studio video switcher, and the studio audio mixer, except as provided for in Section (6) contained herein, and/or to the performance of newsgathering functions covered by the Local 600 Agreement, e.g., news photography, such that there shall exist "interchangeability" of functions pertaining to the work performed by such individuals. The I.B.E.W. further agrees that the Company may supplement I.B.E.W. represented employees in staffing remotes under the exclusive jurisdiction of this agreement (as defined in **ARTICLE II, Section 2.B.** in the 2011-2014 Agreement) with either Local 600 represented employees or casual employees.  The Company agrees to make a good faith effort to utilize Local 600 represented employees in staffing such remotes where a Local 600 represented employee, in the Company's opinion, is both qualified and available to perform the work involved, and the Company would not incur any additional cost in using the Local 600 represented employee rather than a casual employee.

The Company shall also have the right to make such assignments in accordance with whichever condition(s) contained in the 2011-2014 Agreement or the Local 600 Agreement the Company determines are most appropriate with regard to any assignment.

Nothing in this Agreement shall be construed to require the Company to employ any specific number of individuals such that the Company shall have the sole discretion to determine the number of individuals required to perform any and/or all functions.

**(2)**     I.B.E.W. recognizes and agrees that, in the event, and to the extent, the Company employs individuals who are represented for collective bargaining purposes by Local 600, the terms and conditions of employment of such employees shall not be covered by this Agreement, or by the 2011-2014 Agreement.

**(3)**     **(a)**     Except as provided in **Section (3) (b)** below, in the event the Company, on or after the execution of this Agreement, employs individuals on a permanent and regular, although indefinite, full-time basis (referred to throughout this Agreement as "individual(s)"), to perform newsgathering functions, e.g., news photography, editing, microwaving/satellite uplinking, ENG playback, etc., either out of a News Bureau or out of the Company's main studio location, such individuals shall be represented for collective bargaining purposes as follows:

Local 600 recognizes that the first individual so employed shall be represented for collective bargaining purposes by I.B.E.W., and shall be subject to the "Union Security" provisions set forth in **ARTICLE VII** of the 2011-2014 Agreement.

The second individual so employed shall be represented for collective bargaining purposes by Local 600.

Thereafter, any additional individuals so employed shall be represented for collective bargaining purposes on an alternate basis, such that the third individual

so employed shall be represented by I.B.E.W., and the fourth individual so employed shall be represented by Local 600, and so on.

**(b)**   The only exception(s) to the employment sequence set forth in **Section 3 (a)** above, shall be that:

   **(1)**   In the event the employment of an individual who is represented by I.B.E.W. is terminated, or for any reason leaves the Company, the individual, if any, who is thereafter employed to replace the terminated individual, shall be represented for collective bargaining purposes by I.B.E.W. Meanwhile, the employment sequence shall continue, and remain undisturbed, as if the termination and replacement had not occurred. Likewise, an individual, if any, employed to replace an individual who is represented for collective bargaining purposes by Local 600, shall be represented for collective bargaining purposes by Local 600 in the same manner as described above with regard to I.B.E.W.

   **(2)**   In the event an individual who is represented by I.B.E.W. transfers into news, the individual shall continue to be represented for collective bargaining purposes by I.B.E.W. and shall count as the next I.B.E.W. hire as described in Section 3 (a) above.  Likewise, an individual who is represented for collective bargaining purposes by Local 600, who transfers from one news seniority classification to another (i.e., News Photographers/Van Technicians, or New Editors, or ENG Technicians) shall be represented for collective bargaining purposes by Local 600 in the same manner as described above with regard to I.B.E.W., and shall count as the next Local 600 hire as described in **Section 3 (a)**.

**(4)**   The Company and I.B.E.W. agree that in the event of a layoff affecting "individual(s)" assigned to newsgathering functions, either out of a News Bureau or out of the Company's main studio location, that such layoff would proceed as follows:

The first individual to be laid off would be an individual represented for collective bargaining purposes by the union that had the most recent hire of an individual hired after May 1, 1988, and who is assigned to the seniority classification in which the layoff is to occur (i.e., News Photographers/Van Technicians, or News Editors or ENG Technicians).

Should a second layoff occur, employees so effected will be laid off in inverse order of their seniority in the seniority classification in which the layoff is to occur, regardless of their union affiliation.

The selection of the particular individual(s) to be laid off that are represented by Local 600 shall be subject to the provisions contained in the Local 600 Agreement.  The selection of the particular individual(s) to be laid off that are represented by I.B.E.W. shall be subject to the provisions contained in the **KPIX-IBEW SIDELETTER AGREEMENT** and the 2011 - 2014 Agreement.

**(5)**     The Company and I.B.E.W. recognize that vacation selection for individuals represented for collective bargaining purposes by I.B.E.W. shall be governed by total bargaining unit seniority as defined in **ARTICLE XXX- SENIORITY** of the 2011-2014 Agreement. Where in the Company's opinion, too many individuals assigned to perform predominantly newsgathering functions, represented by either I.B.E.W. or Local 600, request the same vacation period, the employee with greater total bargaining unit seniority shall prevail.

**(6)**     **(a)**     The Company agrees that, in the event it becomes necessary to employee "short term" relief in post-production or primary video tape, the Company may assign such relief work to any qualified regular full-time employee represented for collective bargaining purposes by I.B.E.W. or I.A.T.S.E. who is employed at KPIX-TV.

       **(b)**     Should a permanent opening occur in master control, post production or primary video tape and the Company determines the most prospective candidate for the position happens to be represented for purposes of collective bargaining by I.A.T.S.E. the following shall be strictly adhered to in selecting said employee:

          **(i)**     The I.A.T.S.E. represented employee is ineligible if he/she has no experience performing the open position when an I.B.E.W. represented employee on layoff has recall rights to the seniority classification covering the open position.

          **(ii)**     The I.A.T.S.E. represented employee during the period of training shall not be required to change union affiliation. However, following a training period of up to a maximum of thirty-one (31) days, should the employee be permanently assigned to perform that function, he/she shall change affiliation to I.B.E.W. and will commence accruing seniority as a new employee for purposes of layoff; however, such employee shall retain "bumping rights" as provided in **ARTICLE XV - SENIORITY** in the 2011 - 2014 KPIX-IATSE Agreement. For purposes of vacation selection, combined bargaining unit seniority from both IBEW and IATSE shall determine such transferred employee's vacation selection rights.

**(7)**     Except as specifically set forth otherwise in this Agreement, the terms and conditions of employment of individuals represented for collective bargaining purposes by I.B.E.W. shall be the same terms and conditions as those set forth in the 2011 - 2014 Agreement.

**(8)**     In the event of a conflict between language contained in this Agreement and language contained in the 2011 - 2014 Agreement, the provisions of this Agreement shall control.

**(9)**     This Agreement may be modified only by writing, signed by both the Company and I.B.E.W.

**(10)**     This Agreement shall remain in full force and effect for the same duration, and subject to the same provisions, as set forth in **ARTICLE I** of the 2011-2014 Agreement.

Please confirm that the above properly summarizes our understanding by signing below:

KPIX-TV

By: _____

    Kevin Walsh
    **President & General Manager**

Date: _____7/31/18_____

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL

By: _____

    Elaine Ocasio
    **Business Manager/Financial Secretary**

Date: _____8/6/18_____

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 2

## NON-BARGAINING UNIT EMPLOYEES "HANDS-ON"

September   , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Lloyd:

This will confirm the Agreement reached during the 2001 negotiation concerning the proper interpretation of **ARTICLE II, Section 2 K., (Non-Bargaining Unit Employees "Hands-On").**

The twenty-five (25) hours of bargaining unit work referred to in the above Article and Section shall be calculated on the basis of the actual time the employee spends in a day performing operations work otherwise under the exclusive jurisdiction of this Agreement, rounded upward to the nearest five (5) minute increment, with a daily minimum assessment of fifteen (15) minutes for each such employee who performs such operations work on any given day. Shop Stewards will post logs in key locations around the KPIX-TV/KBCW-TV facility. Assigning Managers as well as bargaining unit members are eligible to record such work.  Logs will be reviewed regularly by Shop Stewards.  If this reporting process is deemed inconvenient or impractical by either Party, the Parties agree to bargain in good faith to establish a less cumbersome process.  Should the Parties be unable to agree upon another process, a third party shall be appointed to resolve the issue.

Please confirm that the above properly summarizes our understanding by signing below:

KPIX-TV/KBCW-TV

By: _____

**Kevin Walsh**
**President & General Manager**

Date: ___7/31/18_____

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL

By: _____

**Elaine Ocasio**
**Business Manager/Financial Secretary**

Date: _____8/10/18_____

- 49 -

**SUPPLEMENTARY LETTER OF INTENT**
**AND UNDERSTANDING NO. 3**

**CASUAL EMPLOYEE CHECK-OFF**

September   , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

The Company agreed effective the first full work week in January 2002 to permit casual employees to participate in dues check-off in accordance with the provisions set forth in **ARTICLE VII – UNION MEMBERSHIP**. The Union acknowledges that the Company is only obligated to permit such dues check-off for casual employees provided the Company's then existing payroll system can automatically perform such deductions without requiring a system / software modification or without requiring on-going manual entry of data. Furthermore, to facilitate such deductions, the Union agrees that the Company's obligation is limited to withholding a flat, unvarying percentage for all participating casual employees. While this percentage may occasionally change, the Company must receive at least ninety (90) days advance written warning for such change to be effective, and no more than one change per year shall be permitted.

KPIX-TV/KBCW-TV

By: _____

    **Kevin Walsh**
    **President & General Manager**

Date: _7/31/18_____

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL

By: _____

    **Elaine Ocasio**
    **Business Manager/Financial Secretary**

Date: _____8/10/18_____

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 4

### SPECIAL WORK WEEK

September   , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

This will confirm the Agreement reached during our most recent negotiation concerning a special work week.

Notwithstanding any provisions to the contrary contained in the 1995-1998 KPIX-IBEW Agreement, the Company and the Union agree to the following:

(1)     In the event any bargaining unit employee is assigned three (3) consecutive days off in his/her work week, and one (1) day off in his/her work week immediately following that week, the employee shall be paid as follows:

Week 1 -     five (5) days straight time pay (one day of which is an advance of eight (8) hours of straight-time pay on work to be performed in the next week).

Week 2 -     five and one-half (5-1/2) days straight time pay (the employee is entitled to six and one-half (6-1/2) days straight-time pay for working six (6) days that week, but this is reduced by one (1) day's straight-time pay that was advanced for the prior week.

In the event any bargaining unit employee is assigned one (1) day off in his/her work week and three (3) consecutive days off in his/her following work week, the employee shall be paid for six and one-half (6-1/2) days at straight time for the first week (five (5) days at straight-time and one (1) day at time and one-half), and four (4) days at straight-time for the following week.

(2)    In the event a vacation relief employee is assigned two (2) days off in his/her work week that are not consecutive, he/she shall be paid a penalty of four (4) hours at his/her applicable straight-time rate of pay as the only penalty for not having had two (2) consecutive days off that week.

Please confirm that the above properly summarizes our understanding by signing below:

**KPIX-TV/KBCW-TV**

By: _____

    **Kevin Walsh**
    **President & General Manager**

Date: _____7/30/18_____

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS - LOCAL 45, AFL-CIO-CFL**

By: _____

    **Elaine Ocasio**
    **Business Manager/Financial Secretary**

Date: _____8/10/18_____

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 5

## VACATION SENIORITY PREFERENCE

September, 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

This will confirm the Agreement reached during our most recent negotiation concerning vacation seniority preference.

The Company and the Union agreed that notwithstanding the provisions in **ARTICLE XXIX - VACATIONS, Section F.**, that the below listed employees, for so long as they remain continuously employed in the bargaining unit, shall select vacation based on the seniority date listed below beside their respective names:

Robert Inouye        10/15/79
Bob Lai               6/30/86

Please confirm that the above properly summarizes our understanding by signing below:

KPIX-TV

By: _____

Kevin Walsh
President & General Manager

Date: 7/31/18

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL

By: _____

Elaine Ocasio
Business Manager/Financial Secretary

Date: 8/10/18

- 53 -

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 7

### "VACATION PAY"

October 29, 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

This letter is to confirm our agreement that notwithstanding the provisions of the 1995-1998 KPIX-IBEW Local 45 Agreement, that vacation pay for regular full-time bargaining unit employees hired as such prior to January 1, 1986 shall be calculated at the time their employment terminates at KPIX as provided below.

Regular, full-time bargaining unit employees hired as such prior to January 1, 1986 were allowed to select prorated vacation on the first January 1st following their initial full-time employment based on their length of service in the initial calendar year they were so employed. Such employees did not receive any additional vacation eligibility until the following January 1st, twelve (12) months later, at which point they could select two (2) weeks of vacation and one (1) week in lieu of holidays.

Based on the fact that regular full-time employees hired prior to January 1, 1986 were compensated for vacation in this fashion, rather than in accordance with current Company Policy, at the time of their hire, the Company has agreed to compensate them upon the termination of their employment at KPIX in accordance with the listing set forth below:

| NAME | VACATION DAYS OWED ON TERMINATION |
|---|---|
| Alcorn, C. | 7 days |
| Garaventa, S. | 6 days |
| Gomez, P. | 7 days |
| Inouye, R. | 5 days |

| NAME | VACATION DAYS OWED ON TERMINATION |
|------|-----------------------------------|
| McDowell, J. | 7 days |
| Oliver, D. | 8 days |
| Vigienzoni, R. | 6 days |
| Villegas, A. | 4 days |

The IBEW agrees that the above list constitutes a complete and accurate accounting of the vacation pay owed upon termination to all regular, full-time employees hired prior to January 1, 1986. All regular, full-time employees hired after January 1, 1986 shall be compensated upon termination in accordance with Company Policy.

Please confirm that the above properly summarizes our understanding by signing below:

KPIX-TV

By: _____
    **Kevin Walsh**
    **President & General Manager**

Date: ____7/31/18____

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL

By: _____
    **Elaine Ocasio**
    **Business Manager/Financial Secretary**

Date: ____8/10/18____

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 8

### VACATION SELECTION

September   , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

This will confirm the Agreement reached during the 2004 negotiation concerning the fact that vacation selection is subject to the operating necessities of the stations.

The Company and the Union agreed during those negotiations that the attached vacation schedule was a reasonable balance of the Company's operating necessities with the Employees desire for vacation scheduling flexibility.

Please confirm that the above properly summarizes our understanding by signing below:

KPIX-TV/KBCW-TV

By: _____

**Kevin Walsh**
**President & General Manager**

Date: _7/31/18_____

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL

By: _____

**Elaine Ocasio**
**Business Manager/Financial Secretary**

Date: _8/10/18_____

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 9

## "EYE ON THE BAY"

September  , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Lloyd:

      While the IBEW and IATSE agree that they do not have jurisdiction over the production of any material for Eye On The Bay, they have expressed an interest in having some involvement, on a non-exclusive basis, in that program.  The Company has agreed to consider using news photographers, if they are scheduled to work that day and they are available in the Company's opinion, to perform photography work on behalf of Eye On The Bay.

**KPIX-TV**

By: _____

    **Kevin Walsh**
    **President & General Manager**

Date: _____7/31/18_____

**INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL**

By: _____

    **Elaine Ocasio**
    **Business Manager/Financial Secretary**

Date: _____8/10/18_____

**SUPPLEMENTARY LETTER OF INTENT
AND UNDERSTANDING NO. 10**

**NON-LINEAR/DIGITAL/EDITING**

September  , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

During negotiations toward the Agreement in effect between the Parties from July 5, 1995 to July 4, 1998, the Union, in agreeing to Company Proposal 6. (Version 6), stated the position, agreed to by the Company, that if an individual hired by the Company to directly replace a full-time Employee who has left the Company's employ, is assigned exclusively to the non-linear/digital editing of news material covered by the Agreement, the individual should be covered by the Agreement, including **ARTICLE VII - Union Membership.**  However, the Union agreed, in turn, that if an individual is employed on a regular, recurring basis in the performance of any functions in addition to non-linear/digital editing (for example, any news writing, news gathering, reporting, producing, news management, etc.) then such an individual shall not be subject to this Agreement, including **ARTICLE VII - Union Membership.**

Please confirm that the above properly summarizes our understanding by signing below:

KPIX-TV

**INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL**

By: _____

**Kevin Walsh
President & General Manager**

By: _____

**Elaine Ocasio
Business Manager/Financial Secretary**

Date: _7/31/18_____

Date: ___8/10/18_____

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 11

### "SINGLE VACATION DAYS"

September   , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

Notwithstanding the provisions set forth in **ARTICLE XXIX-VACATIONS**, the Company agreed during calendar year 2009 to permit full-time employees to take one week of earned vacation in single or multiple days subject to the following restrictions:

(a)     An employee must advise appropriate station management in writing of their intention to take this option at the beginning of the annual vacation selection period. Requests for scheduling such dates shall only be dealt with after completion of the annual vacation selection process.

(b)     Requests and scheduling these vacation days shall be subject to the same provisions as apply to holiday payback days as set forth in **ARTICLE XXVIII-HOLIDAYS, Section 2E**, e.g., subject to the Company's operating necessities, etc., except that these five vacation days must all be requested <u>and</u> taken by no later than November 1st. All requests must identify clearly whether the requested off day is for a single vacation day or for a holiday payback day, and such designation may not change after it is originally requested. Furthermore, once a requested day off is approved the employee may not withdraw or alter that requested day off.

(c)     Scheduling shall be approved on a first come basis, not on the basis of seniority.

(d)     Any single/multiple vacation days not taken by November 1st shall be either scheduled by management or paid out at management's discretion.

KPIX-TV/KBCW-TV

By: _____
**Kevin Walsh**
**President & General Manager**

Date: 7/31/18 _____

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL

By: _____
**Elaine Ocasio**
**Business Manager/Financial Secretary**

Date: 8/10/18 _____

- 59 -

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 12

## "TRANSMITTER TECHNICIANS"

September   , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

During the negotiations that culminated in the 2008-2009 KPIX-TV/KBCW-TV–IBEW Agreement, the parties agreed to changes regarding transmitter jurisdiction.  The Company agreed, however, that notwithstanding these changes, that Robert Thompson and Will Loman shall not be laid off solely as the direct result of Station Broadcast Operations and Engineering management employees performing installation, maintenance and repair work on the Stations' transmitters.

**KPIX-TV/KBCW-TV**

By: _____
   **Kevin Walsh**
   **President & General Manager**

Date: 7/31/18

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS - LOCAL 45, AFL-CIO-CFL**

By: _____
   **Elaine Ocasio**
   **Business Manager/Financial Secretary**

Date: 8/10/18

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 13

### SWEEPS – VACATION SCHEDULE

September   , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

During the negotiations that culminated in the 2004-2008 KPIX-TV/KBCW-TV-IBEW Agreement the Company agreed that in the event that the Station ceases to treat the traditional Sweeps periods as special ratings periods for marketing the Station to advertisers, then the Station agrees to meet with the Union to discuss revisions to the vacation schedule that had been followed prior to such a change.  Any changes that may be resolved out of such meetings shall be effective in the following calendar year, unless the Station chooses to implement such changes at an earlier date.

**KPIX-TV/KBCW-TV**

By: _____

**Kevin Walsh**
**President & General Manager**

Date: _7/31/18_____

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS - LOCAL 45, AFL-CIO-CFL**

By: _____

**Elaine Ocasio**
**Business Manager/Financial Secretary**

Date: _____8/10/18_____

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 14

## UNION ACTIVITIES – REPLACEMENT COSTS

September   , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

During the negotiations that culminated in the 2004-2008 KPIX-TV/KBCW-TV-IBEW Agreement it was agreed that the Union shall reimburse the Company for any replacement costs resulting from union members attendance at negotiations or grievance/arbitration sessions.  The Station shall have the right to decide on its own how it wants to address union members attendance at Quarterly meetings, and past practice shall not be binding.

KPIX-TV/KBCW-TV

By: _____

**Kevin Walsh**
**President & General Manager**

Date: _____7/31/18_____

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL

By: _____

**Elaine Ocasio**
**Business Manager/Financial Secretary**

Date: _____8/10/18_____

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 15

## FOUR DAY WORK WEEK

September   , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA 90028

Dear Elaine:

During the negotiations that culminated in the 2004-2008 KPIX-TV/KBCW-TV-IBEW Agreement the parties agreed to allow for the option of a four (4) day, ten (10) hour (exclusive of any unpaid meal period if assigned) work week (4/10 week) where mutually agreed upon by the Station and the Employee.  This agreement is subject to resolving the various work week issues this 4/10 week will create, e.g., overtime, short-turnaround, meal periods, vacation, sick leave, consecutive days off, etc.

The Union agreed that any Station decisions regarding the 4/10 week shall not be subject to grievance or arbitration under any circumstances, including but not limited to the denial of a request for a 4/10 week or the reversal of the Station's decision to grant a 4/10 week.

**KPIX-TV/KBCW-TV**

By: _____

**Kevin Walsh**
**President & General Manager**

Date: 7/3/18 _____

**INTERNATIONAL BROTHERHOOD OF**
**ELECTRICAL WORKERS - LOCAL 45,**
**AFL-CIO-CFL**

By: _____

**Elaine Ocasio**
**Business Manager/Financial Secretary**

Date: 8/10/18 _____

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 16

## CASUALS – SIXTH/SEVENTH DAYS

September   , 2014

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA  90028

Dear Elaine:

Notwithstanding any provisions set forth elsewhere in this Agreement, the Company agrees that casual employees will be eligible for overtime pay when they work on a sixth (6th) and seventh (7th) consecutive workday, even if the sixth and seventh consecutive workdays span two consecutive work weeks. However, it is understood that the work week remains Sunday through Saturday.  An eighth (8th) consecutive work day, and all days thereafter, shall be at straight time.

KPIX-TV/KBCW-TV

By: _____
    **Kevin Walsh**
    **President & General Manager**

Date: _____7/31/18_____

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL

By: _____
    **Elaine Ocasio**
    **Business Manager/Financial Secretary**

Date: _____8/10/18_____

**SUPPLEMENTARY LETTER OF INTENT
AND UNDERSTANDING NO. 17**

**MEAL PERIODS**

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA  90028

Dear Elaine:

      The following describes the understanding and agreement that was reached regarding the issue of meal periods.

      As we confirmed during the negotiations, both CBS and IBEW, Local 45 believe that the language of Article XIV was negotiated to provide for on-duty ("eat-on-the-job") meals for those employees who could not effectively be relieved of their duties, and that the Union, as the collective bargaining representative, agreed to on-duty meals on behalf of such employees. Moreover, it is the parties' understanding that the meal period penalty provisions of the collective bargaining agreement apply to meal period issues in general, whether relating to the assigned on-duty or off-duty meal period.

During the negotiations, we confirmed our understanding on the following points:

- The parties continue to believe that the nature of the work of the unit employees who work in Master Control prevent them from being relieved of all duty, and as such, they can be assigned an on-duty meal.  IBEW Local 45 hereby reaffirms its consent to such on-duty meal period on behalf of unit employees assigned to Master Control.  Also, CBS will continue to provide a document to Master Control employees providing them with an opportunity to individually consent to an on-duty meal, and notifying them of their individual right to withdraw that consent if they subsequently choose to do so.  It is further agreed that at any time, any unit employee who works in Master Control may inform IBEW Local 45 and CBS in writing that he/she does not agree to work an on-duty meal, and such employee(s) will be re-assigned to an unpaid meal period as soon as practicable and consistent with the Department's scheduling needs.

- The parties continue to believe that the nature of the work of Maintenance Technicians also prevents them, at times, from being relieved of all duty, and as such, they can be assigned an on-duty meal.  CBS will continue to provide a document to Maintenance employees providing them with an opportunity to individually consent to an on-duty meal, and notifying them of their individual right to withdraw that consent if they subsequently choose to do so. If a Maintenance Technician desires at any time to withdraw his/her consent in general to the on-duty

meal, such employee may inform IBEW Local 45 and CBS in writing that he/she does not agree to work an on-duty meal, and such employee will be re-assigned to an unpaid meal period as soon as practicable and consistent with the Department's scheduling needs.  Furthermore, if any Maintenance Technician who has consented to an on-duty meal believes that he/she can be relieved of duty on any particular day and wants an unpaid, off-duty meal on such day, such Maintenance Technician shall notify his/her Manager of such fact, and if operational needs permit such off-duty meal, it will be given.  If, however, an off-duty meal cannot be given in such circumstance, the Maintenance Technician shall receive a penalty payment of $2.00, in lieu of the penalty provided in Article XIV.

- CBS has agreed that if an employee in Master Control has an on-duty meal and works 12 hours during a shift, he/she shall receive a meal penalty payment of one half hour at his/her overtime rate of pay.  Local 45 agrees that this penalty payment is in lieu of a second meal period.

- During the term of the Collective Bargaining Agreement, the parties will meet at the request of either party to discuss the applicability of the on-duty meal to Technicians who work in other areas not covered by this Sideletter.

- The provisions of Article XIV, as modified by this Sideletter shall remain in full force and effect.

If the foregoing is in accord with your understanding of our agreement, please sign and date in the space provided below.


KPIX-TV/KBCW-TV

By: _____

    **Kevin Walsh**
    **President & General Manager**

Date: _____


INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL

By: _____

    **Elaine Ocasio**
    **Business Manager/Financial Secretary**

Date: _____

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 18

## ELECTRONIC TIMEKEEPING SYSTEM

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA  90028

Dear Elaine:

During the negotiations that culminated in the 2008-2009 KPIX-TV/KBCW-TV/IBEW
Agreement the parties discussed the Station's plans to implement an electronic timekeeping
system.  George Brandt outlined the system for the Union, and described that it is to be accessed
through using.  The system will contain each Employee's work schedule.  An Employee will
have access to the system to confirm or correct the actual hours they worked versus the computer
work schedule.  It was explained that the Station plans to replace paper time sheets in the future
with this system.

KPIX-TV/KBCW-TV

By: _____

    **Kevin Walsh**
    **President & General Manager**

Date: ___7/31/18_____

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL

By: _____

    **Elaine Ocasio**
    **Business Manager/Financial Secretary**

Date: ___8/10/18_____

November 24, 2014

## SUPPLEMENTARY LETTER
## OF INTENT AND UNDERSTANDING,
## MULTI-MEDIA JOURNALIST, Sideletter #19

The Company and IBEW/IATSE agree to the following terms and conditions for IBEW/ IATSE Multi-Media Journalists ("IMMJ") employed under either the IBEW or IATSE Agreement:

I. Create a new job category of IBEW/ IATSE Multi Media Journalist ("IMMJ").
   IMMJs shall perform any and all duties necessary for the gathering, photographing, recording, writing, editing, producing, transmitting and reporting of news on air.  Full-time IMMJs from IATSE/IBEW shall be on a separate combined seniority list for layoff and vacation selection.

II. The station shall have the right to assign individuals represented by IBEW/IATSE to perform the on-air functions of IMMJs to the extent these duties are non-exclusive under the SAG-AFTRA Agreement.   The Station shall also have the right to assign individuals represented by SAG-AFTRA to perform the other functions of IMMJs as defined in paragraph 1 above. (note:  This change is merely a clarification of existing language.)  IBEW/ IATSE represented employees are the only employees who may be assigned the operation and/ or maintenance of satellite and microwave trucks.

III. **Current Employees**:  A total of five (5) full-time IBEW or IATSE represented photographers, to be designated by management, may perform MMJ duties on a full-time basis and continue to be covered by the terms and conditions of the applicable IBEW or IATSE collective bargaining agreement so long as the aforementioned five (5) individuals remain employed by KPIX-TV as Photographers and provided they are upgraded on a daily basis to either: the pro-rated $1775 per week ($1810 effective 01/01/2015; and $1846 effective 01/01/2016) rate or fifty dollars ($50.00) per day, whichever is higher.

If a IBEW/IATSE MMJ is no longer assigned to perform MMJ duties on a full-time basis, he/she shall be returned to his/her previous position as a photographer and shall retain his/her seniority on the applicable photographer seniority list.  The Company agrees that if one of the five (5) full-time IBEW/IATSE MMJs is no longer employed in this category, that the Company will replace that individual with another full-time IBEW/IATSE MMJ.   The "grandfathered" PMMJs are as follows:

Don Ford
Jennifer Mistrot
John Ramos
~~Patrick Sedillo~~
Wilson Walker
Emily Turner

IV. New Hires IMMJs employed after the effective date of this agreement shall be compensated the applicable rate based on their length of service as a IMMJ.  The rates are as follows:

|  | 01/01/17 | 01/01/18 | 01/01/19 |
|---|---|---|---|
| 0-1 year | $1,883 | $1,921 | $1,959 |
| 1-2 years | $2,097 | $2,139 | $2,182 |
| 2-3 years | $2,209 | $2,254 | $2,299 |
| 3 years or more | $2,427 | $2,475 | $2,525 |

The IMMJs hire after the effective date of this agreement to replace one of the five named IMMJs listed above shall not be covered by the seniority provisions of either the IBEW or the IATSE collective bargaining agreement and shall only be entitled to termination pay under Article V (J) of this sideletter. Notwithstanding the above, the Company agrees to give good faith consideration to any individual hired under this provision for technical employment (non-IMMF) if in the sole discretion of the Company the individual has the requisite expertise. The vacated IMMJ position made available due to re-assignment, termination, retirement, resignation or death shall be replaced within ninety (90) days of position being made available. All replacements shall be required to be a hyphenated individual into SAG-AFTRA.

V. IBEW/ IATSE Multi-Media Journalists, who are employed after the effective date of this agreement, and earning in excess of the rates set forth above and have entered into a personal service agreement for their "on-air" IMMJ services shall be required to be a hyphenated individual into SAG-AFTRA and shall be employed pursuant to the following terms:

 A. Hours: The regular work week for IMMJ hired pursuant to this sideletter shall consist of forty (40) hours in five (5) consecutive days with two (2) consecutive days off. Work weeks cannot be joint so as to require regular days beyond five (5) consecutive days. Based on the requirements of the daily work assignment, the Company will assign each individual to a work day of eight (8) consecutive hours and a reasonable opportunity to eat while on duty. Or, alternatively, a meal period of up to one (1) hour may be assigned with work in excess of eight (8) hours in nine (9), paid for at the overtime rate.

 The regular work week shall be posted no later than Wednesday of the preceding week. When an Employee is given an overnight assignment, and the total actual elapsed hours traveled exceed eight (8) hours in a calendar day, the Employee shall be paid in accordance with this Agreement for all elapsed hours traveled up to a maximum of eight (8) hours of travel in calendar day.

 On a day when an employee works and travels, she/he shall be paid for hours worked and traveled. This provision shall be posted no later than Wednesday of the preceding week. When an Employee is given an overnight assignment, and the total actual elapsed hours traveled exceed eight (8) hours in a calendar day, the Employee shall be paid in accordance with this Agreement for all elapsed hours traveled up to a maximum of eight (8) hours of travel in a calendar day. On a day when an employee works and travels, she/he shall be paid for all hours worked and traveled.

 B. Overtime and Call Back

 1. Overtime – In addition to the basic minimum weekly salary, overtime shall be paid for all hours worked in excess of eight (8) hours per day and forty (40) hours per week at the hourly rate of time and one half of one fortieth (1/40th) of the basic minimum weekly salary. Compensation for work on a day off shall be based on the largest of the following amounts:

      i. 1/5 of the applicable weekly rate, or

      ii. The number of hours actually worked multiplied by the above-referenced overtime rate.

      iii. The live studio fees earned.

C. Vacations

    After six (6) months total employment – One (1) week vacation with pay.
    After one (1) year total employment – Two (2) weeks' vacation with pay.
    After five (5) years total employment – Three (3) weeks' vacation with pay.
    After fifteen (15) years total employment – Four (4) weeks' vacation with pay.

    In the event a IMMJ is terminated (voluntarily or involuntarily) without having taken vacation, he/she shall be paid whatever vacation is due to him/her, based on length of service as defined above, at his/her then current rate of pay.

    Vacations must be taken each year during the current vacation period which runs from January 1 through December 31.

    Vacation period preferences shall be submitted by March 1 in order to exercise seniority rights.  Earned vacations are to be allowed when requested by subject to the operating necessities of the Company.

D. Holidays

    1. In addition to the foregoing vacation, IMMJ shall be entitled to an additional week off with pay in lieu of the five (5) following holidays:

               Martin Luther King Day
               Presidents Day
               Memorial Day
               Labor Day
               Columbus Day

    During a IMMJ's first and last year of employment, the "in lieu of week" shall be prorated as to the number of the above holidays that occur during the IMMJ's employment in that year.

    2. New Year's Day (January 1), July 4th, Thanksgiving Day, the day after Thanksgiving Day, and Christmas Day (December 25th) shall be paid holidays.  In addition to a IMMJ's normal minimum weekly compensation, he/she shall be paid in the event an IMMJ is required to work on any such holiday, additional compensation in the amount of one-fifth (1/5) of the applicable weekly rate.  In lieu of such additional compensation, a substitute day off may be requested.  Such day off shall be granted only at times mutually convenient to the individual and the Company.

E. Sick Leave:  The Company agrees to grant sick leave to IMMJs in accordance with the policy of the company prevailing at the time of request, and shall not  Company for a period of six (6) months immediately prior to such request, while the IMMJ is on sick leave until after at least ninety (90) days.  If such IMMJ shall return within such ninety

The Company and the Union agree that a IMMJ who is terminated by the Company and who is eligible for severance pay shall have the option to execute a release as provided below.

In consideration for the execution by such terminated IMMJs of a release of a form provided by the Company, he/she shall receive, in lieu of severance pay as provided above; the IMMJ shall receive the greater of the following:

1. Compensation calculated at two (2) week's salary based on the individual's current weekly salary or $1/52^{nd}$ of his/her annual guarantee at the time of termination for each full year of service with the Company up to a maximum payment of thirty (30) week's salary; or

2. Compensation calculated at two (2) week's salary for each year of service with the Company based on the applicable basic minimum weekly salary for IMMJs set forth in this sideletter , up to a maximum payment of forty-seven (47) weeks' salary.  The IMMJ shall have a ten (10) week review period from the date of notice of termination to review and execute the release, and this ten (10) week review period shall be inclusive of any notice periods contained in the release, the Agreement and any existing personal agreement.  Upon execution of the release by the IMMJ he/she shall have a seven (7) day reconsideration period to withdraw the release and this seven (7) day reconsideration period shall be inclusive of any reconsideration periods contained in the release.  Payment of compensation under this provision shall be made after the expiration of the reconsideration period unless the release has been withdrawn.

   The Company shall notify the Union of the name of the IMMJ being terminated and provide the Union with an accounting of the monies to be paid to the terminated IMMJ.

K. Additional Benefits:  IMMJ's employed pursuant to Article V above shall be eligible to participate  in the CBS 401(k) Plan, CBS Basic Life and AD&D Insurance Plan, CBS Business Travel Accident Insurance Plan, CBS Long Term Disability Plan, CBS Optional AD& D Plan, CBS Supplemental Life Insurance for Employees, and CBS Supplemental Life.

L. Turn Around Rest Period:  There shall be at least a twelve (12) hour break between the termination of the staff assignment on one day and the commencement of the staff assignment on the next day.  The two (2) consecutive days off each week shall comprise a period of sixty (60) hours (fifty-four (54) hours in case of a rotation of staff or illness) elapsed between.

K. Crediting:  If a IMMJ is employed under a personal services contract in excess of the minimum rate set forth above, the Company shall be entitled to credit against the difference between the applicable minimum weekly rate and the personal service contract amount any and all penalties, fees, overtime, short turnaround, or any other such form of compensation.  Such crediting shall be performed on a semi-annual basis, corresponding with each twenty-six (26) week period of the individual personal service contract.

VI. IMMJs employed after the effective date of this Agreement and are required to join SAG-AFTRA shall receive a single, non-creditable quarterly stipend of $400.00 in addition to their regular pay as consideration for the additional duties being performed.

VII.   Photographers covered by an applicable IBEW or IATSE collective bargaining agreement, may be seen or heard on air in connection with an additional ten (10) stories per week provided they are upgraded on a daily basis to either: the pro-rated AFTRA 0-1 year rate, or fifty dollars ($50.00) per day, whichever is higher.

VIII.  IMMJs shall be given adequate training.

IX.   Company provided equipment shall be adequately maintained by the Company.  IMMJs shall not be held responsible for equipment malfunctions or equipment lost or stolen through no fault of their own.  Employees are expected to exercise reasonable care with regard to equipment.  By way of example but not limitation, cameras should not be left unattended in public places or in plain sight on a car seat.

X.    If a IMMJ is required to use a vehicle supplied by the Company, or volunteers to use his or her own vehicle, the Company will be responsible for related vehicle expenses.

XI.   Critiques of packages, footage, pieces or other material created by IMMJs shall take place in a professional manner, including management and/or peer review.

XII.   The Company reaffirms its practice of relying upon the professional judgment of IMMJs on the scene as to whether an assignment is hazardous.

XIII.  IBEW/IATSE and the Company will establish a committee of IMMJs and news management to meet and deal collegially on an ongoing basis with any concerns that the parties may have regarding the assignments and practices concerning IMMJ duties.  The committee will meet upon the request of either party or subject to any schedule the parties adopt."

If the above properly reflects the agreement of the Parties, please execute were indicated below.
ACCEPTED AND AGREED:

_____  Date: ____7/31/18_____

Kevin Walsh
President and General Manager
KPIX-TV/ KBCW-TV

ACCEPTED AND AGREED:

_____  Date: _____8/10/18_____

Elaine Ocasio
Business Manager/ Financial Secretary
IBEW Local 45

## SUPPLEMENTARY LETTER OF INTENT
## AND UNDERSTANDING NO. 20

### HUBBING OF MASTER CONTROL

Elaine Ocasio
IBEW - Local 45
6255 Sunset Blvd., Suite 721
Hollywood, CA  90028

Dear Elaine:

During the negotiations that culminated in the 2017-2020 KPIX-TV/KBCW-TV/IBEW Agreement the
parties discussed the Station's plans to implement "hubbing" of the master control functions and agreed to
the following terms:

1) Should the Company elect to hub its station master control functions (hereafter referred to
as "Hubbing"), it shall make reasonable efforts to provide the Union with at least two (2)
months' notice prior to implementation and advise which employees would be subject to
layoff as a result.  Should any such master control functions currently performed by IBEW
bargaining unit employees remain at or return to the station they will be performed by
IBEW bargaining unit employees.

2) Master Control Operators subject to layoff as a result of Hubbing are free to apply for any
open position for which they qualify and will be given reasonable consideration for such
position by the Company.  The decision concerning whether any such Master Control
Operator will be reassigned shall be within the sole discretion of the Company.

3) For layoffs due to Hubbing, the Company agrees that employees shall receive severance in
accordance Article XXXI (E), but for these individuals affected by the elimination of
Master Control, the current severance cap of forty (40) weeks will be increased to fifty-
two (52) weeks.

4) Any Master Control Operator laid off as a result of hubbing, who at the time of layoff **is
not** "Medicare Eligible" will also receive, provided that he/ she is enrolled in the Company
medical coverage at the time of layoff and elects COBRA coverage, a monthly payment
equivalent to the amount the Company pays for its portion of employee coverage for the
same period of time the Company has agreed to in severance payments.  For example, if a
technician is entitled to forty (40) weeks of severance at the time of layoff, than that
individual is entitled to ten (10) months of Medical Continuation Payments as outlined
above."

**KPIX-TV/KBCW-TV**

By: _____
    **Kevin Walsh**
    **President & General Manager**

Date:_ 7/31/18

**INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS - LOCAL 45,
AFL-CIO-CFL**

By: _____
    **Elaine Ocasio**
    **Business Manager/Financial Secretary**

Date: 8/10/18